IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| United States Department of Justice | § | |
| Criminal Division | § | |
| Asset Forfeiture and Money | § | |
| Laundering Section | § | |
| 1400 New York Avenue, NW., 10th Floor | § | |
| Washington, DC 20005, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No.:   1:12-cv-1905 (RWR) |
| | § | Judge:      Richard W. Roberts |
| THE SUM OF $70,990,605 HELD IN | § | Date Filed:  October 11, 2013 |
| ACCOUNT NUMBER 050210000527810, IN | § | |
| THE NAME OF HIKMAT SHADMAN | § | |
| LOGISTICS SERVICES COMPANY, | § | |
| LOCATED AT AFGHANISTAN INTER- | § | |
| NATIONAL BANK, AND ALL INTEREST, | § | |
| BENEFITS OR ASSETS TRACEABLE | § | |
| THERETO; | § | |
| | § | |
| THE SUM OF $6,930,000, HELD IN | § | |
| ACCOUNT NUMBER 050210001288613, IN | § | |
| THE NAME OF FAIZY ELHAM BROTHERS, | § | |
| LTD., LOCATED AT AFGHANISTAN INTER- | § | |
| NATIONAL BANK, AND ALL INTEREST, | § | |
| BENEFITS OR ASSETS TRACEABLE | § | |
| THERETO. | § | |
| | § | |
| ALL FUNDS HELD FOR OR BY THE BENEFIT | § | |
| OF AFGHANISTAN INTERNATIONAL BANK | § | |
| AT STANDARD CHARTERED BANK, NEW | § | |
| YORK, OF AN AMOUNT UP TO BUT NOT TO | § | |
| EXCEED $1.5 MILLION OR THE SUM HELD | § | |
| AT AFGHANISTAN INTERNATIONAL BANK | § | |
| ACCOUNT NUMBER 050210000527810, IN | § | |
| THE NAME OF HIKMAT SHADMAN | § | |
| LOGISTICS SERVICES COMPANY, OR | § | |
| AFGHANISTAN INTERNATIONAL BANK | § | |
| ACCOUNT NUMBER 050210001288613, IN | § | |
| THE NAME OF FAIZY ELHAM BROTHERS, | § | |
| LTD.; | § | |
| | § | |

ALL FUNDS HELD FOR OR BY THE BENEFIT    §
OF BANK ALFALAH AT CITIBANK, N.A.    §
NEW YORK, NOT TO EXCEED $55,569,790 OF    §
THE TOTAL SUM OF ANY FUNDS    §
TRANSFERRED ON OR AFTER    §
NOVEMBER 20, 2012, TO ANY ACCOUNT AT    §
BANK ALFALAH FROM AFGHANISTAN    §
INTERNATIONAL BANK ACCOUNT NUMBER    §
050210000527810, IN THE NAME OF HIKMAT    §
SHADMAN LOGISTICS SERVICES COMPANY,    §
AND AFGHANISTAN INTERNATIONAL BANK    §
ACCOUNT NUMBER  050210001288613, IN    §
THE NAME OF FAIZY ELHAM BROTHERS;    §
    §
ALL FUNDS HELD FOR OR BY THE BENEFIT    §
OF BANK ALFALAH AT DEUTSCHE BANK    §
TRUST COMPANY AMERICSAS, NOT TO    §
EXCEED $55,569,790 OFTHE TOTAL SUM OF    §
ANY FUNDS TRANSFERRED ON OR AFTER    §
NOVEMBER 20, 2012, TO ANY ACCOUNT AT    §
BANK ALFALAH FROM AFGHANISTAN    §
INTERNATIONAL BANK ACCOUNT NUMBER    §
050210000527810, IN THE NAME OF HIKMAT    §
SHADMAN LOGISTICS SERVICES COMPANY,    §
AND AFGHANISTAN INTERNATIONAL BANK    §
ACCOUNT NUMBER 050210001288613, IN    §
THE NAME OF FAIZY ELHAM BROTHERS;    §
    §
ALL FUNDS HELD FOR OR BY THE BENEFIT    §
OF BANK ALFALAH AT HABIB AMERICAN    §
BANK, NOT TO EXCEED $55,569,790 OF    §
THE TOTAL SUM OF ANY FUNDS    §
TRANSFERRED ON OR AFTER    §
NOVEMBER 20, 2012, TO ANY ACCOUNT AT    §
BANK ALFALAH FROM AFGHANISTAN    §
INTERNATIONAL BANK ACCOUNT NUMBER    §
050210000527810, IN THE NAME OF HIKMAT    §
SHADMAN LOGISTICS SERVICES COMPANY,    §
AND AFGHANISTAN INTERNATIONAL BANK    §
ACCOUNT NUMBER 050210001288613, IN    §
THE NAME OF FAIZY ELHAM BROTHERS;    §

