**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                               )
UNITED STATES OF AMERICA,       )
                               )
         Plaintiff,             )
                               )
         v.                     )     Civil Action No. 12-1905 (RWR)
                               )
SUM OF $70,990,605, et al.,      )
                               )
         Defendants.            )
_____)
```

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff United States filed this civil *in rem* forfeiture action, alleging that the defendant funds -- approximately $61.3 million in three different banks -- are the proceeds of a wire fraud conspiracy and subject to seizure under 18 U.S.C. §§ 981, 983 and 984. Claimants Hikmat Shadman Logistics Services Co., Hekmat Shadman General Trading, LLC, Faizy Elham Brothers, Ltd., Everest Faizy Logistics Services, Hikmatullah Shadman, Najibullah, and Rohullah move under Federal Rule of Civil Procedure 12(b) to dismiss the forfeiture action. Because the complaint states a claim upon which relief could be granted and because international comity and the act of state doctrine do not bar jurisdiction at this point, the claimants' motion to dismiss will be denied.

<u>BACKGROUND</u>

The United States "pays contractors and subcontractors through the North Atlantic Treaty Organization ('NATO') to

- 2 -

resupply military forces operating in [Afghanistan,]" and NATO's Maintenance and Supply Agency ("NAMSA") administers the resupply program.  2d Am. Compl. ¶¶ 22-25.  The transport mission "is awarded by means of a document formally referred to as a Transportation Movement Request ['TMR']," which requires NAMSA to engage "prime contractors, who, in turn, award individual TMRs to local Afghan subcontractors."  Id.  Under NATO Contract No. 4600001510 (colloquially known as the "Jingle Truck" contract), the sole prime contractor is TOIFOR Global Life Support Services ("TOIFOR"), a Hungarian firm.  Id. ¶ 24.  Hikmat Shadman Logistics Services Company is one of the TOIFOR subcontractors for the Jingle Truck contract.  Id. ¶ 34.

Hikmat Shadman Logistics Services Company ("HSLSC") is a transportation and logistics company, owned by Hikmatullah Shadman.  Claimants' Mot. for Expedited Review and Mot. to Dismiss Complaint ("Mot. to Dismiss") at 1.  Claimants Najibullah (also known as Yaser Elham) and Rohullah are Shadman's brothers. Id. at 2.  Najibullah is the president of Faizy Elham Brothers, Ltd., while Rohullah is the president of Everest Faizy Logistics Services.  Id.  Shadman is also the vice president of Faizy Elham Brothers.  Id.

The United States alleges that Shadman, as a subcontractor and owner of HSLSC, "conspired to obtain payments from the United States for the transportation of military supplies in Afghanistan

- 3 -

through the illegal and fraudulent use of the wires . . . [by making] bribe payments, fraudulently inflat[ing] prices, and caus[ing] the United States to be invoiced for and to make payments of $77,920,605 to two bank accounts in Afghanistan."  2d Am. Compl. ¶ 10.  The United States alleges that Shadman paid bribes to TOIFOR operations managers Henry Omonobi-Newton and Paul Hele, id. ¶ 38, and that Shadman conspired with Hele to "inflate[] and manipulate[]" subcontractors' bids, id. ¶ 39, to allow Hele "to award TMRs to [HSLSC] at an inflated rate," id. ¶ 39g.  Allegedly because of the bribery and fraud, HSLSC was awarded 5,421 TMRs, which cost the United States $77,920,605. See id. ¶¶ 35, 43.

The United States filed this civil forfeiture action and seized the defendant funds as the proceeds of a wire fraud conspiracy.  The second amended complaint alleges that the proceeds of the contracts were deposited into an account at Afghanistan International Bank.  Id. ¶ 44.  The funds were then transferred in and out of accounts in the name of HSLSC, Hekmat Shadman General Trading LLC, Faizy Elham Brothers, Ltd., and Everest Faizy Logistics Services at Afghanistan International Bank, Bank Alfalah, and Emirates NBD Bank.  Id. ¶ 44-76.  Some of the funds at Afghanistan International Bank were also wired into an account in the name of Yaser Elham at Emirates NBD Bank.  Id. ¶ 67-69.  The United States has restrained a total of

- 4 -

$63,049,141, with $52,949,141 from the accounts in Bank Alfalah and Emirates NBD Bank, and $10.1 million in Afghanistan International Bank under various seizure warrants issued by the court upon a probable cause finding.

On August 27, 2013, Shadman, Najibullah, and Rohullah filed a verified claim and statement of interest in the seized property, asserting that they are the owners of the seized funds. Verified Claim and Statement of Interest or Right in Property Subject to Forfeiture In Rem at 8.  They made these claims both individually, and on behalf of their companies.  Id. at 14-16. It appears that all the accounts are held in the name of the companies, rather than the individuals, except for one account at Emirate National Bank.  Id. at 8-12.  Claimants then filed a motion under 18 U.S.C. § 983(f) for immediate release of funds, which has been denied.  The claimants also filed a motion for preliminary injunctive relief under Federal Rule of Civil Procedure 65, which has also been denied.

The claimants now move under Federal Rule of Civil Procedure 12(b) to dismiss the complaint asserting that the doctrine of international comity and the act of state doctrine bar forfeiture, the complaint fails to state a claim upon which relief can be granted, and the forfeiture violates the Eighth Amendment and the civil forfeiture statute.  Mot. to Dismiss at 1, 34, 43.  The United States opposes.  United States' Opp'n to

- 5 -

the Claimants' Mot. for Expedited Review and Mot. to Dismiss

Compl. ("U.S. Opp'n").

<center>DISCUSSION</center>

## I.   FAILURE TO STATE A CLAIM

The claimants contend that the government's second amended

complaint should be dismissed with prejudice[1] because it fails to

state a claim against the claimants.

A complaint may be dismissed under Federal Rule of Civil

Procedure 12(b)(6) when a plaintiff fails to state a claim for

which relief can be granted.  See Fed. R. Civ. P. 12(b)(6).  When

considering a Rule 12(b)(6) motion, a court construes the

complaint "in the light most favorable to the plaintiff and 'the

court must assume the truth of all well-pleaded allegations.'"

Bonaccorsy v. District of Columbia, 685 F. Supp. 2d 18, 22

---

[1] Even if the complaint were to be dismissed for failure to
state a claim, dismissal with prejudice is inappropriate here.
Dismissal because of failure to state a claim is typically
without prejudice.  "[D]ismissal with prejudice is warranted only
when a trial court determines that the allegation of other facts
consistent with the challenged pleading could not possibly cure
the deficiency." Belizan v. Hershon, 434 F.3d 579, 583 (D.C.
Cir. 2006) (internal quotation marks, emphasis, and citations
omitted).  Rather, "a complaint that omits certain essential
facts and thus fails to state a claim warrants dismissal pursuant
to Rule 12(b)(6) *but not dismissal with prejudice*." Id.
