## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 12-1905-RDM-AK** |
| ) | |
| **SUM OF $70,990,605 et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## MEMORANDUM OPINION

Before the Court is the government's motion to strike the claim of Afghanistan

International Bank ("AIB") for lack of statutory standing.  Dkt. 93.  For the reasons stated below,

the motion is **GRANTED** in part and **DENIED** in part.

## I.  BACKGROUND

This action arises from a civil forfeiture complaint against $77,920,605 that the

government alleges was fraudulently obtained as payment for transportation of United States

military supplies in Afghanistan by Hikmatullah Shadman, his associates, and companies he

controls.  Dkt. 3 ¶ 2.  To date, the United States has seized of $57,279,428.03 from accounts

maintained by three foreign banks at financial institutions in the United States.  Dkt. 225 ¶ 49.  It

has seized these funds pursuant to its authority under 18 U.S.C. § 981(k), which allows the

government to seize funds held in U.S bank accounts for the benefit of foreign banks when the

foreign banks themselves hold funds that are subject to forfeiture.  *See* 18 U.S.C. § 981(k)(1)(A).

As discussed in greater detail below, allowing the government to seize funds held in these

"interbank" accounts closed a loophole in the asset forfeiture laws and significantly expanded the ability of United States authorities to pursue forfeiture of assets held abroad.

According to the third amended complaint ("Complaint"), Mr. Shadman and others "falsified contracting documents, stole fuel from the United States, made bribe and gratuity payments [and] fraudulently inflated prices" in the course of a wire fraud conspiracy to obtain favorable logistics contracts in Afghanistan, and were paid at least $77,920,605 by the United States under those contracts.  Dkt. 225 ¶ 20.  Mr. Shadman, other individuals, and companies he controls[1] (the "Shadman Claimants") have filed a claim against the seized funds.  Dkt. 24.

Afghanistan International Bank ("AIB") is one of the foreign banks whose funds in United States interbank accounts have been seized.  The Complaint includes allegations regarding three accounts held by the Shadman Claimants at AIB.  The first—account number ██████ 7810 (the "7810 Account")—was the account into which money the Shadman Claimants earned pursuant to logistics contracts was deposited.  Dkt. 225 ¶¶ 44, 46.  According to the government, "at least $77,920,605" was deposited into this account "[d]uring the alleged conspiracy period."  *Id.* ¶ 43.  AIB does not, at least at this stage, challenge the government's characterization of the funds deposited in the 7810 Account as criminal proceeds.

The second account—number ██████ 8613 (the "8613 Account")—received transfers of $4,000,000 and $2,930,000 from the 7180 Account in June and July 2011.  Dkt. 225 ¶¶ 47-48.  As with the 7810 Account, for present purposes AIB does not challenge the characterization of these funds as criminal proceeds.

---

[1]  Hikmat Shadman Logistics Services Co., Hekmat Shadman General Trading, LLC, Faizy Elham Brothers, Ltd., Everest Faizy Logistics Services, Hikmatullah Shadman, Najibullah, and Rohullah.  *See* Dkt. 163 at 1.

The third account—number ████████5115 (the "5115 Account")—had, in early 2013, a balance of at least $10,000,000.  *See* Dkt. 244 ¶ 83.  On April 1, 2013, $10,000,000 was transferred from the 5115 Account to an account held by the Shadman Claimants at Bank Alfalah in Pakistan.  *Id.*  On May 8, 2013, $5,000,000 was transferred back from the Bank Alfalah account into the 5115 Account.  *Id.* ¶ 84.  The government has not presented evidence that any of the money in the 5115 Account prior to April 1, 2013, or any of the money transferred into the 5115 Account on May 8, 2013, was the proceeds of criminal activity.  Nor has the United States alleged any facts purporting to trace the source of that money.  The Complaint says nothing about the source of the funds held in the 5115 Account prior to April 1, 2013, and it contains no allegations suggesting that funds from other sources were commingled with the funds withdrawn from the 5115 Account in the recipient account at Bank Alfalah.  Nonetheless, the government does allege conclusorily that "there was probable cause to believe that as of May 8, 2013 . . . [a]t least $5 million of the criminal proceeds [derived from the criminal activity alleged in the third amended complaint] was located in [the 5115 Account]."  Dkt. 225 ¶ 85.

Based on these allegations, the United States seized $1.5 million from AIB's interbank account at Standard Chartered Bank in the United States on or about May 10, 2013 and $8.6 million from the same account on or about May 24, 2013.  *Id.* ¶¶ 69-70, 86.  The United States subsequently released $5,769,712.97 of the $10.1 million seized from AIB based on the fact that AIB had $4,330,287.03 on deposit in accounts controlled by or for the benefit of Mr. Shadman on May 24, 2013.  Dkt. 225 ¶ 87.  Thus, the United States has seized from AIB's interbank account at Standard Chartered Bank an amount equal to the total amount AIB held on deposit from the Shadman claimants on May 24, 2013.