ALL FUNDS HELD FOR OR BY THE BENEFIT §
OF BANK ALFALAH AT HABIB BANK §
LIMITED, NOT TO EXCEED $55,569,790 OF §
THE TOTAL SUM OF ANY FUNDS §
TRANSFERRED ON OR AFTER §
NOVEMBER 20, 2012, TO ANY ACCOUNT AT §
BANK ALFALAH FROM AFGHANISTAN §
INTERNATIONAL BANK ACCOUNT NUMBER §
050210000527810, IN THE NAME OF HIKMAT §
SHADMAN LOGISTICS SERVICES COMPANY, §
AND AFGHANISTAN INTERNATIONAL BANK §
ACCOUNT NUMBER 050210001288613, IN §
THE NAME OF FAIZY ELHAM BROTHERS; §
§
ALL FUNDS HELD FOR OR BY THE BENEFIT §
OF BANK ALFALAH AT HSBC BANK USA §
N.A., NOT TO EXCEED $55,569,790 OF §
THE TOTAL SUM OF ANY FUNDS §
TRANSFERRED ON OR AFTER §
NOVEMBER 20, 2012, TO ANY ACCOUNT AT §
BANK ALFALAH FROM AFGHANISTAN §
INTERNATIONAL BANK ACCOUNT NUMBER §
050210000527810, IN THE NAME OF HIKMAT §
SHADMAN LOGISTICS SERVICES COMPANY, §
AND AFGHANISTAN INTERNATIONAL BANK §
ACCOUNT NUMBER 050210001288613, IN §
THE NAME OF FAIZY ELHAM BROTHERS; §
§
ALL FUNDS HELD FOR OR BY THE BENEFIT §
OF BANK ALFALAH AT JP MORGAN CHASE §
BANK NATIONAL ASSOCIATION, NOT TO §
EXCEED $55,569,790 OF THE TOTAL SUM OF §
ANY FUNDS TRANSFERRED ON OR AFTER §
NOVEMBER 20, 2012, TO ANY ACCOUNT AT §
BANK ALFALAH FROM AFGHANISTAN §
INTERNATIONAL BANK ACCOUNT NUMBER §
050210000527810, IN THE NAME OF HIKMAT §
SHADMAN LOGISTICS SERVICES COMPANY, §
AND AFGHANISTAN INTERNATIONAL BANK §
ACCOUNT NUMBER 050210001288613, IN §
THE NAME OF FAIZY ELHAM BROTHERS; §

ALL FUNDS HELD FOR OR BY THE BENEFIT §
OF BANK ALFALAH AT MASHREQ BANK §
PSC, NOT TO EXCEED $55,569,790 OF §
THE TOTAL SUM OF ANY FUNDS §
TRANSFERRED ON OR AFTER §
NOVEMBER 20, 2012, TO ANY ACCOUNT AT §
BANK ALFALAH FROM AFGHANISTAN §
INTERNATIONAL BANK ACCOUNT NUMBER §
050210000527810, IN THE NAME OF HIKMAT §
SHADMAN LOGISTICS SERVICES COMPANY, §
AND AFGHANISTAN INTERNATIONAL BANK §
ACCOUNT NUMBER 050210001288613, IN §
THE NAME OF FAIZY ELHAM BROTHERS; §
§
ALL FUNDS HELD FOR OR BY THE BENEFIT §
OF BANK ALFALAH AT STANDARD §
CHARTERED BANK, NEW YORK, NOT TO §
EXCEED $55,569,790 OF THE TOTAL SUM OF §
ANY FUNDS TRANSFERRED ON OR AFTER §
NOVEMBER 20, 2012, TO ANY ACCOUNT AT §
BANK ALFALAH FROM AFGHANISTAN §
INTERNATIONAL BANK ACCOUNT NUMBER §
050210000527810, IN THE NAME OF HIKMAT §
SHADMAN LOGISTICS SERVICES COMPANY, §
AND AFGHANISTAN INTERNATIONAL BANK §
ACCOUNT NUMBER 050210001288613, IN §
THE NAME OF FAIZY ELHAM BROTHERS; §
§
ALL FUNDS HELD BY OR FOR THE BENEFIT §
OF EMIRATES NATIONAL BANK AT JP §
MORGAN CHASE BANK NATIONAL §
ASSOCIATION NOT TO EXCEED $4 MILLION §
OF THE TOTAL SUM OF ANY FUNDS HELD §
IN ANY ACCOUNT AT EMIRATES NATIONAL §
BANK IN THE NAME OF YASER ELHAM, §
§
               Defendants *in rem*. §
_____ §

## CLAIMANTS' *CORRECTED*[1] OPPOSITION
## TO UNITED STATES' MOTION FOR LEAVE TO FILE SURREPLY MEMORANDUM IN OPPOSITION TO CLAIMANTS' MOTION FOR IMMEDIATE RELEASE, AND, *IN THE ALTERNATIVE*, MOTION TO STRIKE SURREPLY

---

[1] This Document supersedes and replaces Doc. 36, which is hereby withdrawn with this filing.

TO THE HONORABLE JUDGE OF THIS COURT:

COME NOW, Claimants (Hikmat Shadman Logistics Services, Hekmat Shadman General Trading, LLC, Faizy Elham Brothers, Ltd., Everest Faizy Logistics Services, Hikmatullah Shadman, Najibullah, and Rohullah), and respectfully file this Opposition to United States' Motion for Leave to File Surreply Memorandum in Opposition to Claimants' Motion for Immediate Release, and, *in the alternative*, Motion to Strike Surreply, and in support thereof, represents as follows:

## I.      Overview

On September 16, 2013, Claimants (Hikmat Shadman Logistics Services, Hekmat Shadman General Trading, LLC, Faizy Elham Brothers, Ltd., Everest Faizy Logistics Services, Hikmatullah Shadman, Najibullah, and Rohullah) filed a Motion for Immediate Release of Seized Property, pursuant to 18 U.S.C. § 983(f) (Doc. 27).  Claimants filed this motion to protect their statutory rights in this Court, although Claimants also filed a Motion to Dismiss that contested this Court's jurisdiction over this forfeiture proceeding (Doc. 28).  The Motion for Early Release is a separate statutory petition that must be decided not later than 30 days after the date of its filing.  18 U.S.C. § 983(f)(5).