(emphasis added); see also Firestone v. Firestone, 76 F.3d 1205,
1206 (D.C. Cir. 1996) ("Failure to plead fraud with particularity
likewise does not support a dismissal with prejudice.  To the
contrary, leave to amend is almost always allowed to cure
deficiencies in pleading fraud." (internal quotation marks
omitted)).  The claimants have provided no argument as to why
dismissal with prejudice would be the appropriate remedy for
failure to state a claim here.

- 6 -

(D.D.C. 2010) (quoting <u>Warren v. District of Columbia</u>, 353 F.3d

36, 39 (D.C. Cir. 2004)).  A court may consider "only the facts

alleged in the complaint, any documents either attached to or

incorporated in the complaint and matters of which [it] may take

judicial notice."  <u>EEOC v. St. Francis Xavier Parochial Sch.</u>, 117

F.3d 621, 624 (D.C. Cir. 1997).[2]  The moving party's "factual

---

[2]  In support of their motion, the claimants rely on several
matters outside the pleadings, and they present many exhibits
submitted as evidence.  The claimants also "offer[ed]
supplemental evidence" via several unrequested supplemental
briefs, but those briefs similarly rely on evidence outside the
pleadings.  <u>See, e.g.</u>, Claimants' Notice of Supplemental
Authority in Support of Mot. to Dismiss ("Claimants' First
Supp.") (ECF No. 66); Claimants' Notice of Supplemental Authority
in Support of Mot. to Dismiss ("Claimants' Second Supp.") (ECF
No. 69); Claimants' Notice of Supplemental Auth. in Support of
Mot. to Dismiss ("Claimants' Third Supp.") (ECF No. 84).
Certainly, "the facts alleged in the complaint, documents
attached as exhibits or incorporated by reference in the
complaint," as well as "documents upon which the plaintiff's
complaint necessarily relies even if the document is not produced
by the plaintiff in the complaint but by the defendant in a
motion to dismiss," <u>Ward v. D.C. Dep't of Youth Rehab. Servs.</u>,
768 F. Supp. 2d 117, 119 (D.D.C. 2011) (citations and internal
quotation marks omitted), may be considered in assessing a motion
to dismiss.  However, there have been no documents attached as
exhibits to the complaint nor did the complaint incorporate by
reference most of the documents presented by the claimants.  <u>See</u>
<u>Farah v. Esquire Magazine</u>, 736 F.3d 528, 534 (D.C. Cir. 2013)
("[T]he court may consider the facts alleged in the complaint,
documents attached thereto or incorporated therein, and matters
of which it may take judicial notice.").  While the Jingle Truck
contract may be considered, as is discussed below, the contract
does not aid the claimants' arguments.  The remainder of the
documents provided by the claimants are other extraneous
documents that the government's complaint does not necessarily
rely on or incorporate by reference, such as newspaper articles,
Shadman's letters, and HSLSC's business documents.  As such, this
evidence cannot be considered unless the motion to dismiss is
converted to a motion for summary judgment.

    Where, as here, there are disputed factual allegations,

- 7 -

allegations, if in agreement with plaintiff['s], only reinforce
plaintiff['s] case; if in disagreement, they must be ignored.
Thus, at this stage of the proceedings, the only relevant factual
allegations are the plaintiff['s]." Ramirez de Arellano v.
Weinberger, 745 F.2d 1500, 1506 (D.C. Cir. 1984) (en banc),
judgment vacated on other grounds, 471 U.S. 1113 (1985).

> To survive a motion to dismiss, a complaint must
> contain sufficient factual matter, accepted as true, to
> "state a claim to relief that is plausible on its

---

conversion to a motion for summary judgment is particularly
inappropriate. See Ramirez de Arellano v. Weinberger, 745 F.2d
1500, 1538 (D.C. Cir. 1984) (en banc) (agreeing with the district
court that a conversion to summary judgment "is clearly
impermissible under the[] circumstances" because there were
"essential disputes as to the material facts in the case"
(internal quotation marks omitted)), judgment vacated on other
grounds, 471 U.S. 1113 (1985); e.g., McMillan ex. rel. Estate of
McMillan v. College Pro Painters (U.S.) Ltd., 350 F. Supp. 2d
132, 135 (D. Me. 2004) (granting plaintiff's motion to strike the
motion to dismiss because there was a "real dispute of fact"
between the parties and "[f]urther factual development beyond the
allegations of the Complaint is required before the ultimate
question of law can be properly resolved").
Further, even if conversion to a motion for summary judgment
were appropriate, both parties must be informed of that intent
and given an opportunity to present additional facts. Gordon v.
Nat'l Youth Work Alliance, 675 F.2d 356, 360-61 (D.C. Cir. 1982)
(stating that, while a court does not need to consider matters
outside the pleadings, "once it decides to consult such matters
it should so inform the parties and set a schedule for submitting
additional affidavits and documents if the parties wish"); Fed.
R. Civ. P. 12(d) (explaining that, if the motion is treated as a
motion for summary judgment, "[a]ll parties must be given a
reasonable opportunity to present all the material that is
pertinent to the motion").  That has not been done here.
Accordingly, matters outside the pleadings will not be
considered in resolving the claimants' Rule 12(b)(6) argument.
It will be treated as a motion to dismiss and will not be
converted to a motion for summary judgment. See Fed. R. Civ. P.
12(d).

> face."  A claim has facial plausibility when the
> plaintiff pleads factual content that allows the court
> to draw the reasonable inference that the defendant is
> liable for the misconduct alleged.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations omitted)

(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007));

see also Rollins v. Wackenhut Servs., Inc., 703 F.3d 122, 129-30

(D.C. Cir. 2012).  "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully."  Iqbal, 556

U.S. at 678 (quoting Twombly, 550 U.S. at 556).  Thus, "[w]here a

complaint pleads facts that are merely consistent with a

defendant's liability, it stops short of the line between

possibility and plausibility of entitlement to relief."  Id. at

678 (internal quotation marks omitted) (quoting Twombly, 550 U.S.

at 557).  "A court must assess the legal feasibility of the

complaint, but may not weigh the evidence that might be offered

to support it."  Howard v. Office of Chief Admin. Officer of U.S.

House of Representatives, 720 F.3d 939, 950 (D.C. Cir. 2013)

(internal quotation marks omitted) (citing Global Network

Communic'ns, Inc. v. City of N.Y., 458 F.3d 150, 155 (2d Cir.

2006)).

A civil forfeiture complaint is subject to the heightened

pleading requirements of Rule G of the Supplemental Rules for

Admiralty or Maritime Claims and Asset Forfeitures ("Rule G"):

the government must "state sufficiently detailed facts to support
a reasonable belief that the government will be able to meet its
burden of proof at trial."  Rule G(2)(f).  The government's
burden at trial is to prove that the assets are subject to
forfeiture by a preponderance of the evidence.  18 U.S.C.
§ 983(c)(1).  However, a complaint cannot be dismissed "on the
ground that the Government did not have adequate evidence at the
time the complaint was filed to establish the forfeitability of
the property."  Rule G(8)(b)(ii); 18 U.S.C. § 983(a)(3)(D).