According to AIB, following the seizure of the funds held at AIB's interbank account in the United States, the Afghan Attorney General's office and the Afghan central bank directed AIB to release all of the funds it held in Mr. Shadman's accounts in Afghanistan to Mr. Shadman, notwithstanding the fact that AIB's funds in its interbank account had been seized. Dkt. 41 ¶ 13.  Thus, AIB asserts, it is unable to debit the Shadman claimants' accounts based on the seizure in this case.  AIB contends that under these circumstances it "has an ownership and possessory interest in the remaining seized defendant property of $4,330,287.03," and on this ground filed a claim in this action.  *Id.*

On July 2, 2014, the United States filed a motion to strike AIB's claim.  Dkt. 93.  It argues that 18 U.S.C. § 981(k) authorizes only "owners" of seized funds to bring claims and that the foreign financial institution whose funds are seized pursuant to that section is explicitly excluded from the statutory definition of "owner."  *Id.* at 8-12.  The United States contends that AIB thus lacks statutory standing to bring its claim and that the claim must therefore be stricken pursuant to Supplemental Rule G(8)(c)(i)(B) of the Federal Rules of Civil Procedure.  *Id.*

AIB argues in response that it need not demonstrate ownership in order to establish statutory standing; that, in any event, the United States has failed to trace the funds on deposit at AIB on which its seizure of funds from AIB's interbank is based to any criminal activity; and that prohibiting AIB from asserting a claim under circumstances in which AIB is unable to set off its losses by debiting the Shadman claimants' accounts in Afghanistan would violate due process.  AIB also raises an admittedly premature argument that forfeiture in this case would violate the Excessive Fines Clause of the Eighth Amendment.

## II.  DISCUSSION

**A.  The Statutory Scheme**

This case raises an issue not previously addressed in this Circuit relating to the interpretation and validity of 18 U.S.C. § 981(k), which was enacted as an amendment to § 981 by the USA PATRIOT Act, Pub. L. 107-56 (2001).  Many foreign banks maintain "interbank" or "correspondence" accounts at banks in the United States in order to facilitate international funds transfers.  If a depositor in Country A wishes to transfer funds to a recipient in Country B, his local bank can receive his funds and instruct the U.S. bank at which it holds an interbank account to transfer an equivalent amount of money to the U.S. interbank account of a bank in Country B. The bank in Country B is alerted to the transfer and correspondingly credits the ultimate recipient's local account.  This system allows transfers to take place between banks in separate countries that have no direct relationship with one another and eliminates any immediate need for currency to move across national borders.

In theory, the interbank account system also exposes funds held by suspected criminals abroad to seizure in the United States: if criminal proceeds are deposited in a foreign bank and that bank holds an interbank account in the United States, seizing funds from the interbank account seems functionally equivalent to seizing funds directly from the suspected criminal's foreign account.  Until the enactment of § 981(k), however, this rarely worked in practice.  *See* 147 Cong. Rec. 510547-01.  Foreign banks whose funds were seized from interbank accounts were the legal owners of those funds and, as such, were able to file claims to recover them.  *Id.* Unless the foreign banks were actually implicated in the wrongdoing on which the seizure was predicated—which was unusual—they could successfully establish that they were "innocent owners" under the forfeiture laws and reclaim the funds.  *Id.*  This meant that suspected criminals

5

abroad could take advantage of the United States financial system, by depositing their funds in banks that held interbank accounts, without exposing their assets to the risk of forfeiture in the United States.

Section 981(k) addresses this problem.  It provides that forfeitable funds deposited with a foreign financial institution that maintains a U.S. interbank account "shall be deemed to have been deposited into the interbank account in the United States."  18 U.S.C. § 981(k)(1)(A).  It therefore authorizes seizure of funds from the U.S. interbank account "up to the value of the funds deposited into the account at the foreign financial institution."  *Id.*  It also imposes a new limitation on claims against seized property.  Only the "owner of the funds deposited into the account at the foreign financial institution . . . may contest the forfeiture"—and, subject to two exceptions, the statute's definition of "owner" explicitly excludes "the foreign financial institution."  *Id.* § 918(k)(3), (k)(4)(B)(i)(II).  Under the first exception, a "foreign financial institution . . . may be considered an 'owner' of the funds" where "the basis for the forfeiture action is wrongdoing committed by the foreign financial institution."  *Id.* § 981(k)(4)(B)(ii).  In addition—and importantly for purposes of this case—a "foreign financial institution" is considered an "owner," and is thus able to bring a claim, "to the extent" it "had discharged all or part of its obligation to the prior owner of the funds" prior to the date of the seizure.  *Id.* § 981(4)(B)(ii)(II).  The foreign financial institution bears the burden of establishing ownership under this second exception by a preponderance of the evidence.  *Id.*

The effect of § 981(k) in a typical case is straightforward.  After funds are seized from an interbank account, the foreign depositor may contest the seizure.  If the foreign depositor successfully establishes a defense to forfeiture, the funds are returned to the interbank account.  If, however, the foreign depositor is unsuccessful, the funds are forfeited and the foreign bank

will typically be able to set off the loss from its interbank account by debiting the foreign

depositor's account abroad.  The statute also contemplates, however, that a foreign bank may be

unable to recoup its losses from the foreign depositor's account due to a "conflict of law

between" the foreign jurisdiction and the United States.  *Id.* § 981(k)(1)(B).  Under that

circumstance, the Attorney General "may suspend or terminate the forfeiture" if doing so "would

be in the interest of justice and would not harm the national interests of the United States."  *Id.*

Beyond this authority conferred on the Attorney General, however, the statute does not create

any recourse for a foreign bank that is unable to recover against its depositor after the United

States seizes its funds from its interbank account.

**B.  Ownership as a Requirement for Statutory Standing**

AIB argues that the government's motion must be denied because § 981(k) does not

make ownership of funds seized from an interbank account a requirement for statutory standing.

Under Supplemental Rule G, "the government may move to strike a claim or answer . . . because

the claimant lacks standing."  Fed. R. Civ. P. Supp. R. G(8)(c)(i).  The parties agree that a

claimant in a forfeiture case must demonstrate statutory standing.  *See* Dkt. 93 at 5; Dkt. 181 at

16.