On September 30, 2013, the government filed its Opposition to Claimants' Motion for Early Release (Doc. 31).  On October 3, 2013, Claimants filed a Reply to that Opposition (Doc. 33).  On October 9, 2013, the government then filed a Motion for Leave to file a Surreply, alleging that Claimants' Reply contained two new misrepresentations (Doc. 35).   As demonstrated below, this was an incorrect assertion.

## II.        Memorandum in Opposition to Motion for Leave

In the government's Motion for Leave to file a surreply memorandum in opposition to Claimants' Motion for Immediate Release of Seized Property, the government bases its motion for leave on the contention that Claimants' Reply raised two new misrepresentations.  This is an incorrect assertion.

Moreover, the Court should deny this motion for two primary reasons.  First, the government's Motion does not raise any new matters, and the government did not provide a meaningful opportunity to confer on this issue because it purposefully hid what it was going to say and what "evidence" it was going to use.  Second, the Surreply itself does not rely on competent contemporaneous evidence (namely, the record of proceedings leading up to and including the U.S. military hearing that exonerated Mr. Shadman), and is an improper *post hoc* attempt to defeat this Court's jurisdiction to Order relief through SIGAR's transfer of Claimant's business property (excluding the cash seized from its business in its bank accounts) to NATO after the filing of Claimants' Motion for Early Release.  This obvious litigation-motivated contrivance cannot impair this Court's authority to grant the relief requested at the time the motion was filed.

### A. This Court Should Deny the Motion for Leave to File Surreply Because Claimants' Reply Presented No New Matters.

The standard for granting leave to file a surreply is whether the party making the motion would be "unable to contest matters presented to the court for the first time" in the opposing party's reply.  *Ben-Kotel v. Howard Univ.*, 319 F.3d 532, 536 (D.C. Cir. 2003) (quoting *Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001)).  If the motion for leave fails to address any new matters presented by the opposing party's reply, the court should deny the motion.  *See Lewis*, 154 F. Supp. 2d at 61.  This is because surreplies are disfavored in this district.  *In re*

6

*Papst Licensing GmbH & Co. KG Litig.*, — F. Supp. 2d —, 2013 WL 5530525, at * 7 (D.D.C. Oct. 8, 2013) (citing *Crummey v. Soc. Sec. Admin.*, 794 F. Supp. 2d 46, 62 (D.D.C. 2011)).

Here, the government's Motion for Leave contends that Claimant's Reply raised two new matters: (1) the U.S. military tribunal considered and rejected the allegations in the Complaint, and (2) the United States continues to restrain all assets of Mr. Shadman's company (Doc. 35, pp. 1–2).  To the contrary, both these issues were first raised in Claimant's Motion for Early Release.

First, in the Motion's Statement of Facts, Claimants described in detail, and with supporting exhibits, how the U.S. military tribunal completely exonerated Mr. Shadman of any wrongdoing (Doc. 27-1, pp. 25–26).  They then asserted the same issue in the Motion's arguments (Doc. 27-1, p. 34, ¶ 49; p. 37, ¶ 54; p. 49 n.20).  While the government's Opposition addressed Afghanistan's exoneration of Mr. Shadman (see Doc. 31, p. 8 n.5), the government declined to address the U.S. military tribunal's exoneration, although Claimants had already fully presented that matter to the Court.

Second, throughout their Motion, Claimants asserted that the government continues to restrain all assets of Mr. Shadman's company (see, e.g., Doc. 27-1, p. 25, ¶ 34; p. 31, ¶ 45; p. 35, ¶ 49; p. 38, ¶ 56).  In the government's Opposition, the government addressed this argument by stating (for the first time) that the U.S. Counterinsurgency Task Force in Afghanistan had seized these items, and that those assets were not sought for forfeiture nor were before this Court (Doc. 31, p. 3 n.3).  Further, the Opposition stated that "Counsel for the United States has advised Claimants that inquiries regarding these additional assets should be directed to the U.S. Counterinsurgency Task Force" because SIGAR did not take possession of the items and "the current disposition of the items is within the authority of the Task Force and not SIGAR" (*Id.*).

After Claimants' Reply addressed this argument and the government's misrepresentations[2] (Doc. 33, ¶¶ 5–7), the government now requests leave to file a surreply based on contentions that directly contradict its previous statements to this Court (Doc. 35, p. 2).