Essentially, "[a]t the pleading stage, it suffices for the
government to simply allege enough facts so that the claimant may
understand the theory of forfeiture, file a responsive pleading,
and undertake an adequate investigation."  United States v. One
Gulfstream G-V Jet Aircraft, 941 F. Supp. 2d 1, 14 (D.D.C. 2013)
(citing United States v. Mondragon, 313 F.3d 862, 864 (4th Cir.
2002)); see also United States v. Funds in the Amount of $40,000,
No. 03 C 8220, 2004 WL 2191576, at *2 (N.D. Ill. Sept. 28, 2004)
("Most courts have agreed that the particularity requirement of
Rule E(2)(a)[3] is satisfied by providing specific information
about the date and location of the seizure, the amount of money
seized, and the claimant's actions on the date of the seizure."
(internal quotation marks and citations omitted)); cf. Henok v.

---

[3]  Rule E(2)(a)'s standard "has evolved to the standard
stated in [Rule G] subdivision (2)(f)."  Rule G advisory
committee's notes.

Chase Home Finance, LLC, 922 F. Supp. 2d 110, 122 (D.D.C. 2013)
(explaining that, to plead fraud under Federal Rule of Civil
Procedure 9(b), a plaintiff must plead "matters such as the time,
place and content of the false [representations], the
misrepresented fact and what the opponent retained or the
claimant lost as a consequence of the alleged fraud" (internal
quotation marks omitted)).

The government here is proceeding under § 981(a)(1)(C),
which provides that the property that "constitutes or is derived
from proceeds traceable to a violation of" 18 U.S.C. § 1343,[4] the
wire fraud statute, or from any offense constituting a wire fraud
conspiracy, is forfeitable.[5]  18 U.S.C. § 981(a)(1)(C).

---

[4]   Forfeiture can be premised on "any offense constituting
'specified unlawful activity' (as defined in section 1956(c)(7)
of this title), or a conspiracy to commit such an offense."  18
U.S.C. § 981(a)(1)(C).  In turn, 18 U.S.C. § 1956(c)(7) defines
"specified unlawful activity" as "any act or activity
constituting an offense listed in section 1961(1) of this
title[.]"  18 U.S.C. § 1956(c)(7).  Section 1961(1) lists section
1343, wire fraud, as an offense.  18 U.S.C. § 1961(1).

[5] The claimants allege in their second unrequested
supplemental brief that "the U.S. government does not have the
authority to seize the defendant assets at issue in this case
because they are NATO funds from a NATO contract," Claimants'
Second Supp. at 1, and state that they asserted this argument in
the motion to dismiss and reply.  Id. (citing Mot. to Dismiss at
¶ 73; Reply at 8).
     The cited portion of the motion to dismiss states that
"HSLSC had a NATO contract, not a U.S. Government contract" and
argues that the funds came from "many countries . . . and
ultimate payments came from TOIFOR's bank account."  Mot. to
Dismiss at 41-42.  The claimants then argue that "the
[g]overnment asks for the [c]ourt to infer the requisite wire
communication element . . . ."  Id.  This cited section of the

A. Elements of wire fraud and conspiracy

To allege a wire fraud violation under 18 U.S.C. § 1343, the government must plead that there was a scheme to defraud and a transmission by wire of a document or communication for the purposes of executing the scheme. United States v. Philip Morris

---

motion to dismiss does not argue that the United States did not have the authority to seize the funds.

The claimants also cite the reply, where they first raise the argument that "the U.S. government does not even have the authority to seize the NATO funds from this NATO contract." Reply at 8. The claimants also allege for the first time in their second and third supplemental briefs that this lack of authority implicates subject matter jurisdiction. Claimants' Second Supp. at 1 (arguing that "Afghanistan has exclusive jurisdiction over HSLSC, an Afghan subcontractor"); Claimants' Third Supp. at 7 (arguing that "the Court lacks subject matter jurisdiction over this case"). However, arguments raised for the first time in a reply brief are not considered. See Taitz v. Obama, 754 F. Supp. 2d 57, 61-62 (D.D.C. 2010).

In any event, the United States' authority to seize the funds stems from 18 U.S.C. § 981. As is explained above, the defendant assets are subject to forfeiture as property that "constitutes or is derived from a violation" of the wire fraud statute. 18 U.S.C. § 981(a)(1)(C). The statute includes no requirement that the United States be a party to the contract between NATO and TOIFOR, or TOIFOR and HSLSC before the United States can seize the defendant assets, nor has the claimant provided any legal authority supporting such a claim. Nor does this implicate subject matter jurisdiction. See 28 U.S.C. § 1345 (granting the districts courts original jurisdiction in "all civil actions, suits or proceedings commenced by the United States" except "as otherwise provided by Act of Congress"); 28 U.S.C. § 1355 (granting the district courts original jurisdiction for forfeitures).

Relatedly, the claimants also claim that the contract "specified that 'any dispute arising out of this contract shall be settled by arbitration' pursuant to French law." Claimants' Second Supp. at 2. Because the claimants are not pursuing this argument at this point, see id. at 2 n.1, and because it is raised for the first time in a second, unrequested supplemental brief, this argument will not be adjudicated.

USA Inc., 566 F.3d 1095, 1116 (D.C. Cir. 2009).  In turn, to

allege a wire fraud conspiracy, the government must allege that

Shadman or HSLSC knowingly entered into an agreement with at

least one other person to commit wire fraud.  See United States

v. Alston-Graves, 435 F.3d 331, 336-37 (D.C. Cir. 2006)

(explaining the elements of wire fraud and conspiracy).[6]  The

government does not need to allege facts that demonstrate an

explicit agreement; rather "[p]roof of a tacit, as opposed to

explicit, understanding is sufficient to show agreement."

Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983); see also

United States v. Mellen, 393 F.3d 175, 191 (D.C. Cir. 2004)

(Henderson, J., dissenting in part) ("[A] conspiracy can be

inferred from a combination of close relationships or knowing

presence and other supporting circumstantial evidence." (internal

quotation marks omitted) (citing United States v. Brito, 136 F.3d

397, 409 (5th Cir. 1998)).  "[A]llegations that a defendant acted

---

[6] The claimants assert that conspiracy requires an overt
act.  See Mot. to Dismiss at 40.  The government does not
directly contest this, but does not include an overt act in its
recitation of the elements of conspiracy.  See U.S. Opp'n at 6.
Neither § 981 under which the government is proceeding, nor the
wire fraud conspiracy statute, 18 U.S.C. § 1349, includes an
overt act requirement in its text.  See Whitfield v. United
States, 543 U.S. 209, 213-14 (2005) (finding that an overt act is
not required to prove a conspiracy unless the text of the statute
requires an overt act since the "common law understanding of
conspiracy does not make the doing of any act other than the act
of conspiring a condition of liability" (internal quotation marks
omitted)).  If the government were proceeding under the general
conspiracy statute, 18 U.S.C. § 371, however, the government
would be required to prove an overt act.

- 13 -

in ways consistent with a conspiratorial agreement, but also equally well explained by legitimate economic incentives, do 'not suffice . . . to show illegality.'"  <u>RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP</u>, 682 F.3d 1043, 1051-52 (D.C. Cir. 2012) (quoting <u>Twombly</u>, 550 U.S. at 556-87), <u>cert. denied</u>, 133 S. Ct. 870 (2013).