According to the government, § 981(k) requires that any claimant meet the definition of

an "owner" under that section, and, if AIB cannot do so, AIB lacks statutory standing.  This

argument is well supported by both the language and purpose of the statute.  Section 981(k)(3)

states that "[i]f a forfeiture action is instituted against funds restrained, seized, or arrested under

[§ 981(k)], the owner of the funds deposited into the account at the foreign financial institution

. . . may contest the forfeiture by filing a claim under [18 U.S.C.] section 983."  18 U.S.C.

§ 981(k)(3).  Under straightforward application of the *expressio unius* canon, this language

implies that a person who is not an "owner of the funds deposited into the account at the foreign financial institution" may not "contest the forfeiture by filing a claim" under § 983. *See Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 644 (D.C. Cir. 2000) (unless "there are other reasonable explanations for an omission in a statute," "mention of one thing implies the exclusion of another thing") (quotation marks omitted). Here, the only reasonable interpretation of the ownership requirement in § 981(k) is to preclude claims brought by persons other than owners as defined in that section. If non-owners—and specifically foreign banks whose funds have been seized from interbank accounts—could still bring claims, § 981(k) would not achieve its intended purpose. Foreign banks would bring claims pursuant to § 983 and successfully assert the innocent owner defense under § 983(d), which is not affected by the definition of "owner" in § 981(k). *See* 18 U.S.C. § 981(k)(4) (definitions in § 981(k) apply only "[f]or purposes of this subsection"). Section 981(k) does not operate by precluding foreign banks from establishing the innocent owner defense on the merits; it operates by precluding them from filing claims in the first place. And the legislative history of § 981(k) unequivocally confirms this plain reading of the statute. *See* H.R. Rep. 107-250 at 58 (2001) ("only the initial depositor, and not the intermediary bank, would have standing to contest" a forfeiture action against funds held in the intermediary bank's interbank account).

AIB's arguments to the contrary conflate the ownership requirement in § 981(k) and the ownership element of the innocent owner defense under § 983(d). It may be true that, in most forfeiture cases, ownership is simply an element of an affirmative defense and not a requirement for standing.[2] *See United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 959 F. Supp.

---

[2]  AIB has cited a number of cases holding that ownership is not required to establish Article III standing in a forfeiture action. *See Via Mat Int'l S. Am. Ltd. v. United States*, 446 F.3d 1258, 1263 (11th Cir. 2006) (considering Article III standing and holding that claimant need not satisfy

2d 81, 91 (D.D.C. 2013) (under § 983, "[a]ny person claiming an interest in the seized property may file a claim") (quotation marks and alterations omitted).  But § 981(k) imposes an additional requirement on persons seeking to file claims that is not present in other contexts, and AIB must demonstrate that it can satisfy that requirement before it is allowed to pursue its claim here.

AIB also argues that statutory standing in forfeiture cases requires only that the claimant "has complied with the Supplemental [Rules] for Admiralty or Maritime Claims & Asset Forfeiture Actions."  Dkt. 181 at 17.  In some statutory contexts that may be enough.  But none of the cases AIB cites for the proposition that compliance with the Supplemental Rules is sufficient to establish statutory standing involved a forfeiture action under § 981(k).  *See United States v. Technodyne LLC*, 753 F.3d 368, 373 (forfeiture under 18 U.S.C. § 981(a) and the Fugitive Disentitlement Statute, 28 U.S.C. § 2466); *United States v. 8 Gilcrease Lane, Quincy, Fla. 32351*, 638 F.3d 297, 298 (D.C. Cir. 2011) (forfeiture under § 981(a)); *In re Am. River Transp. Co.*, 728 F.3d 839, 841 (8th Cir. 2013) (considering standing to bring claim in admiralty proceeding under the Limitation of Shipowners' Liability Act, 46 U.S.C. §§ 30501 *et seq.*); *United States v. $22,050.00 U.S. Currency*, 595 F.3d 318, 320 (6th Cir. 2010) (currency seized from office during execution of a search warrant).  Statutory standing is, after all, statutory— whether it is present will depend on the particular conditions the relevant statute imposes for filing a claim.  Here, because § 981(k) bars persons or entities that are not "owner[s]" from filing

---

statutory standing requirements); *United States v. Real Prop. Located at 5208 Los Franciscos Way, L.A., Cal.*, 385 F.3d 1187, 1192 (9th Cir. 2004) (describing requirements for Article III standing in forfeiture cases); *United States v. Premises Known as 7725 Unity Ave. N., Brooklyn Park, Minn.*, 294 F.3d 954, 957 (8th Cir. 2002) (same) *United States v. One-Sixth Share Of James J. Bulger In All Present And Future Proceeds Of Mass Millions Lottery Ticket No. M246233*, 326 F.3d 36, 41 (1st Cir. 2003) ("any colorable claim on the defendant property suffices" to establish Article III standing).  The parties do not contest, however, that AIB's claim satisfies the requirements of Article III standing.

claims, a prospective claimant must show that it is an "owner"—as that term is defined in § 981(k)(4)(B)—in order to establish statutory standing.

Finally, AIB is incorrect that reading § 981(k)'s ownership requirement as a requirement of standing would render "the ownership prong of the innocent owner defense . . . superfluous." Dkt. 181 at 19 n.8.  The substantive criteria for "ownership" under § 981(k) and § 983(d) are different—this is why foreign banks could successfully assert the innocent owner defense before they were denied standing to do so by § 981(k).  And even if they were not, § 983 applies to many forfeitures other than those against funds held in interbank accounts under § 981(k)—in all of these cases, the "ownership" prong of the innocent owner defense persists with the same effect it had before the enactment of § 981(k).