As an initial point, Claimants' statement that the United States continues to restrain the business's assets is not a misrepresentation, as the United States has not returned a single item to Claimants. Further, the government's Motion does not allege that the United States has returned any items. Instead, the Motion states that the Counter Insurgency Task Force (now labeled a "multinational coalition" for the first time, rather than a U.S. task force), "would be" releasing certain items, but the Motion fails to identify what items it will release or when it will release them (Doc. 35, p. 2). Moreover, the Motion's attached electronic mail message actually clarifies that SIGAR does have possession of these items (Doc. 35-4), contrary to what the government first alleged before this Court (Doc. 31, p. 3 n.3). While the message then states that SIGAR will return some of the items to the Counter Insurgency Task Force in the future (Doc. 35-4), it does not support the Motion's contention that Claimants' Reply misrepresented that the government continues to restrain these assets. As of this date, the government has not returned the business's seized items, which constituted all assets necessary to run the business that was seized.

Therefore, this Court should deny the government's Motion for Leave to file a surreply as it does not address any new matters because Claimants raised both issues in their original Motion. *See Ben-Kotel*, 319 F.3d at 536. Furthermore, although not part of the standard for granting leave to file a surreply, Claimants want to be clear that these two reiterated matters in Claimants' Reply were not misrepresentations.

---

[2] For example, while the government alleged to this Court that it had advised Claimants that the U.S. Counterinsurgency Task Force had seized the business's assets (Doc. 32, p. 3 n.3), the government never mentioned the Counterinsurgency Task Force and its supposed role to Claimants or undersigned counsel until October 3, 2013—three days after the government made this allegation in its Opposition (Doc. 35-4, p. 1).

**B. This Court Should Deny the Motion for Leave to File Surreply Because the Government Failed to Comply with Its Meet and Confer Obligations Pursuant to Local Rule 7(m).**

District of Columbia Local Civil Rule 7(m) requires counsel to confer before filing any nondispositive motion in a civil action.  L.R. 7(m).  Specifically, the Rule requires a "good-faith effort to determine whether there is any opposition to the relief sought and, if there is opposition, to narrow the areas of disagreement."  *Id.*  This means counsel must take "real steps to confer." *U.S. ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 456 F. Supp. 2d 46, 52 (D.D.C. 2006), *aff'd*, 530 F.3d 980 (D.C. Cir. 2008).  The Rule therefore serves the important purpose of "promot[ing] the resolution of as many litigation disputes as possible without court intervention, or at least . . . forc[ing] the parties to narrow the issues that must be brought to the court." *Ellipso, Inc. v. Mann*, 460 F. Supp. 2d 99, 102 (D.D.C. 2006).  For this reason, courts have found that a party violates Local Rule 7(m)'s duty to confer when the party shows a "lack of candor in providing full notice" of the nondispositive motion's issues during the conference.  *See Dist. Hosp. Partners, L.P. v. Sebelius*, — F. Supp. 2d —, 2013 WL 5273929, at *4 (D.D.C. Sep. 19, 2013); *see also Abbott GmbH & Co. KG v. Yeda Research & Dev., Co.*, 576 F. Supp. 2d 44, 48 (D.D.C. 2008) (finding defendant's failure to provide detail on scope of motion "ma[de] it difficult, if not impossible, for the parties to engage in fruitful discussions" to "narrow the issues").  Therefore, parties fail to comply with the Rule if they do not confer as to all of the issues they plan to raise so as to promote the resolution of as many issues as possible without court intervention.  *Sebelius*, 2013 WL 5273929, at *4.

Here, government counsel called local D.C. counsel to request Claimants' consent for the government to file a surreply.  During this conference, government counsel only indicated that she wanted to file a surreply to "clarify" the record on two matters: (1) the counter-insurgency

task force has Mr. Shadman's property, and (2) the nature of the military tribunal was a detention

tribunal.  She did not explain what she wanted to clarify on these two issues; she also did not

discuss that the government was alleging that Claimants' Reply had misrepresented these two

matters.  Since the government provided no detail on what it wanted to "clarify," Claimants'

counsel indicated Claimants would not consent to a surreply without more details or a copy of

the surreply.  Government counsel did not provide more details; instead, the government filed the

Motion for Leave.  Contrary to the Motion's assertion that the United States consulted with

Claimants pursuant to Local Rule 7(m) and that Claimants have taken the Motion "under

consideration" (see Doc. 35, p. 3), government counsel did not take "real steps" to confer in good

faith on the Motion or even mention that the government was filing such a motion.  Counsel did

not provide full notice of the nondispositive motion's issues, and displayed a lack of candor

when discussing why the government wanted to file a surreply.

Therefore, this Court should deny the government's Motion for Leave because

government counsel failed to confer in good faith on this Motion, pursuant to Local Rule 7(m).

### III.    Memorandum for Motion to Strike Surreply

If this Court grants the government's Motion for Leave, Claimants, in the alternative,

respectfully request the Court to strike the government's Surreply because that pleading contains

insufficient and unsupported arguments, redundant or immaterial matter, and is contrary to law.

### A. This Court Should Strike the Surreply Because Its Arguments Are Supported By Flawed, Unreliable Evidence.

In the government's Surreply, the government alleges that no U.S. Military Tribunal

considered the allegations set forth in this forfeiture action (Doc. 35-1, pp. 1–2).  This is a

misrepresentation that the government only supports with one exhibit—October 5, 2013

Investigative Report containing interview notes with Colonel Martin Sims and attached Detainee

Review Procedures (Doc. 35-2, 35-3).    Claimants request the Court to strike this misrepresentation because it is double hearsay based solely upon flawed evidence that contains no personal knowledge of the proceeding at issue, but instead, serves as a *post hoc* rationalization.