The government has pled that Shadman and the TOIFOR operations managers at Kandahar Airfield Newton and his successor Hele engaged in a "scheme to defraud."  2d Am. Compl. ¶¶ 34-43. As part of this scheme, Shadman allegedly "bribed and paid 'kickbacks'" to the TOIFOR officials, <u>id.</u> ¶ 38, and, in turn, the TOIFOR officials fraudulently inflated the price of the contracts, <u>id.</u> ¶ 39a-39i.  The government not only alleges that Shadman paid the TOIFOR officials bribes, but also provides specific examples of bribery.  <u>See id</u>. ¶ 38a-38d (describing an exchange of money when Shadman directed a confidential source to deliver hundreds of dollars in an envelope to Newton and "to show the envelope to no one but Newton").[7]  The government also alleges that an informant stated "that money was transferred from an HSLSC bank account to a bank account belonging to Hele in

---

[7] The claimants contend that the money that the government alleges is a bribe "was a donation to the Filipino relief fund." Mot. to Dismiss at 37.  However, this factual allegation is contradicted by the government's allegation and thus must be ignored in determining whether the complaint sufficiently pleads a claim.  <u>See Ramirez de Arellano</u>, 745 F.2d at 1506.

- 14 -

South Africa," id. ¶ 38i, and that around November 2011, another informant "saw a bank transfer receipt for the transfer of $10,000 from an HSLSC bank account at Afghanistan International Bank to Hele's personal bank account at Afghanistan International Bank." Id. at ¶ 38j.  The government further alleges as evidence of bribery that a TOIFOR employee informed a source that Newton, one of Shadman's coconspirators, had given "TOIFOR employees approximately $500 in cash" and that Newton "told the employees that the money was from [Shadman]." Id. ¶ 38f.  Taking all inferences in the light most favorable to the government, these allegations are more than just consistent with liability, but rather support an inference of criminal activity.

Additionally, the government alleged details of the scheme to fraudulently inflate the price of the contracts.  Id. ¶ 39. For example, the government alleges that as part of the scheme, Hele engaged another person "to participate in a price-fixing scheme so that Hele could continue to award TMRs to [Shadman] at an inflated rate," by asking the other person to submit bids "more than three times higher" than originally proposed.  Id. ¶ 39f-g.  This allowed Hele "to ensure that at least one other bidder in the pool from which he picked HSLSC was sufficiently high as to make [Shadman] and HSLSC's bid appear reasonable." Id. ¶ 39g.

- 15 -

Here, the government has alleged sufficient details to infer the contours of the scheme, and HSLSC is implicated by more than "association only." See Mot. to Dismiss at 37-38. In arguing that the government has failed to state a claim against HSLSC, claimants rely on One Gulfstream, where the court dismissed the forfeiture complaint for failing to link the defendant jet to any specific illicit acts despite the pattern of corruption the complaint described. However, the complaint in this case does not suffer from mere conclusory and broad-brushed allegations as did the complaint in One Gulfstream. In One Gulfstream, the government alleged that the claimant was a member of "a coterie of powerful individuals . . . [who] demand[ed] extortionate payments from oil companies seeking to do business in the country. . . . [M]embers of the [coterie also] misappropriate[d] government funds into a slush fund created for their personal use." 941 F. Supp. 2d at 5. The government then claimed that since the claimant's level of spending was inconsistent with his government salary, the defendant jet must have been "derived from or traceable to extortion, misappropriation, theft, or embezzlement of public funds by a public official," and should thus be forfeitable. Id. at 5, 14-15. Here, as is explained in more detail below, the government has done more than "describe[] a disconcerting pattern of corruption," id. at 4; rather, the government has specifically identified the victim of the scheme

(the United States government), members of the conspiracy
(Shadman, Newton, and Hele), the goal of the conspiracy (to
induce the United States to pay inflated prices for contracts
that had been fraudulently obtained), the means of effectuating
the conspiracy (the bribery and kickbacks, as well as involving
other subcontractors to inflate their bid prices), and which
members of the conspiracy were responsible for which acts, even
though Shadman may be held liable for the acts of his
coconspirators committed in furtherance of their conspiracy.
See Mellen, 393 F.3d at 183 ("[W]here two individuals agree to
commit an offense, each becomes liable for actions taken by the
other in furtherance of that particular crime." (emphasis
omitted)).

Additionally, Shadman is specifically implicated by the
government's allegations that he provided the bribes to the
TOIFOR official, 2d Am. Compl. ¶ 38, in order to further the
conspiracy to "inflate[] and manipulate[] bids," id. at ¶ 39.
Further, the fact that "[o]ver ninety percent of the low-risk
routes, and a majority of the high-risk routes" were awarded to
Shadman's company, id. ¶ 39f, in combination with analysis that
found that a majority of the contracts "had significant indicia
of fraud during one year of the approximately 17 month conspiracy
period," id. ¶ 41, implicate HSLSC by more than mere association.
These contracts were awarded to HSLSC "when it was the

- 17 -

*highest* bidder," id. ¶ 41a, "when it *did not even submit a bid*,"
id. ¶ 41b, "when it was the *only* bidder," id. ¶ 41c, and "where
it *did not submit a bid, and no bids were submitted by any other
contractor*," id. ¶ 41d.[8]  These factual allegations by the
government are sufficient to state a claim upon which relief may
be granted.

The government has also provided sufficient factual
allegations to support an inference of illegal activity, well
beyond the examples of allegations that merely assume that
unexplainable wealth implies illegal activity, see One
Gulfstream, 941 F. Supp. 2d at 14-15, or that the mere presence
of significant amounts of cash "oddly packaged" reflects illicit
drug trafficking, see Mondragon, 313 F.3d at 866, or that
parallel conduct signals an agreement in violation of antitrust

---

[8]  The claimants argue that HSLSC was awarded these
contracts because of a "sole source" approval, Shadman's
relationship with the military forces, "the U.S. vetting
program," and "the other factors beyond price that determined
contract award, including availability and dependability."  Mot.
to Dismiss at 39.  As is recognized by the claimants, there is no
mention of the sole source approval in the complaint, or the
other factors discussed by the claimants.  See Mot. to Dismiss at
10 (stating that "the Government conveniently omits that HSLSC
was an approved sole source").  The government alleges that the
contracts were awarded "without sufficient justification" and "in
circumstances without explanation," particularly when "other
subcontractors [were] available to do the transportation mission
under the Jingle Truck contract."  2d Am. Compl. ¶ 41.  Whether
the government did omit these facts and whether the claimants'
alternative explanations will sufficiently rebut the government's
fraud and conspiracy allegations is not relevant at the motion to
dismiss stage.