Because only "owners" may file claims under § 981(k), being an "owner" is a requirement for statutory standing in a forfeiture action under that subsection.  If AIB does not fall within the statutory definition of an "owner," its claim is barred by § 981(k).

## C.  Whether AIB Is an Owner under Section 981(k)

AIB argues that, even if § 981(k) requires ownership as an element of statutory standing, it has met that requirement because it is an owner of all but $147,938.59 of the more than $4 million seized from its interbank account.  AIB notes that the United States has identified two AIB accounts controlled by Mr. Shadman in Afghanistan into which alleged proceeds of criminal activity were deposited—the 7810 Account and the 8613 Account.  AIB has presented evidence that on May 10, 2013 (when the United States first seized funds from AIB's interbank account), the 7810 Account held $58,249.49 and the 8613 Account held $89,689.10, for a total of

$147,938.59.[3]  Dkt. 180-2 at 116, 146.  The United States does not contest the accuracy of this evidence.

The parties disagree, however, about the significance of the balances in the 7810 and 8613 Accounts at the time of the seizure.  AIB reasons that the balances show it "had discharged . . . part of its obligation to the prior owner of the funds" by the date of the seizure and that AIB must therefore "be deemed the owner of the funds to the extent of such discharged obligation." 18 U.S.C. § 981(k)(4)(B)(ii)(II).  If the Shadman claimants deposited the proceeds of allegedly illegal activity into those two accounts, and those two accounts held relatively little money on the date of the seizure, the Shadman claimants must have withdrawn the bulk of the forfeitable proceeds before the date of the seizure.

The government takes a different view.  It observes that the *total* amount "on deposit in accounts controlled by or for the benefit of Mr. Shadman" on May 24, 2013, was $4,330,287.03. Dkt. 25 at 9.  The discrepancy is largely, although not entirely, explained by the fact that another Shadman account—the 5115 Account—held $4,055,123.80 on that date.  *Id.*  The government argues that AIB had not "discharged . . . its obligation to the prior owner of the funds" because AIB was still obligated to Mr. Shadman or entities he controls, even though its obligations were

---

[3]  The United States calculated the amount of money it released to AIB after its initial seizures of $10.1 million based on the balances of the Shadman Claimants' accounts at AIB on May 24, 2013, which was the date of the second seizure from AIB's interbank account.  Dkt. 225 ¶ 87. The Court concludes, however, that the appropriate reference date for determining the extent of AIB's obligation to the Shadman Claimants "prior to the restraint" (18 U.S.C. § 918(k)(4)(B)(ii)(II)) is May 10, 2013—the date of the first seizure from AIB's interbank account.  *See* Dkt. 225 ¶ 69.  The balances of the 7810 and 8613 Accounts did not change appreciably between May 10, 2013, and May 24, 2013.  *See* Dkt. 180-2 at 116, 146.

the result of the balances in an account that is separate from those to which the government has, as of now, traced proceeds of allegedly criminal activity.[4]  Dkt. 188 at 4.

The government relies almost exclusively on the First Circuit's decision in *United States v. Union Bank for Savings and Investment (Jordan)*, 487 F.3d 8 (1st Cir. 2007), which is the only precedent either party has identified that bears on this question.  The facts of *Union Bank* are, in relevant part, analogous to those in this case.  There, the United States seized $2.8 million from the interbank account held by Union Bank (Jordan) at the Bank of New York.  *Id.* at 11.  The amount corresponded to the value of 124 cashier's checks that had been deposited into two Union Bank accounts in Jordan, which the government argued were the proceeds of a "telemarketing fraud scheme that victimized American citizens."  *Id.*  At the time the government seized funds from Union Bank's interbank account, one of these accounts had been closed.  *Id.* at 12.  The other still had some money in it, but its balance was less than the amount that was seized.  *Id.*  There was, however, a third account belonging to a participant in the alleged criminal scheme; together, the second and third accounts exceeded the amount of the seizure.  *Id.*

Union Bank argued, among other things, that it was the owner of the seized funds to the extent their amount exceeded the balance of the two accounts into which the cashier's checks had been deposited.  *See id.* at 20.  This is analogous to the argument AIB advances here: according to both banks, a foreign financial institution "discharge[s] its obligation" to the prior

---

[4]  The government does allege in the Complaint that there was "probable cause to believe that as of May 8, 2013 . . . [a]t least $5 million of the criminal proceeds was located in [the 5115 Account]."  Dkt. 225 ¶ 85.  The government does not rely on this allegation, however, to refute AIB's showing that the bank discharged virtually all of the obligation created by the Shadman claimants' deposit of allegedly criminal proceeds.  At this stage, moreover, such a conclusory allegation would not suffice to defeat AIB's showing that it returned virtually all of the money deposited in the 7810 and 8613 Accounts.

owner of allegedly forfeitable funds when the prior owner withdraws those funds from the accounts into which they were deposited, regardless of whether the prior owner maintains additional balances in other accounts.  The First Circuit, however, rejected this view.  Analyzing the language of the exception to the ownership requirement that it relevant here, it concluded that "[t]he obligation at issue in section 981(k) is the bank's 'obligation to the prior owner of the funds,' not the obligation under a specific account or the obligation 'arising' from the deposit of forfeitable funds."  *Id.* (citation omitted).  Thus, according to the court in *Union Bank*, a foreign financial institution cannot demonstrate standing to challenge the seizure of its funds under § 981(k) unless its total obligations—in all accounts—to the "prior owners" of the forfeitable funds are lower than the amount seized.