The Supreme Court has held that *post hoc* rationalizations should not be relied upon as the basis for reviewing an agency's decision.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 419 (1971); *see In re Sang Su Lee*, 277 F.3d 1338, 1345 (Fed. Cir. 2002).  *Post hoc* rationalizations "are unacceptable substitutions for a contemporaneous basis and purpose statement."  *Rodway v. U.S. Dep't of Agriculture*, 514 F.2d 809, 817 (D.C. Cir. 1975); *accord Volpe*, 401 U.S. at 419; *Burlington Truck Lines v. U.S.*, 371 U.S. 156, 168–69 (1962); *SEC v. Chenery*, 318 U.S. 80, 87 (1943) (*Chenery I*); *SEC v. Chenery*, 332 U.S. 194, 196–97 (1946) (*Chenery II*); *Tabor v. Joint Bd. For Enrollment of Actuaries*, 566 F.2d 705, 709–12 (D.C. Cir. 1977); *KIRO, Inc. v. FCC*, 545 F.2d 204, 208 (D.C. Cir. 1976).

For example, in *La Botz v. FEC*, this Court denied FEC's motion to dismiss after it found that the FEC's dismissal of the plaintiff's administrative complaint was only based on *post hoc* rationalization evidence.  889 F. Supp. 2d 51, 61 (D.D.C. 2012).  In *La Botz*, the plaintiff, a Socialist Party candidate for the Senate, had brought an action against the FEC after it dismissed his administrative complaint, which alleged that his exclusion from televised debates violated the Federal Election Campaign Act.  *Id.* at 54.  The FEC contended it had dismissed the plaintiff's administrative complaint only after determining that the news organization had employed pre-established, objective criteria to select the candidates invited to the debate.  *Id.* at 60.  The FEC

based this argument on one piece of evidence—an affidavit from a member of the news organization, which stated:

> [The news organization] pre-established a number of criteria for selecting the candidates to participate in the debates. . . . [Its] pre-selected criteria first ensured the eligibility of the candidates and then pared down the field of candidates to the two frontrunners based upon indicators of electoral support, including independent current (and historical) polling including Quinnipiac polling, conversation with political reporters and sources regarding the races in question, and financial disclosures which provide insights into a candidates [sic] viability.

*Id.* at 61.   While this affidavit supposedly described the process that the news organization utilized to select the candidates, the District Court found that the affidavit suffered from two serious flaws: (1) it contained no indicia of personal knowledge, and (2) it was submitted after the FEC inquiry had commenced.  *Id.* at 61–62.   The Court noted that such evidence raises "the risk that they will merely provide a vehicle for a party's post hoc rationalizations."  *Id.* at 62 (citing *Ponte v. Real*, 471 U.S. 491, 509 (1985) ("The best evidence of why a decision was made as it was is usually an explanation, however brief, rendered *at the time of the decision*.")). Without the production of any contemporaneously written evidence, the Court found that the affidavit was not reliable or trustworthy.  *Id.* at 61.   As such, the Court denied the FEC's motion to dismiss.  *Id.* at 63–64.

Here, the government's proffered evidence suffers from the same serious flaws because (1) the interview notes contained no indication of first-hand knowledge and (2) were submitted well after the military hearing had occurred and this proceeding had commenced.

First, undersigned counsel has known Colonel Marty Sims for more than 23 years and greatly respects his accomplishments.  Undersigned counsel is not contending that Colonel Sims is an unreliable source *per se*, but Colonel Sims's unsworn hearsay statements are unreliable for the military hearing at issue because they are not made on personal knowledge.  Frankly, it

appears that not even Colonel Sims was told the true purpose of what he was being asked since he was informed it was for a "pending criminal investigation" (Doc. 35-2, p. 1).  Until recently, Colonel Sims served on the U.S. Army Court of Criminal Appeals and the U.S. Court of Military Commission Review.  He was not the Staff Judge Advocate for CJIATF 435 in Kabul, Afghanistan in December 2012 when the military hearing occurred.  From July 2012 until July 2013, Colonel Brian Brady was the Staff Judge Advocate for CJIATF 435—during the entire time period in dispute.  Further, Colonel Sims did not provide information about what transpired during Mr. Shadman's military hearing; instead, SIGAR asked him "to provide a brief overview of a DRB," which he did (Doc. 35-2).  This is akin to the government providing a procurement regulation in response to a bid protest and telling the Court "that's what we did;" it is just as unreliable here.

Second, the government misuses Colonel Sims's interview as a *post hoc* rationalization. SIGAR interviewed Colonel Sims on October 5, 2013 (Doc. 35-2)—almost a month after Claimants first presented evidence that a U.S. military tribunal had exonerated Mr. Shadman (Doc. 27), and three days after Claimants' submitted their Reply (Doc. 33).  This interview occurred almost a year after Mr. Shadman's military hearing and well after this forfeiture proceeding had commenced.  In contrast to this *post hoc* interview, Claimants submitted a report that Mr. Shadman gave to the Afghanistan Presidential Office delegation less than two months after his military hearing (Doc. 27, Exs. 21 & 22).  This report was considered during Afghanistan's judicial investigation (Doc. 27, Exs. 25 & 26).  Further, this report detailed how Americans interrogated Mr. Shadman for months about the allegations in this case, and Mr. Shadman verified that the three-member panel of officers considered this evidence before determining unanimously that Mr. Shadman was not guilty of the allegations (Doc. 27-1, ¶ 36;

Doc. 27, Exs. 21 & 22).   This contemporaneous evidence and Mr. Shadman's factual understanding of the military proceeding, as verified, is the best evidence.   Therefore, the government's unsupported misrepresentation leaves Claimants' statements and supporting evidence unrebutted.