- 18 -

laws, see Twombly, 550 U.S. at 557.  The government does more
than "ask[] this Court to 'leap to the conclusion' that these
awarded TMRs are 'evidence of criminal activity,'" see Mot. to
Dismiss at 39; the government has provided factual allegations
that "[a] certified forensic examiner . . . [found that the TMRs]
had significant indicia of fraud," 2d Am. Compl. ¶ 41.  The
complaint does not rest on allegations that HSLSC received a
majority of the TMRs; rather, the government also describes the
signals of fraud, as is explained above, such as HSLSC being
awarded contracts without a bid, when its bid was the highest
bid, and when it was unexplainably the only bidder.  Id.  These
signals of fraud, "[w]hen viewed in tandem with other details
suggesting illegal behavior," such as the money paid to TOIFOR
officials as bribes, suffice to describe the contours of the
illegal scheme.  See One Gulfstream, 941 F. Supp. 2d at 15.

    The government has also sufficiently pled that an interstate
wire communication was used to further the scheme.  See Philip
Morris, 566 F.3d at 1116.  The conspirators do not need to use
the wires themselves, but must cause the wires to be used.  See
Pereira v. United States, 347 U.S. 1, 8 (1954) ("To constitute a
violation of these provisions, it is not necessary to show that
petitioners actually mailed or transported anything themselves;

- 19 -

it is sufficient if they caused it to be done.")[9]; id. at 8-9

("Where one does an act with knowledge that the use of the mails

will follow in the ordinary course of business, or when such use

can be reasonably foreseen, even though not actually intended,

then he 'causes' the mails to be used."); see also 18 U.S.C.

§ 1343 (explaining that "[w]hoever . . . transmits or causes to

be transmitted by means of wire" a communication "for the

purposes of executing such a scheme" is guilty of wire fraud).

Here, the government's complaint is rife with allegations of the

use of the wires, all of which were alleged to have been caused

by the conspirators' scheme to defraud.  2d Am. Compl. ¶¶ 29-33,

36-37, 45, 47, 82 (use of the wires to transmit invoices and

payments).  That the invoices and payments were transmitted

electronically "in the ordinary course of business," Pereira, 347

U.S. at 9, is apparent given the international nature of the

enterprise and the accompanying payments, and the claimants do

not contest this.

The claimants instead insist that the complaint "never

states that these wired funds were then transmitted to

Mr. Shadman; instead the Complaint says that 'TOIFOR then

disbursed payments for the TMRs on an approximately monthly

---

[9]  Because the mail and wire fraud statutes are similar,
"cases construing mail fraud apply to the wire fraud statute as
well."  United States v. Lemire, 720 F.2d 1327, 1334 n.6 (D.C.
Cir. 1983).

- 20 -

basis.'"  Mot. to Dismiss at 42; Reply at 15-16.  This, the
claimants contend "asks for the court to infer the requisite wire
communication element without providing any detail on the actual
source of Mr. Shadman's payments."  Mot. to Dismiss at 42; Reply
at 15-16.  First, as is explained above, the wire communication
does not need to be from or to the claimants; rather, the
conspirators must merely cause the wire communication.  Second,
and more importantly, the claimants omit an essential part of the
sentence they quote from the government's complaint: "TOIFOR then
disbursed payment for the TMRs on an approximately monthly basis
by EFT[10] in U.S. dollars to defendant AIB Bank Account . . . held
in the name of Hikmat Shadman Logistics Services Company, located
at Afghanistan International Bank."  2d Am. Compl. ¶ 47 (emphasis
added); see also id. ¶ 82 ("[T]he United States Government
electronically . . . transfer[ed] at least $77,920,605 to NAMSA
as payment to TOIFOR for the fraudulently obtained TMRs and
invoices submitted by Hikmatullah, which funds TOIFOR transferred
to Hikmatullah's company, by electronic funds transfer" into
HSLSC's bank account at AIB).  The government has in fact alleged
that wired funds were transmitted to Shadman via an electronic
communication.  This is sufficient to show that Shadman and his
coconspirators "cause[d] to be transmitted by means of wire"

_____

[10]  The complaint defines "EFT" as an electronic fund
transfer.  2d Am. Compl. ¶ 31.

communications "for the purposes of executing" the scheme to defraud the United States.  18 U.S.C. § 1343.  Further, not only has the government sufficiently alleged that the funds were electronically wired to Shadman, but the government has also sufficiently alleged that the wires were used in furtherance of the scheme as well.

The government has also successfully pled the elements of a conspiracy: that Shadman agreed with at least one other person to defraud the United States, and that he knowingly participated with the intent to commit the offense.  <u>Mellen</u>, 393 F.3d at 180.

The government has sufficiently alleged that Shadman, along with at least Hele and Newton, agreed to engage in the scheme to defraud described above.  Further, by virtue of the "modus operandi of the scheme," <u>United States v. Reid</u>, 533 F.2d 1255, 1264 (D.C. Cir. 1976), as well as the bribes and kickbacks that Shadman allegedly paid, the government has pled that Shadman knowingly participated with the intent to commit the fraud.

B.   <u>The forfeitability of the assets</u>

The claimants assert that the complaint fails to plead sufficient facts to show that the assets are subject to forfeiture.  Mot. to Dismiss at 35-36.  For defendant assets to be subject to forfeiture, the assets must "constitute[] or [be] derived from proceeds traceable to a violation" of the wire fraud statute, "or a conspiracy to commit such offense."  18 U.S.C.

§ 981(a)(1)(C).  While the government does not need to identify
specific property involved in the offense (for example, that the
exact dollars that went into the claimants' account from the
fraud were the exact dollars that were seized), <u>see</u> 18 U.S.C.
§ 984,[11] the government must still show that the assets are
"traceable to a [specified] violation."  18 U.S.C.
§ 981(a)(1)(C).

The government easily meets this burden.  Here, as is
explained above, the government has sufficiently pled that there
was a wire fraud conspiracy, a predicate to establishing that the
defendant funds are subject to forfeiture.  Further, the
government has alleged that the defendant funds are the payments
that the United States government made for the contracts that
were fraudulently obtained.  <u>E.g.</u>, 2d Am. Compl. ¶¶ 5, 10.  As
such, the government is alleging that the seized defendant assets
are "the proceeds of a wire fraud conspiracy."  <u>Id.</u> ¶ 5.  Because

---

[11]  The claimants also argue that § 984, which states that
the government does not have to identify specific property, does
not apply because "[t]he Complaint fails to plead any facts that
demonstrate the intent requirement."  Mot. to Dismiss at 43
(explaining that § 984 "does not apply to an action against funds
held by a financial institution in an <u>interbank account</u> unless
the account holder knowingly engaged in the offense that is the
basis for the forfeiture").  Even assuming that is true, the
government has sufficiently pled intent.  <u>See</u> <u>United States v.
Reid</u>, 533 F.2d 1255, 1264 (D.C. Cir. 1976) ("Fraudulent intent
may be inferred from the modus operandi of the scheme.").  Here,
drawing all inferences in the light most favorable to the
government, "[t]he fraudulent intent and the nature of the scheme
[are] undeniably apparent."  <u>Id.</u>

the defendant funds are alleged to constitute the proceeds of the
illegal act and the government has alleged sufficient information
to establish a wire fraud conspiracy, the government has
"state[d] sufficiently detailed facts to support a reasonable
belief that the government will be able to meet its burden of
proof at trial."  Rule G(2)(f).