If the holding in *Union Bank* is correct, AIB loses.  The government has seized only an amount equal to AIB's total obligations to the "prior owners" of the forfeitable funds, so AIB would not "own" any of the seized funds.  On the other hand, if the holding in *Union Bank* is incorrect, AIB has standing to claim the vast majority of funds seized from its account because, at the time of the seizure, relatively little money remained in the two accounts to which the government has traced criminal proceeds.

The First Circuit's analysis in *Union Bank* begins persuasively.  The language of § 981(k)(1)(A) makes clear that once funds are "*deposited* into an account at a foreign financial institution," funds in the corresponding interbank account "up to the value of the funds *deposited* into the account at the foreign financial institution may be . . . seized."  18 U.S.C. § 981(k)(1)(A) (emphasis added).  As the First Circuit concluded, seizure from an interbank account is contingent on the initial "deposit" in the foreign account, "not the continued presence of funds in that account."  *Union Bank*, 487 F.3d at 21.  Thus, from the moment that proceeds of allegedly

criminal activity were deposited into the 7810 and 8613 Accounts, the United States was authorized to seize an equal amount of money from AIB's interbank accounts.  The fact that Mr. Shadman or an associated person or entity may have subsequently withdrawn funds from the accounts that received the proceeds, moreover, had no effect on the government's power to make the initial seizure—if a subsequent withdrawal matters at all, it must be considered in the context of the § 981(k)(4)(B)(ii)(II) exception.

Under that exception, the key inquiry is whether the "foreign financial institution . . . had discharged all or part of its obligation to the prior owner of the funds" "prior to the restraint."  18 U.S.C. § 981(k)(4)(B)(ii)(II).  The First Circuit concluded that the statute speaks in terms of the bank's obligation *to a depositor*, not its obligation *pursuant to the contract creating an account*. If a person opens multiple accounts at a bank, the bank's obligation to that depositor is the sum of the balances in those accounts.  *See Union Bank*, 487 F.2d at 20.  Under that reading, a bank like AIB must "discharge[ ] all or part of its obligations" in all accounts to its depositor in order to become an "owner" for purposes of § 981(k).

The next clause in the § 981(k)(4)(B)(ii)(II), however, casts doubt on an interpretation that severs the "obligation" from the actual criminal proceeds.  If a foreign bank discharges "all or part of its obligations to the prior owner of the funds," the bank "shall be deemed the owner of the funds [seized in the interbank account] to the extent of such discharged obligation."  *Id.*  If the bank's "obligation" refers to the sum of the balances of all accounts held by a particular depositor, then this clause would *prevent* forfeiture in some cases where it seems clearly appropriate.  Imagine, for example, that a foreign depositor uses "clean" money to open an account with $5 million.  The bank's "obligation" is $5 million.  He then opens another account at the same bank, into which he deposits $2 million of money traceable to criminal activity.  The

14

obligation increases to $7 million.  Next, however, he withdraws $3 million from the first

account.  Accepting the First Circuit's broad definition of "obligation," the bank has "discharged

. . . part of its obligation to the prior owner of the funds" and "shall be deemed the owner of the

funds [seized in the interbank account] to the extent of such discharged obligation"—in this

hypothetical, $3 million.  If the government subsequently seizes $2 million (as it is authorized to,

pursuant to § 981(k)(1)), the bank will have statutory standing to contest the entire forfeiture, and

will prevail if it can establish it is an innocent owner of the seized funds.

This is the danger of reading "obligation" to refer to all of a depositor's funds at a foreign

bank, rather than to the criminal proceeds whose deposit gave rise to a 981(k) forfeiture.  If

"obligation" referred to all of a depositor's funds, then "discharge[ ]" of even plainly innocent

funds would confer standing on the foreign bank "to the extent of such discharged obligation."

18 U.S.C. § 981(k)(4)(B)(ii)(II).  It is no answer, moreover, that the government could rely on

accounting techniques such as the lowest intermediate balance rule to avoid this result.  *See*

*United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1159 (2d Cir. 1986), *superseded in*

*part by statute*, 18 U.S.C. § 984, *as recognized in In re 650 Fifth Ave. & Related Props.*, 777 F.

Supp. 2d 529, 571 (S.D.N.Y. 2011).[5]  Those techniques allow courts to "determine[ ] under what

circumstances a 'traceable connection' exists between [criminal activity] and a credit balance of

an active account into which some criminal proceeds were deposited" along with untainted

funds.  *Id.*  Default accounting rules of this type, however, have no application where tainted

money is already segregated in its own account.  That is, where there is no commingling of

---

[5]  The lowest intermediate balance rule, borrowed from the law of trusts, holds that a bank
account contains all criminal proceeds that have been deposited in it "so long as the account
balance never falls below" the sum of the deposits.  *See Banco Cafetero Panama*, 797 F.2d at
1159.

funds, there is no basis for adopting accounting assumptions designed to differentiate otherwise undifferentiated funds.  Indeed, to disregard the fact that distinct funds have been deposited into distinct accounts—and, instead, to focus on the identity of the depositor—risks transforming an *in rem* action into an *in personam* suit.  This is why untainted money held in separate accounts is generally not subject to forfeiture.  *See, e.g.*, *United States v. Bornfield*, 145 F.3d 1123, 1137-38 (10th Cir. 1998) (reversing verdict where jury ordered forfeiture of funds from claimant's "business account, which," unlike his personal account, "had no connection to" the offense at issue).