Tellingly, the government has not offered the detention file and report of the military hearing's proceedings to this Court, although that would be the best evidence for what the U.S. Military Tribunal actually considered and decided.   While the Supreme Court has held that a detainee's civilian counsel must be privy to such proceedings to satisfy the Geneva Convention and the Uniform Code of Military Justice, *Hamdan v. Rumsfeld*, 548 U.S. 557, 613–15 (2006), the government continues to withhold this evidence.   This subterfuge is an attempt to conceal the fact that SIGAR participated in the military proceedings.   In the *Wall Street Journal*'s August 9, 2013 article about this case, the Journal reports that at the time U.S. forces detained Mr. Shadman and accused him of "contract corruption" on October 1, 2012, officials familiar with the case stated that Mr. Shadman's passport had been turned over to SIGAR's investigators and that two people working for U.S. Special Operations Command had attempted to intervene during the military proceeding (Doc. 27, Ex. 52).   Furthermore, SIGAR confirmed that they now are investigating these Special Forces soldiers (Doc. 27, Ex. 52).[3]

If the government really wanted this Court to know what transpired leading up to and during the military hearing, it would have produced the entire investigative record or, at the very least, the tribunal proceedings summary.   We know these records exist because, pursuant to procedures of the Court on which Colonel Sims used to sit, they are required to exist for that Court's review.   Indeed, the Supreme Court has also required that such records be maintained

---

[3] SIGAR's statements are another indication that Claimants' request for this Court's protection of U.S. Special Forces witnesses is all the more urgent (Doc. 34).

and that civilian counsel be given access.  *Hamdan v. Rumsfeld*, 548 U.S. at 613–15.  Absent

such evidence, Mr. Shadman's statement and the supporting documentation remain unrebutted.

Therefore, the Court should strike the Surreply and grant Claimants' Motion for Release

because the government supported its misrepresentation with flawed and unreliable evidence.

### B. This Court Should Strike the Surreply Because Its Arguments Are Redundant, Immaterial, and Contrary to Law.

In the government's Surreply, the government alleges that SIGAR obtained the release of

items seized by CITF, and in so doing, has defeated Claimants' Motion for Early Release (Doc.

35-1, pp. 3–4).  Claimants request the Court to strike this argument because it is contrary to law,

supported by misrepresentations, and contains redundant or immaterial matter.

#### 1. *The government's actions were a litigation-motivated contrivance to defeat Claimant's motion and remove this Court's jurisdiction.*

First, the government's actions were a litigation-motivated contrivance, the purpose of

which was to defeat this Court's jurisdiction to effect relief, and to which this Court should show

no deference.

Once a court has been accorded jurisdiction over an action, events may occur which moot

the controversy.  *Sys. Plus, Inc. v. United States*, 69 Fed. Cl. 757, 768–69 (2006).  However,

"those events may not be manufactured by the defending agency solely for the purpose of

divesting the court of its judicial power."  *Id.* at 769 (citing *Adams Fruit Co. v. Barrett*, 494 U.S.

638, 650 (1990)); *see Fed. Maritime Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 745 (1973)

("[A]n agency may not bootstrap itself into an area where it has no jurisdiction").  When a

governmental agency takes steps because of a pendency of an action, such steps are *post hoc*

endeavors.  *Sys. Plus, Inc.*, 69 Fed. Cl. at 768.  These *post hoc* endeavors constitute a "litigation-

motivated contrivance" when they serve to remove or elude a court's jurisdiction to hear the

pending action. *Id.* (citing *Citizens to Preserve Overton Park*, 401 U.S. at 420). Courts do not give such contrivances deference. *Id.*

Here, in the government's proposed Surreply, government counsel alleges that she first informed Claimants counsel that "neither the Justice Department nor SIGAR objected to the return of the items in CITF possession to the Claimants" as early as August 5, 2013 (Doc. 35-1, p. 3). This is an untrue statement. Government counsel never told undersigned counsel or D.C. counsel that CITF possessed Claimants' items nor that the government did not object to the items release. Instead, government counsel stated that SIGAR would allow Mr. Shadman limited access to the material in SIGAR's possession, which was confirmed through electronic correspondence with both government counsel and Agent Robert Doherty (see Doc. 34, Ex. 2).

These items contained the entirety of HSLSC's business property, business records and documents, and monetary funds. After Claimants filed their Motion for Early Release (Doc. 27), and after the government filed its Opposition (Doc. 31), the government then took steps to remove the business's assets from this Court's consideration (Ex. 1). Specifically, on October 3, 2013, SIGAR first contacted Claimants to state that SIGAR was going to transfer the seized business assets to the Counter Insurgency Task Force (CITF) (Ex. 1). SIGAR sent this email the same day that Claimants filed their Reply (Doc. 33), and then used this email as support for its Surreply (Doc. 35-1).