The case that the claimants cite, One Gulfstream, to support
their allegation that the government's factual allegations are
insufficient is inapposite.  See Mot. to Dismiss at 36.  Unlike
in One Gulfstream, the government here is alleging that the
defendant assets "constitute" the "proceeds of a wire fraud
conspiracy," 2d Am. Compl. ¶ 5, rather than property derived from
the proceeds of unlawful activities.  By contrast, in One
Gulfstream, the government sought to forfeit a jet purchased by
the claimant "with funds derived from extortion,
misappropriation, theft, and embezzlement," 941 F. Supp. 2d at 4.
In other words, the government sought to forfeit the jet as
property derived from proceeds of a violation.  Thus, there, the
government was required to show that (1) the claimant acquired
funds from those illegal activities, and (2) the claimant used
those funds to purchase the jet that the government sought to
have forfeited.  However, the government there failed to plead
facts showing that the claimant's wealth was derived from an
illegal source.  Id. at 15-16.  Because the government could not

- 24 -

show that the funds to buy the jet were derived from an illegal source, the government also could not demonstrate that the jet was "derived from or traceable to illicit activity." Id. at 14-16.  Without the connection between the property and proceeds from illegal acts, the government could not forfeit the property under § 981.  Id.  Notably, the government did not allege that the jet itself was the proceeds of the violation.  See id.; cf. United States v. 10150 NW 133 Street, Hialeah Gardens, Fla., 278 Fed. App'x 880, 883 (11th Cir. 2008) ("The kickbacks that led to the claims made them fraudulent, so the money paid for the claims is the proceeds of a crime.").

The government has "state[d] sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."  Rule G(2)(f).  The government has alleged that the property is subject to forfeiture because the property "constitutes or is derived from proceeds traceable to" a wire fraud and wire fraud conspiracy.  18 U.S.C. § 981(a)(1)(C).  The complaint also pleads ample facts to show that the seized assets are forfeitable.  Moreover, the government's factual allegations of a wire fraud conspiracy go beyond mere "labels and conclusions."  See Twombly, 550 U.S. at 555.  The government has not merely stated that Shadman and his co-conspirators conspired to commit a wire fraud.  Rather, the government has made detailed factual allegations that states a

claim to relief that is plausible on its face by identifying the dates and amounts of the seizure and explaining the claimants' actions precipitating that seizure.  Accordingly, because the government has met the heightened pleading requirement of Rule G, the claimants' Rule 12(b)(6) motion will be denied.

II.  INTERNATIONAL COMITY AND THE ACT OF STATE DOCTRINE

The claimants allege that the government's second amended complaint should be dismissed because of international comity and the act of state doctrine.  In particular, the claimants contend that an Afghanistan court has already adjudicated this specific forfeiture allegation and that that court claimed exclusive jurisdiction over the case.

International comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws."  Hilton v. Guyot, 159 U.S. 113, 164 (1895).  Comity is a "term [that] 'summarizes in a brief word a complex and elusive concept -- the degree of deference that a domestic forum must pay to the act of a foreign government not otherwise binding on the forum.'"  de Csepel v. Republic of Hungary, 714 F.3d 591, 606 (D.C. Cir. 2013) (quoting Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 937 (D.C. Cir. 1984)).  "'Comity is

an affirmative defense' for which the party seeking recognition of the judgment bears the burden of proof." Id. at 607 (quoting Taveras v. Taveraz, 477 F.3d 767, 783 (6th Cir. 2007)).

Similarly, the party invoking the act of state doctrine bears the burden to prove its applicability. Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela, Civil Action No. 11-1735 (RLW), 2013 WL 5290126, at *8 (D.D.C. Sept. 20, 2013) ("[T]he party raising the defense bears the burden to affirmatively show that an act of state has occurred and 'that no bar to the doctrine is applicable under the factual circumstances.'" (quoting Ramirez de Arellano, 745 F.2d at 1534)).[12]  Additionally, "[a]s a substantive rather than a jurisdictional defense, the Act of State doctrine is more

---

[12]  While the D.C. Circuit has not explicitly recognized the act of state doctrine as an affirmative defense, at least one other circuit has. See Konowaloff v. Metro. Museum of Art, 702 F.3d 140, 146 (2d Cir. 2012) ("[A]s the district court noted, the act of state doctrine is an affirmative defense[.]"), cert. denied, 133 S. Ct. 2837 (2013).  The D.C. Circuit has, however, recognized that international comity is an affirmative defense, de Csepel, 714 F.3d 591 at 607, and, as with the international comity defense, the act of state doctrine does not contest the plaintiff's prima facie case, but rather "seeks to avoid liability, in whole or in part, by new allegations of excuse, justification, or other negating matter." See Amy St. Eve & Michael A. Zuckerman, The Forgotten Pleading, 7 Fed. Cts. L. Rev. 152, 161 (2013).  Accordingly, the act of state doctrine is also appropriately considered an affirmative defense since it functions to bar liability in the face of the plaintiff's prima facie case.  See 61A Am. Jur. 2d Pleading § 300 (2013) ("An affirmative defense is any matter that serves to excuse the defendants conduct or otherwise avoid the plaintiff's claim, but which is proven by facts extrinsic to the plaintiff's claim.").

- 27 -

appropriately raised in a motion for summary judgment than in a motion to dismiss." Daventree Ltd. v. Republic of Azerbaijan, 349 F. Supp. 2d 736, 755 (S.D.N.Y. 2004).

Accordingly, as an affirmative defense, dismissing on the basis of international comity or the act of state doctrine is appropriate only if the "facts that give rise to the defense are clear from the face of the complaint." Smith-Haynie v. District of Columbia, 155 F.3d 575, 578 (D.C. Cir. 1998); see also Konowaloff v. Metro. Museum of Art, 702 F.3d 140, 147 (2d Cir. 2012) ("[A] court may properly grant a motion to dismiss on the basis of [the act of state] doctrine when its applicability is shown on the face of the complaint."), cert. denied, 133 S. Ct. 2837 (2013).  Indeed, "as long as a plaintiff's potential 'rejoinder to the affirmative defense [is not] foreclosed by the allegations in the complaint,' dismissal at the Rule 12(b)(6) stage is improper." de Csepel, 714 F.3d at 608 (quoting Goodman v. Praxair, Inc., 494 F.3d 458, 466 (4th Cir. 2007) (en banc)).

Here, dismissal would be premature because the government has set forth no facts which foreclose its response to the claimants' arguments on international comity and the act of state doctrine.  "[T]he ordinary process of discovery and factfinding" will develop the "[c]rucial facts pertaining to the defense . . . [that are] not fully developed in a complete record." Ramirez de Arellano, 745 F.2d at 1534; cf. Chen v. District of Columbia, 256

F.R.D. 267, 271 (D.D.C. 2009) (declining to grant the defendant's motion to dismiss on qualified immunity grounds because of "the nature of facts alleged" in the complaint and "the procedural posture" of the case (citing Jacobs v. City of Chicago, 215 F.3d 758 (7th Cir. 2000)); Jacobs, 215 F.3d at 765 n.3 (recognizing that a plaintiff does not need to plead facts to "anticipate and overcome" an affirmative defense).