It is difficult to believe that Congress intended the result in the hypothetical above when it enacted § 981(k) or that, without saying so, it intended to create what is essentially an *in personam* forfeiture action.  To the contrary, the statute repeatedly speaks in terms of deposits "into *an account* at a foreign financial institution," including in the provision authorizing "the owner of the funds deposited into *the account* at the foreign financial institution" to "contest the forfeiture by filing a claim."  18 U.S.C. § 981(k)(1)(A), (k)(3) (emphasis added).  Under the most natural reading of the statute, the foreign financial institution's "obligation" is the obligation created by the deposit of criminal proceeds into an undifferentiated "account" that gave rise to the government's ability to seize funds under § 981(k) in the first place.

The legislative history of the section, moreover, indicates that Congress intended to "make a depositor's funds in a foreign bank's U.S. correspondent account subject to the same civil forfeiture rules that apply to depositors['] funds in other U.S. bank accounts."  147 Cong. Rec. S10547-01 (2001); *see also id.* ("Our bill would . . . plac[e] civil forfeitures of funds in correspondent accounts on the same footing as forfeitures of funds in all other U.S. accounts.").  Under the rules that generally apply to domestic asset forfeitures, "the Government may not

satisfy its tracing burden simply by showing that criminal funds were once deposited into a particular account: it must use accounting principles or circumstantial evidence to show that the particular funds in the account are traceable to criminal activity."  Stefan D. Cassella, *Asset Forfeiture Law in the United States* § 11-4 (2d ed. 2013).  Thus, for example, the Eleventh Circuit in *United States v. $125,938.62*, 537 F.3d 1287, 1293-94 (11th Cir. 2008), held that five certificates of deposit purchased by the claimants were not subject to forfeiture because they were not traceable to criminal proceeds, even though the government had shown that two other certificates of deposit purchased from the same bank were subject to forfeiture.  *See also Bornfield*, 145 F.3d at 1137-38.  The government's interpretation of § 981(k)—and the interpretation embraced by the First Circuit—would reach the opposite result.

Although, read in isolation, the language of the §981(k)(4)(B)(ii)(II) exception does not rule out the First Circuit's interpretation, the statutory purpose of putting interbank accounts on the same footing in forfeiture proceedings as other U.S. bank accounts strongly suggests that the term "obligation" refers only to the foreign bank's obligation pursuant to the contract that created the account into which undifferentiated funds traceable to criminal activity were deposited.

The First Circuit in *Union Bank* gave two additional reasons it found to favor its interpretation.  First, it noted that the "'deeming' language in [§ 981(k)] makes the deposit of forfeitable funds in the foreign account, not the continued presence of funds in that account, the trigger for a forfeiture from the interbank account."  487 F.3d at 20-21.  That is true, but it does not follow that there "would have been no reason to craft such language if Congress had intended to limit forfeitures to the amounts in particular accounts."  *Id.* at 21.  The statute as written creates a rebuttable presumption that illicit funds deposited in a foreign bank remain there.  A foreign bank can assert a claim for the seized funds only when it "establishes[ ] by a

preponderance of the evidence" that it had returned the funds to its depositor at the time of the seizure.  18 U.S.C. § 981(k)(4)(ii)(II).  If Congress had imposed a requirement to prove the contemporaneous presence of criminal proceeds for the seizure itself, the government would have borne the initial burden to establish probable cause that illicit funds remained in a given bank account before the funds could be seized.  Congress, however, structured the statute to lower impediments to a broad initial seizure of funds and to shift to foreign institutions the burden to show that they have returned illicit proceeds to their depositors.  This feature of § 981(k) is hardly unreasonable, and it does nothing to bolster the First Circuit's interpretation of the section.

Second, the First Circuit concluded that language in the House Report "support[s] [its] view that ownership is to be measured in terms of the bank's relationship to a depositor, and not in terms of its relationship to particular accounts."  487 F.3d at 21.  It cites the House Report's statement that "section 981(k) would 'treat the deposit in the correspondent account as a debt owed directly to the depositor, and not as a debt owed to the respondent bank.'"  *Id.* (citing H.R. Rep. 107-250 at 58) (alterations omitted).  But the fact that "no mention is made of the foreign account" in this sentence does not mean that the Committee took a position on either side of the question facing the Court here.  The parties do not disagree that funds held in interbank accounts are treated as "owed directly to the depositor"—the question is what a foreign bank must do to "discharge[ ] its obligation" to its depositor such that it may bring a claim.  18 U.S.C. § 981(k)(4)(B)(ii)(II).  And the court in *Union Bank* itself acknowledged that "[t]here appears to be no legislative history directly addressing the meaning of the term 'obligation'" in § 981(k)(4)(B)(ii)(II).  487 F.3d at 21.  This Court concludes that the most relevant portions of the legislative history are the floor statements indicating that Congress intended to put interbank

and other U.S. deposits on equal footing in forfeiture cases—and that legislative purpose

counsels in favor of AIB's interpretation here. *See* 147 Cong. Rec. S8913-01 (Sen. Levin)

(purpose of § 981(k) to "make a depositor's funds in a foreign bank's U.S. correspondent

accounts subject to the same civil forfeiture rules that apply to depositors' funds in other U.S.

bank accounts"); *id.* ("[t]here is just no reason foreign banks should be shielded from forfeitures

when U.S. banks would not be").

       It is true that this interpretation of the § 981(k)(4)(B)(ii)(II) exception would not in every

case prevent determined money launderers from shielding their funds from forfeiture.  A

criminal could deposit funds in one account, then withdraw the funds and deposit them in a

different account in the same bank.  But this strategy is already available to criminals—they

simply must use a different foreign bank for the second deposit of funds.  And the government

can overcome such efforts at evasion by tracing the criminal proceeds from the first account to

the second account.