In the government's Motion for Leave, the government has contended that CITF is a "multinational coalition which includes the Afghan police" (Doc. 35, p. 2). Furthermore, the government admits that this coalition is a "separate, multi-national entity over which the undersigned prosecutor exercises neither responsibility nor control" (Doc. 35-1, p. 3). This means that although SIGAR had possession of the business's assets at the time Claimants filed

the Motion for Early Release, SIGAR has now transferred these assets, minus any monetary funds, to a multi-national entity outside this Court's consideration (Ex. 1). While the government contends that this entity will return the assets to Claimants, to date, they have not. Yet, the government has taken these *post hoc* actions in an effort to now argue that Claimants cannot establish the seizure of the entire business (Doc. 35-1, p. 4). This litigation-motivated contrivance served only to remove the court's jurisdiction over the pending action, and was an improper attempt to defeat Claimants' Motion. *Sys. Plus, Inc.*, 69 Fed. Cl. at 768. As such, this Court should disregard this argument.[4]

### 2. The government's actions confirm it does not have the authority to seize the monetary assets.

While Claimants have not conceded U.S. jurisdiction over Claimants and their property partly because the government is attempting to seize NATO funds from a NATO contract (Doc. 27-1, ¶ 12; Doc. 28, ¶ 73), the government has now argued that it has no jurisdiction to order SIGAR to do anything with Claimants' business assets because it has or is in the process of giving these assets to a Counter Insurgency Task Force, which is apparently a multinational NATO coalition (Doc. 35, p. 2). The Department of Justice is parsing jurisdiction and continuing its shell game—what gives the government the ability to disclaim authority over the company assets is the same reason the government does not have the authority to seize the monetary assets.

The Jingle Truck contract at issue was a NATO subcontract between Mr. Shadman's company and TOIFOR, a Hungarian Company (Doc. 27, ¶ 12). The funds that paid this contract came from many countries, not just the United States (Doc. 27, ¶ 12), as these NATO countries

---

[4] The government's latest action now makes Claimants' motion for an evidentiary preservation order an emergency (Docs. 29 & 34). The government has already removed copious amounts of evidence, including the disputed TMR documentation, from this Court's jurisdiction by giving it to a multinational entity (Ex. 1), with the unsupported "assurance" that such an entity will eventually return the evidence to Claimants (Doc. 35-1, p. 3).

have always funded the operations of the International Security Assistance Force ("ISAF") in Afghanistan since its inception (Ex. 2, pp. 1, 3). The NATO Procurement Manual and Financial Regulations governed the Jingle Truck Contract (Ex. 3), and NATO approved the sole source for Mr. Shadman's company, at U.S. Special Forces' request, through its Regulations (Doc. 27, ¶¶ 12, 28; Ex. 3, ¶ 13). Further, NATO's theatre finance and accounting officer had the overall responsibility for authorizing and approving the funding of the Jingle Truck contract (Ex. 4). Moreover, SIGAR has committed itself to assist NATO's ISAF in Afghanistan in its mission— which is to support the Government of the Republic of Afghanistan (Ex. 5).

Instead, with this proceeding, the government has ignored its commitments to both NATO and the Republic of Afghanistan, and has erroneously used this Court to seize NATO funds from a NATO subcontract. The Republic of Afghanistan, through the findings of its Special Court and the Afghan Attorney General's Order, retained jurisdiction over this case, exonerated Claimant of the alleged wrongdoing, and ordered the release of his property and monetary assets (Doc. 27, ¶¶ 38–41). The government has contended that Afghanistan did not have the authority to declare exclusive jurisdiction, and that this is an action filed in U.S. Court based on a violation of U.S. law (Doc. 31, p. 8 n.5). This is an incorrect assertion (see Doc. 28, ¶¶ 54–56), and a blatant violation of the U.S. and NATO's supposed commitment to support the Afghan Government and the Afghan rule of law (Ex. 5). As of today, the United Nations extended this mandate for NATO's ISAF to continue its support of the Afghan Government and its interests, after Afghan President Karzai openly criticized the United States and NATO for their "inflicted suffering on the Afghan people" and their repeated violations of Afghanistan's sovereignty (Ex. 6). Yet, with the government's attempt to parse jurisdiction, the government

has confirmed that it will continue to ignore both NATO and Afghanistan's interests to the continued detriment of Afghanistan's asserted sovereignty.

> ### 3. The government's actions were contrary to law as the government should have promptly released the seized property pursuant to 18 U.S.C. § 983(a).

Finally, the government's action was also contrary to law because the government failed to promptly release the seized property, pursuant to 18 U.S.C. § 983(a).

Section 983(a)(3)(A) specifies that once the government seizes property, it must either file a complaint for forfeiture of that property or return the property pending the filing of a complaint not later than 90 days after a claim has been filed.  Section 983(a)(3)(B) sets out the consequences for the government if it fails to file a civil complaint or criminal indictment (or return the property) within the prescribed ninety days.  In short, in the event the government misses the deadline, it must "promptly release the property pursuant to regulations promulgated by the Attorney General," and it "may not take any further action to effect the civil forfeiture of such property in connection with the underlying offense."  *See* Stefan D. Cassella, The Civil Asset Forfeiture Reform Act of 2000: Expanded Government Forfeiture Authority and Strict Deadlines Imposed on All Parties, 27 J. Legis. 97, 145 (2001).