Additionally, deferring resolution of an international comity or act of state doctrine defense at the motion to dismiss stage is particularly necessary here because of the factual disputes between the parties about issues such as the character,[13] scope, and findings of the proceedings involving the

---

[13] The claimants also assert in their first unsolicited supplemental brief that the "[Special Inspector General for Afghanistan Reconstruction] and other U.S. entities chose not to participate, as asserted by undersigned counsel and confirmed by government counsel in the preliminary injunction hearing." Claimants First Supp. at 5. The claimants then cite their unfiled preliminary injunction bench brief, which is neither evidence nor appropriately considered as it was not filed with the court or provided to opposing counsel before the preliminary injunction hearing. See id. Additionally, an examination of the preliminary injunction hearing transcript -- which was "solely to hear argument on the preliminary injunction motion with no intention to have argument concerning the other pending motions or resolution of those [motions]," Transcript of Preliminary Injunction Hearing on 11/14/13 at 6:13-16 -- reveals that the government made no such confirmation. See id. At best, the United States stated, in response to the question of whether "there [was] a finding as to why the MLAT should not be enforced that contradicted what [the government's] allegations [were]," that the Afghanistan tribunal found "that the United States had not proved its case against Mr. Shadman, [and] the United States didn't make any attempt to prove its case against Mr. Shadman in connection with that request for restraint." Id. at 28:25-29:4.

Afghanistan Attorney General's office, which are not clearly
answered by the proffered Afghanistan Attorney General's
opinions.  Compare 2d Am. Complaint ¶ 16 (stating that the
government was informed "that Afghanistan would not comply with
the United States' mutual legal assistance request for
enforcement of the restraint against the defendant AIB bank
accounts"), U.S. Opp'n at 13 (arguing that the Afghanistan
authorities made "a determination . . . that they would not
enforce the United States' mutual legal assistance request to
restrain the original defendant accounts" but did not determine
"whether the defendant assets are the proceeds of fraud committed
against the United States"), and id. (stating that there was "no
foreign judgment" but rather a "determination made by a
delegation of three Afghan officials") with Mot. to Dismiss at

---

However, the United States did not confirm that the United States
was in fact invited to participate in the proceedings to litigate
the substance of the claim and that they refused to do so.  In
fact, the government instead argued that "the understanding [was]
that the merits of the underlying action are litigated in the
countries pending the restraint."  Id. at 29:6-9.

In fact, in the government's reply, it specifically
contended that "[t]he United States neither participated in the
Afghan proceeding, nor had the opportunity to do so."  United
States' Reply to Claimants' Opp'n to United States' Mot. to
Strike Claimants' Notices of Supplemental Auth. at 5-6.  The
claimants, however, contend that this was a
"misrepresent[ation]."  Claimants' Third. Supp. at 7.

Thus, the United States' ability to be involved and the
extent of the United States' involvement in the Afghanistan
hearing is unresolved, as is the nature of the Afghanistan
hearing.  Accordingly, the claimants' affirmative defense of
international comity cannot be resolved at this stage of the
proceedings.

23-24 (stating that the Afghanistan Attorney General found that
"Mr. Shadman was not guilty of the alleged forgery, deceit, and
bribery in this case"), id. at 23 (stating that the Afghanistan
Attorney General "summoned [Shadman] for a judicial proceeding"
and "submitted the case for a special trial before senior Afghan
prosecutor generals"), and Claimants' Reply at 7 (arguing that
the Attorney General's office issued an Executive Order that
"adopted the judiciary's findings, which exonerated Mr. Shadman
of the government's allegations in its Verified Complaint").
These factual disputes also militate against converting this
motion to dismiss into a motion for summary judgment.  See
Ramirez de Arellano, 745 F.2d at 1538 (agreeing with the district
court that a conversion to summary judgment "is clearly
impermissible under these circumstances" because there were
"essential disputes as to the material facts in the case"); e.g.,
McMillan ex. rel. Estate of McMillan v. College Pro Painters
(U.S.) Ltd., 350 F. Supp. 2d 132, 135 (D. Maine 2004) (granting
plaintiff's motion to strike the motion to dismiss because there
was a "real dispute of fact" between the parties and "[f]urther
factual development beyond the allegations of the Complaint is
required before the ultimate question of law can be properly
resolved").[14]

---

[14] In any event, even if these issues could be resolved at
this stage, as is explained in the Memorandum Opinion and Order
resolving the claimants' motion for a preliminary injunction, the

III. "PROCEEDS" AND SIZE OF FORFEITURE

The claimants contend that the government has applied the wrong definition of proceeds to determine the amount to seize under the seizure warrants.  See Mot. to Dismiss at 43-47.  The claimants argue that the definition of "proceeds" in § 981(a)(2)(B), which applies to "cases involving lawful goods or lawful services," is applicable, not the definition in § 981(a)(2)(A), which applies to "cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes."  Id.

The claimants argue that, like insider trading, "the transportation/logistics services by HSLSC constitute 'lawful services,'" "performed in an allegedly 'illegal manner' (fraudulently obtained through bribery, kickbacks, and fraudulently inflated prices)," Mot. to Dismiss at 45, and thus subsection (B)'s definition of proceeds should apply.

The appropriate definition of "proceeds" in this situation is not clear.[15]  The D.C. Circuit has not provided specific

---

evidence here is insufficient to find that these doctrines apply. The claimants have supplied three unsolicited supplemental authorities with additional evidence supporting their arguments, but as is explained above, supra 6-7 n.2, these matters outside the pleadings cannot be considered in a motion to dismiss.

[15]  As is explained below, courts across the country have applied both provisions to a wire fraud case.  Here, the question in determining the applicable definition is whether an "unlawful activity" in § 981(a)(2)(A) is coterminous with "specified unlawful activity" in § 981(a)(1)(C).  If so, then the definition

guidance for determining whether to apply the definition of proceeds in § 981(a)(2)(A) or § 981(a)(2)(B).[16]  Nor do the cases that the parties cite light a clear or consistent path.  See Mot. to Dismiss 44-45; Reply at 18-19 (citing United States v. Mahaffy, 693 F.3d 113 (2d Cir. 2012) (determining that trading securities is not unlawful, but "any illegality occurred when the defendants bought and sold securities as part of a scheme involving illegal bribery and frontrunning"); United States v. Nacchio, 573 F.3d 1062 (10th Cir. 2009) (finding that insider trading of securities is a case involving "lawful goods that were sold in an illegal manner"); United States v. Kalish, No. 06 Cr. 656(RPP), 2009 WL 130215 (S.D.N.Y. Jan. 13, 2009) (finding that for "an advance fee scheme engaged in by an unlicensed entity and in violation of the mail and wire fraud statutes," proceeds must mean net proceeds after applying the rule of lenity)); U.S. Opp'n

---

of proceeds under § 981(a)(2)(A) applies.  If the terms are not coterminous, the question is whether the acts here are "unlawful activities."  Cf. Mahaffy, 693 F.3d at 137 (stating that "unlawful activities" in § 981(a)(2)(A) applies to "inherently unlawful activities, such as robbery"); Nacchio, 573 F.3d at 1088-89 (same).  If so, then the definition in § 981(a)(2)(A) also applies.  Only after determining that the acts alleged here are not "unlawful activities" would the definition in subparagraph B apply.