       Finally, the government contends that "to the extent that AIB . . . challenges the

government's tracing of the defendant assets," AIB is prematurely arguing the merits of its claim

before it establishes standing to do so.  Dkt. 188 at 5 n.1.  But the Supreme Court has recognized

that "the merits inquiry and the statutory standing inquiry often overlap;" in fact, "depending

upon the asserted basis for lack of statutory standing, they are sometimes identical, so that it

would be exceedingly artificial to draw a distinction between the two." *Steel Co. v. Citizens for

a Better Env't*, 523 U.S. 83, 97 n.2 (1998) (quotation marks and citation omitted).  The hurdle

Congress erected for a foreign bank seeking to establish standing under § 981(k) necessarily

raises the issue of tracing the funds deposited in the foreign bank's account, and AIB should not

be denied the opportunity to clear this hurdle simply because it must raise a "merits issue" to do

so.  The standing inquiry at this stage, moreover, is necessarily more limited than a merits-stage traceability analysis after the parties have a full opportunity for discovery.  As AIB and the government develop the factual record in this matter, they may well uncover evidence that prompts the Court to revisit the issue of statutory standing.  The district court in *Union Bank*, for example, addressed the statutory standing issue on cross-motions for summary judgment after the parties had engaged in discovery.  487 F.3d at 13.  The Court simply concludes that, for present purposes, AIB has made a sufficient showing to remain in court.

For the reasons above, the Court concludes based on the record before it that AIB is an "owner" of the funds it discharged from the two accounts into which the government has traced proceeds of allegedly criminal activity—the 7810 Account and the 8613 Account.[6]  Because AIB has shown that the balances of those accounts at the time the United States first seized funds from its interbank account was $147,938.59, and the government has not disputed that evidentiary showing, AIB has standing to challenge the forfeiture of funds from its interbank account to the extent the forfeiture exceeds that amount.

## D.  AIB's Constitutional Arguments

AIB has also raised arguments under the Due Process Clause of the Fifth Amendment and the Excessive Fines Clause of the Eighth Amendment.  The Excessive Fines Clause argument is admittedly premature, *see* Dkt. 181 at 27-28, and, because AIB will remain involved in this litigation, it will have an opportunity to raise that argument if and when it becomes ripe.  Because the Court concludes that AIB lacks statutory standing to challenge a portion of the

---

[6]  AIB asserts that on May 24, 2013, it held funds in eleven separate bank accounts "believed to be controlled or held for the benefit of Shadman."  Dkt. 181 at 9.  The United States, however has not alleged or shown that any of the accounts other than those addressed in this Opinion held criminal proceeds.

seizure of funds from AIB's interbank account, however, the Court must consider whether that ruling violates AIB's due process rights.

AIB argues that § 981(k) deprives it of property—the funds seized from its interbank account—and that in this case the deprivation is permanent because AIB has "no way to make itself whole." Dkt. 181 at 26.  It then asserts that striking its claim "denies it of any opportunity to be heard on the merits of this deprivation."  *Id.*  AIB's position is that § 981(k) is unconstitutional as applied to a foreign bank that has no recourse against a foreign depositor once its funds are seized, because that bank will suffer an actual loss if the forfeiture is sustained.

In response, the government first questions whether AIB, as a foreign entity, is "entitled to due process protection."  Dkt. 186 at 6-7 (citing *United States v. All Assets Held in Account No. 80020796*, ___ F. Supp. 3d ___, 2015 WL 1285791, at *7 (D.D.C. 2015)).  That proposition is indeed doubtful in civil forfeiture cases in which the seized property is located abroad.  *See Account No. 80020796*, 2015 WL 1285791, at *6 ("defendant properties are investment portfolios located in the United Kingdom"); *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999) ("[a] foreign entity *without property* or presence in this country has no constitutional rights") (emphasis added).  But the government cites no case holding that a foreign national with funds on deposit in a U.S. bank is not entitled to due process before the government may seize those funds.  Because the property at issue here was money located in U.S. bank accounts, the Court concludes that AIB is entitled to due process protections in this action.  *See* Dkt. 225 ¶ 8 (defendant funds held in New York).

The parties agree that if AIB is entitled to assert a due process argument here, its claim should be evaluated under the framework set out in *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).  Under *Matthews*, the Court must consider three factors:  "[f]irst, the private interest that

will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.*

It is clear that AIB's "private interest" is significant. Money that belongs to AIB has been seized from its interbank account. Under most circumstances, "in order to comport with fifth amendment due process, an individual must be afforded some kind of hearing before being permanently deprived of a property interest." *United W. Bank v. Office of Thrift Supervision*, 793 F. Supp. 2d 357, 364 n. 2 (D.D.C. 2011) (quotation marks omitted) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)). Here, § 981(k) does provide certain process to a foreign bank. First, the foreign bank can attempt to show that it is the "owner" of the seized assets either because the bank's own alleged "wrongdoing" is at issue, 18 U.S.C. § 981(k)(4)(B)(ii)(I), or because it had "discharged all or part of its obligation to the prior owner of the funds" before the interbank assets were seized, *id.* § 981(k)(4)(B)(ii)(II). For due process purposes, moreover, it makes little difference whether these inquiries are framed as jurisdictional or merits issues—in this case, for example, regardless of the label, AIB had access to the Court to show that all or a substantial portion of its obligation to the prior owner were discharged before the interbank assets were seized. Second, where the obligation has not been discharged, the foreign bank will typically have recourse against the prior owner's deposits in the event the corresponding interbank deposits are forfeited.