Because the government never sent Claimants written notice for these seized assets, and, in fact, did not inform Claimants that a "multinational" Counter Insurgency Task Force possessed Claimants' property until the filing of this Surreply (see Doc. 35, p. 2), Claimants have been unable to file a proper Claim for this seized property, although Claimants established their ownership interest requested release in their Motion for Early Release.  *See* Cassella, *supra*, at 141–42.  However, the government is again circumventing its statutory obligations by removing these assets from its possession.  The government should have promptly returned the property to

Claimants; instead, it gave the property to a multinational entity outside both the government's control and this Court's jurisdiction (Doc. 35-1, p. 3; Ex. 1).

### 4. The government's argument contained redundant, immaterial, and conclusory matter.

Lastly, this Court should strike the government's argument because it contained redundant, immaterial, and conclusory matter.

First, the government makes an unsupported misrepresentation that is contrary to verified evidence already in the record by conclusory stating that "the items were seized by CITF for reasons unrelated to this forfeiture action and were out of the control of U.S. law enforcement" (Doc. 35-1, p. 3). This assertion is contrary to the verified evidentiary record that U.S. coalition forces seized the business's assets in connection with this proceeding (see Doc. 27-1, ¶ 34), which remains unrebutted because the government has not offered any contradictory evidence.

Second, the government repeatedly alleges that CITF has retained "weapons" belonging to Mr. Shadman's business in an effort to misrepresent that Claimants "pose[] a danger to coalition forces in Afghanistan" (Doc. 35, p. 2; Doc. 35-1, p. 4). This unsupported, immaterial, and inflammatory allegation serves only to taint this proceeding, and ignores the documentary evidence that explains these weapons. Specifically, in TOIFOR's contract with Mr. Shadman's company, TOIFOR required his company "to provide security and assure safe and successful trips" in the counterinsurgency territory (Doc. 27-2, p. 6). Further, TOIFOR would not reimburse his company for any damage caused by insurgent forces (Doc. 27-2, p. 8). Of course Mr. Shadman's company possessed weapons. It was required to provide its own security as it fulfilled sensitive transportation missions for U.S. Special Forces, and the retention of these weapons guarantees that Mr. Shadman cannot re-enter transportation contracts in an environment where the Taliban still seeks to kill him. Further, continued retention of these weapons is

contrary to law as instrumentalities in which Claimants have "an ownership interest, that are not *per se* contraband, not the subject of civil forfeiture proceedings, and not being used in a criminal proceeding, are not automatically forfeited to the Government." *United States v. Nguyen*, 2000 WL 34617365, at *3 n.2 (S.D. Tex. May 26, 2000) (citing *United States v. Farrell*, 606 F.2d 1341, 1345–46 (D.C. Cir. 1979)). As such, Claimants are entitled to the weapons return.

Therefore, the government's reference to "weapons" is immaterial and misleading to this Court.

Third, the government uses its Surreply to improperly repeat arguments from its Opposition. The Surreply alleges that the Claimants have not established that a business has been seized because "seizure of some, or even all, of a business's assets is simply not enough to establish the seizure of the business itself" (Doc. 35-1, p. 4). The Government already argued this issue in its Opposition (Doc. 31, p. 6). The Surreply also alleges that "claimants have not established that the currency is that of a legitimate business that has been seized" (Doc. 35-1, p. 4). The Government also already argued this issue in its Opposition (Doc. 31, p. 5). As such, both these arguments are redundant and outside the scope of a Surreply. Therefore, the Court should strike this argument because it contains redundant, conclusory, and immaterial matter.

Thus, this Court should strike the government's Surreply because it contains insufficient and unsupported arguments, redundant or immaterial matter, and is contrary to law.

## IV.    Conclusion

Therefore, Claimants respectfully request that this Court deny the government's Motion for Leave to file Surreply. If this Court grants the government's Motion, Claimants respectfully request, in the alternative, that this Court strike the government's Surreply and Order immediate release of Claimants' business property and assets.

Respectfully submitted,

**NEEL, HOOPER & BANES, P.C.**

_____
Bryant S. Banes
D.C. Bar ID No. TX0109
Texas Bar No. 24035950
Federal ID No. 31149
Kelline R. Linton
Texas Bar No. 24085436
1800 West Loop South, Suite 1750
Houston, Texas  77027-3008
Tel: (713) 629-1800
Fax: (713) 629-1812
E-mail: bbanes@nhblaw.com

Of Counsel:

James Wallace Porter, III
D.C. Bar No. 999070
Bradley Arant Boult Cummings LLP
1615 L Street, NW
Washington, D.C. 20036
(202) 719-8232
(202) 719-8332 (Fax)
E-mail: jporter@babc.com

*Counsel for Claimants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of October, 2013, a copy of the foregoing was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Jaikumar Ramaswamy, Chief
Asset Forfeiture and Money
   Laundering Section
Daniel H. Claman, Assistant Deputy Chief
Elizabeth A. Aloi, Trial Attorney
U.S. Department of Justice
Criminal Division
1400 New York Avenue, NW, 9th Floor
Washington, DC 20530


_____
Bryant S. Banes