[16]   While the D.C. Circuit has not provided guidance to determine the appropriate definition of proceeds in a civil forfeiture action, the D.C. Circuit has adopted the "but-for" test for determining the "nexus between the targeted property and the racketeering activity" for a criminal forfeiture.  See United States v. DeFries, 129 F.3d 1293, 1313 (D.C. Cir. 1997).

at 17 (citing, in part, United States v. Schlesinger, 396 F.

Supp. 2d 267, 278-79 (E.D.N.Y. 2005) (applying the "proceeds"

definition in subsection (A) to a civil forfeiture predicated on

wire and mail fraud), aff'd, 261 Fed. App'x 355 (2008); United

States v. Nicolo, 597 F. Supp. 2d 342 (W.D.N.Y. 2009) (same);

United States v. Maricle, No. 6:09-16-S-DCR, 2010 WL 1253077

(E.D. Ky. Mar. 25, 2010) (criminal forfeiture under § 982)).[17]

Courts have applied both definitions to a wire fraud conspiracy.

Compare Nicolo, 597 F. Supp. 2d at 347 (applying § 981(a)(2)(A)

and finding that "it is irrelevant, for forfeiture purposes,

whether a defendant convicted of fraud in connection with a

kickback scheme actually performed any of the services that he

contracted to perform as a result of the scheme") and United

States v. Yass, 636 F. Supp. 2d 1177, 1183-84 (D. Kan. 2009)

(finding that mail fraud is an "unlawful activity" under

§ 981(a)(2)(A)) with United States v. St. Pierre, 809 F. Supp. 2d

---

[17] The claimants contend that "the government recklessly
cites several irrelevant cases that address the criminal
forfeiture statute or the RICO forfeiture provision in a post-
criminal conviction context, and do not address the precise
statutory definition of 'proceeds' as contained in the
civil forfeiture statute that is applicable here in the
civil forfeiture context." Reply at 19-20. However, in
Schlesinger, though the case originated from a criminal
conviction and the accompanying forfeiture order, the government
was seeking forfeiture under § 981(a)(1)(C), the civil forfeiture
provision, for the mail and wire fraud counts. 396 F. Supp. 2d
at 277-78. Similarly, in Nicolo, the government sought
forfeiture under § 981(a)(1)(C), the civil forfeiture statute.
597 F. Supp. 2d at 347.

- 34 -

538, 543 (E.D. La. 2011) (finding that contracts obtained through
illegal bribes and kickbacks were "legal goods and services
provided in an illegal manner" (internal quotation marks
omitted)).

Even if the applicable definition is found in
§ 981(a)(2)(B), rather than § 981(a)(2)(A), that does not require
dismissal of the case.  The claimants argue that the government
inappropriately seized the "entire gross proceeds . . . instead
of just the net proceeds."  Mot. to Dismiss at 45 (emphasis
omitted).  Contrary to the claimants' argument, the government's
seizure of the gross proceeds is not "inconsistent with its pled
facts," id., because under § 981(a)(2)(B), the government is
entitled to forfeit "the amount of money acquired through the
illegal transactions resulting in the forfeiture."  18 U.S.C.
§ 981(a)(2)(B).  Here, that amount includes any of the "money
acquired through" the alleged scheme.  While this can be offset
by "the direct costs incurred in providing the goods or
services," "the burden of proof with respect to the issue of
direct costs" rests with the claimants.  Id.  If the claimant
fails to prove direct costs,[18] the government can forfeit the

---

[18]  The claimants provide salary, escort, and rental truck
payments, as well as the equipment cost as exhibits to their
motion to dismiss, presumably to prove their direct costs.  As is
explained above, these matters outside the pleading are not
appropriately considered in a motion to dismiss, and the fact
that the claimants may be able to deduct direct costs from an
eventual forfeiture order, if one is deemed appropriate, does not

entire amount claimed here.  <u>See, e.g.</u>, <u>United States v.
Gregoire</u>, 638 F.3d 962, 972 (8th Cir. 2011) (finding that the
"gross revenue" from the sales could be forfeited, and, because
the defendant did not introduce evidence of direct costs, the
full amount was in fact forfeited); <u>United States v. Blechman</u>,
No. 08-40008-JAR, 2010 WL 235035, at *3 (D. Kan. Jan. 8, 2010)
(finding that, because the defendant did not meet his burden to
show direct costs, "no deduction is made from the gross
forfeiture amount awarded").  Accordingly, even if subparagraph
(B) is the applicable definition of proceeds, that does not
militate in favor of granting the motion to dismiss because the
government has provided sufficient evidence that the defendant
assets are subject to forfeiture as the proceeds of a wire fraud
conspiracy.  None of the claimants' cases addressed the
applicable definition of "proceeds" at the motion to dismiss
stage, or without a preexisting forfeiture order.  It would be
premature to determine the appropriate amount of the forfeiture
at this stage because a forfeiture order has not yet been
entered.  Similarly, it would be premature to adjudicate the
claimants' excessive fines argument before entering a forfeiture
order.  Mot. to Dismiss at 46 (arguing that "this forfeiture is
'grossly disproportionate to the offense' and is a clear
violation of the Excessive Fines Clause of the Eighth Amendment

---

mandate dismissal of the complaint under Rule 12(b)(6).

to the U.S. Constitution"); see United States v. $633,021.67 in U.S. Currency, 842 F. Supp. 528, 535 (N.D. Ga. 1993) ("Before evaluating whether the size of a forfeiture is excessive, a court must first determine how much of the seized property will actually be forfeited.  Because it would be premature for this Court to make such a determination at this stage in the proceedings, it is not yet possible to evaluate the allegedly excessive nature of any yet-to-occur forfeiture.").[19]

## CONCLUSION AND ORDER

Because the claimants have failed to demonstrate that the government failed to state a claim upon which relief could be granted and because international comity and the act of state doctrine are more appropriately resolved through a motion for summary judgment, the complaint will not be dismissed. Accordingly, it is hereby

ORDERED that the claimants' motion to dismiss [28] be, and hereby is, DENIED.  It is further

ORDERED that the United States' motion [72] to strike the claimants' notices of supplemental authority [66, 69] be, and hereby is, DENIED as moot.  It is further

---

[19] The claimants also raise collateral estoppel for the first time in their first notice of supplemental authority.  See Claimants' First Supp. at 8.  As with the claimants' other newly raised arguments, because it was raised for the first time in the supplement, it will not be considered.  See Taitz, 754 F. Supp. at 61-62.

- 37 -

ORDERED that the claimants' motion [78] motion for leave to file a surreply to the United States' motion to strike the notices of supplemental authority be, and hereby is, DENIED as moot.

SIGNED this 4th day of March, 2014.


_____/s/_____
RICHARD W. ROBERTS
Chief Judge