The Court recognizes that all of this is cold comfort to a bank, like AIB, that discharged a portion of its obligation to the prior owner of the funds *after* the interbank funds were seized

because the government where the bank is located required that it do so.  The United States

argues that, at least on the facts here, AIB might have protected itself from this dilemma by

refusing to accept further deposits from the Shadman Claimants after it was on notice that the

United States sought to forfeit the funds.  Dkt. 188 at 10.  But, even putting that contention aside,

the Court is not convinced that the dilemma AIB faces necessarily gives rise to an inherent due

process problem.  Indeed, Congress recognized that just this type of problem might arise, and it

provided a procedure to address it.  Under § 981(k)(1)(B), "[t]he Attorney General, in

consultation with the Secretary of the Treasury, may suspend or terminate a forfeiture under this

section if the Attorney General determines that a conflict of law exists between the laws of the

jurisdiction in which the foreign institution . . . is located and the laws of the United States with

respect to liabilities arising from the . . .seizure . . . of such funds, and that such suspension or

termination would be in the interest of justice and would not harm the national interests of the

United States."

Here, AIB petitioned the Attorney General to suspend the forfeiture under this provision,

and the Attorney General declined to do so.  Dkt. 169 ¶ 27.  But the fact that AIB was not

successful, or the fact that the Attorney General's determination must be based on both the

"interest of justice" and the "national interest of the United States," does not mean that AIB was

denied a fair opportunity to be heard.  Nor does due process always require access to the courts,

as opposed to consideration by the executive branch.  That is particularly true in a context like

this one, where the "conflict of law" analysis likely implicates issues of foreign policy better left

to the political branches.  *See Haig v. Agee*, 453 U.S. 280, 292 (1981) ("[m]atters intimately

related to foreign policy and national security are rarely proper subjects for judicial

intervention"); *cf. Lin v. United States*, 561 F.3d 502, 507 (D.C. Cir. 2009) ("[d]ecision-making

in the areas of foreign policy and national security is textually committed [by the Constitution] to the political branches") (citation and quotation marks omitted).  Here, there can be little doubt that the executive branch is in a far better position than the Court to assess whether responsibility, if any, for AIB's dilemma is properly placed on the U.S. or Afghan government, whether a diplomatic solution is available, and the international consequences of accepting AIB's request for relief.  The fact that courts, at times, leave judgments of this type to the political branches does not, standing alone, equate with a due process violation.  *See, e.g.*, *Lin*, 561 F.3d at 503-04 (dismissing as nonjusticiable lawsuit asserting that the United States exercised *de jure* sovereignty over Taiwan and residents of Taiwan were therefore United States nationals).

That, however, does not end the inquiry.  The next factor is "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards."  *Matthews*, 424 U.S. at 335.  It is undeniable that there is a risk of an erroneous deprivation of a bank's property, even in light of the available procedures described above.[7]  Some banks—potentially including AIB—will find themselves unable to satisfy the "owner" requirement and assert a claim, unable to recover against their foreign depositors, and unable to convince the Attorney General to suspend the forfeiture.  To the extent these banks suffer actual losses and have meritorious defenses that they will be

_____

[7] Additionally, the Court notes that the government has moved to strike the Shadman Claimants' claim as to the funds at issue in this motion on the theory that, because the Shadman Claimants have "access to and control over" the funds in their accounts at AIB, they have suffered no concrete injury and do not have Article III standing.  Dkt. 234 at 7.  Although the Court expresses no view on the merits of that motion, it warrants mention that, if the Court were to strike the claims of both AIB and the Shadman Claimants as to these funds, it is possible that there would be no subsequent merits stage at which traceability could be contested because there would be no claimant with standing to raise that argument.  This possibility further contributes to the risk of an erroneous deprivation of property.

prevented from asserting, that deprivation of property will be erroneous.  The precise extent of this risk is not clear, and depends in significant part on the banking and contract laws of foreign nations and how the Attorney General exercises her suspension authority.  It is clear, however, that the risk could be eliminated if banks were given statutory standing to file a claim whenever they established that they were unable to recover the value of seized funds from their initial depositors.

Allowing banks to participate as claimants whenever they show that they have been unable to recover offsetting funds from foreign depositors, however, would frustrate the congressional purpose underlying § 981(k).  Criminals seeking to deposit funds abroad would gravitate toward nations whose laws would prohibit banks from offsetting for seized funds; banks in those jurisdictions might be more willing to accept suspicious deposits, knowing that they no longer had skin in the game; and the government would frequently lack recourse against intrabank accounts used to facilitate foreign transactions.  The net effect would be to reopen the loophole § 981(k) was intended to close.  It is true that the presence of a significant public interest does not, in itself, excuse the government of responsibility to provide due process protections to those whom it deprives of property.  But here, where the government interest is substantial, where the owners of seized property have a number of procedural avenues open to them, and where further procedures that would reduce the risk of erroneous deprivation would severely harm the public interest, the Court cannot conclude that application of § 981(k) violates AIB's due process rights.[8]

---

[8]  The Court does not and need not decide whether adopting the government's interpretation of § 981(k) to bar foreign banks from challenging forfeitures in a broader set of circumstances would affect this due process analysis.

### III. CONCLUSION

For the foregoing reasons, the motion to strike AIB's claim is **GRANTED** in part and

**DENIED** in part.  The motion is **GRANTED** as to the $147,938.59 representing the amount that

remained in the 7810 Account and the 8613 Account on May 10, 2013.  It is **DENIED** as to all

other funds claimed by AIB.  This denial, however, is without prejudice to the government's

right to show that additional funds on deposit at AIB on May 10, 2013, are traceable to criminal

activity.  An appropriate Order accompanies this Memorandum Opinion.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  September 14, 2015