## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>SUM OF $70,990,605, *et al.*,<br><br>*Defendants*. | Civil Action No. 12-1905 (RDM) |

## <u>MEMORANDUM OPINION AND ORDER</u>

This is an *in rem* action seeking forfeiture of assets held at three U.S. banks by or for the benefit of the Afghanistan International Bank ("AIB"), the Emirates NBD Bank ("Emirates Bank"), and Bank Alfalah. Those assets, which the United States has seized, correspond to amounts previously deposited in overseas accounts at those banks in the names of three Afghan companies. The United States alleges that the funds deposited in the overseas accounts were fraudulently obtained as payment for transportation of U.S. military supplies in Afghanistan by Hikmatullah Shadman ("Shadman"), his associates, and companies he controls. Shadman, his two brothers, and four companies that they control (collectively, the "Shadman Claimants") have filed claims asserting their interest in or rights to the defendant assets.[1] Dkt. 24. AIB has also filed a claim asserting its interest in some of these assets. Dkt. 41. Neither Emirates Bank nor Bank Alfalah has filed a claim.

---

[1] The Shadman Claimants include Hikmatullah Shadman; his companies Hikmat Shadman Logistics Services and Hekmat Shadman General Trading, LLC; his brothers Rohullah Faizy and Najibullah Sadullah (who is also known as "Yaser Elham," *see* Dkt. 24 at 5); and their companies, Everest Faizy Logistics Services and Faizy Elham Brothers, Ltd. *See* Dkt. 24 at 5, 8, 11.

Four motions are currently before the Court.  First, the United States moves to strike the Shadman Claimants' claims to the defendant assets that correspond to the funds previously deposited at AIB and Bank Alfalah.  Dkt. 234.  Second, it also moves to strike the claims of Shadman's brothers and two companies that they control on the ground that each of these claimants is allegedly a "straw owner" for Shadman and thus lacks any cognizable interest in the funds.  Dkt. 182.  Third, the Shadman Claimants move to dismiss the action and for release of the seized assets, arguing that a bilateral agreement between the United Sates and the Islamic Republic of Afghanistan commits resolution of the present dispute exclusively to diplomatic channels.  Dkt. 274.  Finally, the Shadman Claimants move for summary judgment on grounds of international comity and the act of state doctrine.  Dkt. 138.

For the reasons explained below, the Court will **GRANT** the motion of the United States to strike the Shadman Claimants' claims with respect to the defendant funds that correspond to the funds previously deposited at AIB and Bank Alfalah; will **DENY** without prejudice the motion of the United States to strike the remaining claims of Shadman's brothers and their companies; and will **DENY** both of the Shadman Claimants' motions.

## I.  BACKGROUND

**A.     Commencement of the Action and Seizure of Funds in Afghanistan**

The United States commenced this *in rem* civil forfeiture action on November 20, 2012, by filing a verified complaint for forfeiture against $77,920,605 located in two accounts (███████7810 and ███████8613) at AIB in Afghanistan.  Dkt. 3 at 3, ¶ 7.  The '7810 account was held in the name of Hikmat Shadman Logistics Services Company, and the '8613 account was held in the name of Faizy Elham Brothers, Ltd.  *Id.*  According to the United States, the funds held in those accounts were the unlawful proceeds of a scheme to defraud the United

States.  In particular, the United States alleges that it "paid contractors and subcontractors through the North Atlantic Treaty Organization (NATO) to resupply U.S. military forces operating in Afghanistan," Dkt. 193-2 at 5, ¶ 12; that one of these subcontractors was Hikmat Shadman Logistics Services Company, *id.* at 6, ¶ 20, which Shadman owns, *id.* at 8, ¶ 24; and that Shadman and others enriched themselves and Hikmat Shadman Logistics Services Company by "falsif[ying] contracting documents, st[ealing] fuel from the United States, mak[ing] bribe and gratuity payments, fraudulently inflat[ing] prices, and caus[ing] the United States to be invoiced and to make payments of at least $77,920,605 to" the '7810 and '8613 AIB bank accounts for "fraudulent" work requests, *id.* at 6–7, ¶ 20.

On December 10, 2012, this Court issued arrest warrants *in rem* for the assets deposited with AIB in the '7810 and '8613 accounts, *see* Dkt. Entry of Dec. 10, 2012, and those warrants were transmitted to the government of Afghanistan pursuant to a mutual legal assistance request under the United Nations Convention Against Corruption, Dkt. 225 at 18, ¶ 51.  The requests for assistance were received by the government of Afghanistan in late December 2012, and, in mid-January 2013, AIB froze the '7810 and '8613 accounts at the direction of the Office of the Attorney General of Afghanistan.  *Id.* at 18, ¶¶ 52–53; Dkt. 41 at 2, ¶ 3.  By the middle of March 2013, however, the Office of the Attorney General of Afghanistan changed course and instructed AIB to release the frozen funds, Dkt. 138-5 at 2; Dkt. 41 at 2, ¶ 4, and, in April 2013, the Central Bank of Afghanistan "advised AIB that it could not block any corporate or individual account related to Shadman," Dkt. 41 at 2, ¶ 5.  The Afghan Attorney General subsequently informed the United States "that Afghanistan would not comply with the United States' mutual legal assistance request for enforcement of the restraint against the defendant AIB bank accounts."

Dkt. 225 at 19, ¶ 55.  In a letter sent to the U.S. Attorney General months later, the Afghan

Attorney General recounted that, at the request of the United States, he

> arrested Mr. Shadman, froze his bank accounts and submitted the case to senior
> prosecutors.  The assigned delegation [of Afghan prosecutors then] asked for
> supportive evidence to the accusations from the US legal and judicial bodies, but
> the legal and judicial bodies remained unanswered due to lack of binding reasons
> and evidence.  As a result of broad and extensive investigation and review of the
> . . . allegations [against Shadman] and other information related to the case, [the
> Attorney General of Afghanistan] considered the accusations illegal and baseless
> based on the judicial findings of the prosecutors with respect to Mr. Shadman's
> [i]nnocence.  [The prosecutors'] determination was approved by . . . the Attorney
> General Office of the Islamic Republic of Afghanistan.

Dkt. 138-3 at 3.  Based on this "determination," the Afghan Attorney General concluded that the

seizure of Shadman's bank accounts was illegal and ordered that the "accounts" be released.  *Id.*

That determination was, in his view, "final in accordance with the applicable laws of"

Afghanistan and not subject to appeal.  *Id.*

**B.**     **Seizure of Funds in the United States**

Shortly after Afghanistan released the previously frozen accounts, Shadman began to

transfer money out of AIB, including to accounts at Bank Alfalah and Emirates Bank held in the

names of Hikmat Shadman Logistics Services Company, Hekmat Shadman General Trading

LLC, Everest Faizy Logistics Services, and Yaser Elham.  Dkt. 225 at 19–26, ¶¶ 54–87.  In light

of these developments, on May 3, 2013, the United States filed an amended, verified complaint

under seal against certain assets held in U.S. "interbank accounts" on behalf of AIB and the other

foreign banks to which Shadman had transferred the funds previously deposited in the AIB

accounts, and it obtained seizure warrants for the funds held in these U.S. accounts.  *Id.* at 19,

¶ 57.  Then, after the United States learned of additional funds transferred from AIB to Emirates

Bank and Bank Alfalah, it filed a second amended, verified complaint, and obtained warrants for

the seizure of funds held in U.S. interbank accounts on behalf of Emirates Bank and Bank Alfalah. *Id.* at 19–20, ¶ 58.

In order to seize the funds, the United States invoked 18 U.S.C. § 981(k), which provides in relevant part:

> If funds are deposited into an account at a foreign financial institution . . . and that foreign financial institution . . . has an interbank account in the United States with a covered financial institution . . . , the funds shall be deemed to have been deposited into the interbank account in the United States, and any restraining order, seizure warrant, or arrest warrant *in rem* regarding the funds may be served on the covered financial institution, and funds in the interbank account, up to the value of the funds deposited into the account at the foreign financial institution . . . , may be restrained, seized, or arrested.

In general, to take advantage of this procedure, the United States need not "establish that the funds are directly traceable to the funds that were deposited into the foreign financial institution." 18 U.S.C. § 981(k)(2). But, because the funds held in the U.S. interbank account are deemed to be the same funds deposited in the foreign account, the owner of the foreign funds may contest the forfeiture. *Id.* § 981(k)(3). If the foreign financial institution demonstrates that it had discharged its obligation to the foreign depositor *before* the funds were seized, however, the nexus to the foreign depositor dissolves, and the foreign financial institution is instead "deemed" to be the owner of the funds held in the interbank account. *Id.* § 981(k)(4)(B)(ii)(II).

The currently operative third amended complaint[2] names five defendant U.S. interbank accounts:

    (a)    All funds held by or for the benefit of Afghanistan International Bank at Standard Chartered Bank, New York, of an amount up to but not to exceed

---

[2] The Court granted the United States leave to file a third amended verified complaint on August 6, 2015. That complaint differs from the second amended verified complaint in one relevant respect: The second amended verified complaint was directed at an amount not to exceed $10,100,000 held in AIB's U.S. interbank account, Dkt. 15 at 4, ¶ 6(a), while the third amended verified complaint reduced this amount to $4,330,287.03, Dkt. 225 at 3, ¶ 8(a). As the United

$4,330,287.03 of the total sum of any funds held in any account at Afghanistan International Bank controlled by or for the benefit of Hikmatullah Shadman, including, but not limited to, account number ███████7810, in the name of Hikmat Shadman Logistics Services Company, account number █████████8613, in the name of Faizy Elham Brothers, Ltd., and account number █████████5115 in the name of Everest Faizy Logistics Services;

(b)  All funds held by or for the benefit of Emirates NBD Bank at Deutsche Bank Trust Company Americas, of an amount up to, but not to exceed, $45 million of the total sum of any funds transferred on or after November 20, 2012, from Afghanistan International Bank account number ███████7810, in the name of Hikmat Shadman Logistics Services Company to any account at Emirates NBD Bank controlled by or for the benefit of Hikmatullah Shadman, including but not limited to, account number ██████████2002 in the name of Hekmat Shadman General Trading LLC;

(c)  All funds held by or for the benefit of Emirates NBD Bank at Deutsche Bank Trust Company Americas of [an] amount up to, but not to exceed, $4 million of the total sum of any funds transferred on or after November 20, 2012, from Afghanistan International Bank account number ███████7810, in the name of Hikmat Shadman Logistics Services Company to any account at Emirates NBD Bank in the name of Yaser Elham;

(d)  All funds held by or for the benefit of Bank Alfalah at Habib American Bank, of an amount up to, but not to exceed, $2,999,977 of the total sum of any funds transferred on or after November 20, 2012, to Bank Alfalah account number ████0241 in the name of Everest Faizy Logistics Services from Afghanistan International Bank account number ██████████5115 in the name of Everest Faizy Logistics Services; and

(e)  All funds held by or for the benefit of Bank Alfalah at Habib American Bank, of an amount up to, but not to exceed, $949,164 of the total sum of any funds transferred on or after November 20, 2012, from Afghanistan International Bank account number ████████7810, in the name of Hikmat Shadman Logistics Services Company to any account at Bank

---

States has explained, AIB demonstrated that it had only $4,330,287.03 on deposit in the accounts allegedly controlled by Shadman at the time of the most recent seizure, and, accordingly, the United States agreed to release $5,769,712.97 of the funds originally seized in AIB's interbank account. Dkt. 234 at 5 n.3; *see also* Dkt. 26 (Notice of Partial Voluntary Dismissal).

Alfalah controlled by or for the benefit of Hikmatullah Shadman, including but not limited to Bank Alfalah account number ████0238 in the name of Hikmat Shadman Logistics Services.

Dkt. 225 at 3–4, ¶¶ 8(a)–(e).  Pursuant to arrest warrants issued by this Court, the United States

seized all of these funds.  Dkt. 23.

## C.      Responses From the Islamic Republic of Afghanistan

The seizure of the funds held in the U.S. interbank accounts did not, however, end

proceedings in Afghanistan.  Sometime before mid-June 2013, Shadman contacted the President

of Afghanistan, Hamid Karzai, to complain about a host of alleged abuses by the United States.

Dkt. 138-6 at 5.  Of relevance here, Shadman complained that, despite the prior "declar[ation]"

of his "innocen[ce]" by the Afghan Attorney General, the United States had blocked "his bank

accounts inside and outside the country."  *Id.* at 10.  In response, President Karzai convened a

meeting in his capacity as "Chairman of the Legal and Judicial Committee of the Islamic

Republic of Afghanistan" to consider Shadman's claims.  Dkt. 84-1 at 19.  As explained by the

Afghan Attorney General, the Legal and Judicial Committee is "the highest legal and judicial

decision-making body in the country."  *Id.* at 6.  As constituted to consider Shadman's

complaints, the Committee included, among others, President Karzai and Afghanistan's Chief

Justice, Minister of Justice, Attorney General, Acting General Director of the National

Directorate of Security, and Director of the Central Bank.  *Id.* at 19.

On January 8, 2014, "[a]fter every member of the [C]ommittee shared [his] comments,"

the Committee "decided that the bank accounts of Hekmatullah Shadman should be released

*inside the country*" and that Shadman's case "should be assessed by the Supreme Court of the"

Islamic Republic of Afghanistan. *Id.* at 20 (emphasis added).  In addition, the Committee

concluded that, "in cooperation with the Attorney General[']s] Office and the Ministry of Foreign

Affairs, necessary and lawful measures should be adopted and return of the case should be requested for assessment from the court in Washington, DC," *id.*—that is, from this Court. And, finally, the Committee directed that "similar cases"—that is, "legal disputes" between citizens of Afghanistan and "foreign forces"—"should be submitted to the Supreme Court [of Afghanistan] and[,] after assessment and conclusion, the Supreme Court and the" Attorney General and the Minister of Foreign Affairs "should take practical action in light of the applicable laws in the country to resolve such cases." *Id.*

Consistent with the Committee's directive, the Afghan Attorney General wrote to the U.S. Attorney General on February 11, 2014, to request that the United States dismiss the action pending before this Court "because of conflict amongst laws" and that it "releas[e]" the seized funds held in the interbank accounts in the United States. Dkt. 138-3 at 3–5. In response, the U.S. Department of Justice declined to comment on a pending lawsuit. Dkt. 274-1 at 79. And, as contemplated by the Afghan Legal and Judicial Committee, the Supreme Court of Afghanistan subsequently issued a decision addressing aspects of Shadman's case. In particular, Bank Alfalah had brought suit against Shadman and one of his brothers, seeking compensation for the losses incurred by the bank due to the U.S. seizure of the $3,939,141 from Bank Alfalah's interbank account in the United States. Dkt. 212-3 at 4. Shadman and his brother counterclaimed, apparently seeking a "tax" for "lack of proof," *id.*, and "damages caused" to Shadman and his brother by the previous "act of blocking . . . their accounts by [Bank] Alfalah." *Id.* at 21. All agreed that, by this time, Bank Alfalah had released any funds deposited by the Shadman Claimants. The primary commercial court of Kabul ruled in favor of Shadman and his brother on both Bank Alfalah's claim and their counterclaims, *id.*, and the appellate court and then the Supreme Court of Afghanistan affirmed, *id.*; Dkt. 212-5 at 9–10. As a result, the

Afghan courts have conclusively held that Bank Alfalah is not entitled to recover from Shadman or his brother for any losses it has sustained due to the seizure of the funds held in Bank Alfalah's U.S. interbank account, notwithstanding Bank Alfalah's release of the $3,939,141 deposited by the Shadman Claimants, Dkt. 212-1 at 4, and notwithstanding that the sole basis asserted by the United States for seizing the interbank account funds is the alleged wrongdoing by Shadman and his associates.

Finally, the government of Afghanistan has recently informed the United States that, in its view, an agreement between the two nations bars this Court—and any other court—from resolving the pending dispute. The question of jurisdiction over civilian contractors working in support of the U.S. mission in Afghanistan has long been a bone of contention. In 2002, the Interim Administration of Afghanistan and the International Security Assistance Force ("ISAF") entered into a Military Technical Agreement ("MTA"). Dkt. 274-1 at 8–21. Under Annex A of the MTA, "[t]he ISAF and supporting personnel" were "subject to the exclusive jurisdiction of their respective national elements in respect of any criminal or disciplinary offenses . . . committed by them on the territory of Afghanistan." *Id.* at 16. According to the Shadman Claimants' expert, this was understood to mean that U.S. contractors and their employees were subject to the jurisdiction of their country of citizenship. Dkt. 274-1 at 5, ¶ 8 (Anar Aff.). When it came time to negotiate a new agreement, according to this expert, "jurisdiction was a sticking point for Afghanistan," which "perceived" that U.S. forces and their security contractors engaged in "abuses . . . against the population" of Afghanistan "without Afghanistan's consent or involvement." *Id.* at 3, ¶¶ 5–6 (Anar Aff.). The United States, on the other hand, was not prepared to subject its military and civilian employees to Afghan jurisdiction. *Id.* at 3, ¶ 5 (Anar Aff.). As a result, a compromise was struck in the new agreement, which took effect on January

1, 2015.  Under that agreement—the "Security and Defense Cooperation Agreement Between the Islamic Republic of Afghanistan and the United States of America" or the "Bilateral Security Agreement" ("BSA")—the United States retained "the exclusive right to exercise jurisdiction" over "members of the [U.S.] force and [members] of the civilian component." *Id.* at 108 (BSA Article 13.1).  But the parties agreed that Afghanistan would "maintain[] the right to exercise jurisdiction over United States contractors and United States contractor employees." *Id*. at 109 (BSA Article 13.6).

Several months after the BSA took effect, the Afghan Minister of Foreign Affairs wrote to the U.S. Secretary of State once again to raise concerns about "the legal case of Afghan national businessman, Mr. Hikmatullah Shadman."  Dkt. 274-1 at 33.  The letter recounted the "all-inclusive investigations" conducted by Afghanistan's Prosecutor General, the requests that were made to the United States for "evidence and documents in support of" the U.S. allegations against Shadman, the Prosecutor General's decision "to enter a judgment of acquittal and [to] declare [Shadman's] innocence through diplomatic channels," and the various Afghan judicial decisions.  *Id.*  It then asserted that the "actions taken by the US judicial organizations against Mr. Shadman . . . are in clear violation of the" MTA, the BSA, and the Constitution of Afghanistan.  *Id.*

Although the letter itself contained no analysis of the relevant issues, it attached a four-page memorandum arguing that "Shadman and his family's property are currently being pursued in United States [c]ourts in matters over which Afghanistan possesses exclusive jurisdiction" and demanding "immediate dismissal" of the case pending before this Court (as well as of a criminal case pending against Shadman in the Eastern District of North Carolina).  *Id*. at 35–38.  In support of the contention that the present dispute is subject to the "exclusive jurisdiction" of

Afghanistan, the memorandum points to Article 13.6 of the BSA, which, as noted above, affords Afghanistan "the right to exercise jurisdiction over United States contractors and United States contractor employees." *Id.* at 109.  And, in support its contention that any dispute over the scope of that jurisdiction is nonjusticiable, it points to Article 24 of the BSA, which provides that "[a]ny divergence in views or dispute regarding the interpretation or application of [the BSA] shall be resolved through consultations between the Parties and shall not be referred to any national or international court, tribunal, or other similar body, or any third party for settlement." *Id.* at 117.  Based on this reading of the BSA, the memorandum asserts that the United States is precluded from: (1) "[c]ontinuing to hold and failing to release to their respective legal representatives any of the assets or property claimed by . . . Shadman or his family and AIB," including assets previously held by any Afghan bank; (2) "[c]ontinuing to assert U.S. . . . jurisdiction over . . . Shadman or any of the assets or property claimed by him and his family or AIB in U.S. Courts;" (3) "[c]ontinuing to oppose the Shadman Claimants['] Motion for Summary Judgment on grounds of Comity and Act of State filed and pending in the Civil Forfeiture Case;" or (4) "[o]pposing . . . Shadman's and his family's and AIB's claims to the assets or property seized by the U.S. Government and pursued in the civil forfeiture case or otherwise, and attempting to strike their claims." *Id.* at 36–37.

## II.  STANDARDS OF REVIEW

A party must have standing throughout the litigation, *see U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 411 (1980), and must prove standing "with the manner and degree of evidence required at the successive stages of the litigation," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Under Rule G of the Supplemental Rules for Admiralty or Maritime Claims, a motion to strike a claim for lack of standing "may be presented as a motion for

judgment on the pleadings or as a motion to determine after a hearing or by summary judgment whether the claimant can carry the burden of establishing standing by a preponderance of the evidence." Supp. R. G(8)(c)(ii)(B). As the issues have been framed by the parties, the summary judgment standard applies to the United States' motion to strike the Shadman Claimants' claims to the funds held in the AIB and Bank Alfalah U.S. interbank accounts, and the motion for judgment on the pleadings standard applies to the United States' motion to strike the claims of the alleged "straw owners."

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" is the evidence is such that a reasonable fact-finder could return a verdict for the non-moving party, *see Scott v. Harris*, 550 U.S. 372, 380 (2007), and a fact is "material" if it could affect the substantive outcome of the litigation, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To survive a motion for summary judgment, the nonmoving party must designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The nonmoving party's opposition must consist of more than unsupported allegations or denials, and must instead be supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. A verified complaint is treated as an affidavit for purposes of deciding a summary judgment motion. *See Neal v. Kelly*, 963 F.2d 453, 457 (D.C. Cir. 1992). Thus, to prevail on the motions to strike, the Shadman Claimants must present "specific facts, . . . which for purposes of the summary judgment motion will be taken to be true," *Lujan*, 504 U.S. at 561, and which show by a preponderance of the evidence that they have standing to claim the assets at issue.

The standard for resolving a motion for judgment on the pleadings is "virtually identical" to the standard applicable to motions to dismiss for failure to state a claim under Rule 12(b)(6). *Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C. Cir. 1987), *abrogated on other grounds by Hartman v. Moore*, 547 U.S. 250 (2006). The Court will thus "accept as true all of the factual allegations contained in the [claim]," *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 772 F. Supp. 2d 205, 208 (D.D.C. 2011) (alteration in original) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)), construe the claim "liberally in the [claimants'] favor," and "grant [the claimants] the benefit of all inferences that can be derived from the facts alleged," *id.* (alterations in original) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)). But the Court need not accept the claimants' legal conclusions, or draw inferences that are not supported by the facts alleged in the claim. *Id.*

Different standards also apply to the Shadman Claimants' two motions. Their motion to dismiss for lack of jurisdiction based on the bilateral security agreement arises under Federal Rule of Civil Procedure 12(b)(1). "In appropriate cases," the Court may "dispose of a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) on the complaint standing alone." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992). The Court may also, "where necessary, . . . consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.* The Shadman Claimants' motion for summary judgment based on the act of state doctrine and international comity, in contrast, must be evaluated under the summary judgment standard, described above.

## III.  ANALYSIS

Four motions are currently pending before the Court.  The United States has filed two motions to strike pursuant to Rule G(8)(c) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.  The first of these motions (Dkt. 234) seeks to strike all of the Shadman Claimants' claims to the defendant assets seized in the United States from the interbank accounts of AIB and Bank Alfalah for lack of Article III standing.  According to that motion, the Shadman Claimants' lack any cognizable stake in these funds because the government of Afghanistan has compelled AIB and Bank Alfalah to release the corresponding funds held at those banks, and thus the Shadman Claimants already have unfettered access to the funds that they deposited.  The United States' second motion (Dkt. 182) is more limited and merely seeks to strike the claims of Shadman's brothers and two companies—Faizy Elham Brothers, Ltd. and Everest Faizy Logistics Services—on the ground that these claimants are "straw owners" for Shadman such that they, too, lack Article III standing.

The Shadman Claimants, in turn, have filed two motions.  Their first motion (Dkt. 274) asserts that the Court lacks jurisdiction because Afghanistan has asserted exclusive jurisdiction over this matter, thereby giving rise to a dispute with the United States under Article 13.6 of the BSA (addressing Afghan jurisdiction over U.S. contractors) and, more importantly, requiring that the United States and Afghanistan resolve any dispute regarding the scope of their respective jurisdiction through the exclusive mechanism of diplomatic "consultations," as required by Article 24 of the BSA (addressing disputes regarding the interpretation of the BSA).  Their second motion (Dkt. 138) sounds similar themes, but, rather than invoking the BSA or any other international agreement, it asserts that the act of state doctrine and principles of international

comity require this Court to defer to the orders and decisions of the Attorney General of Afghanistan and the Afghan courts.

The Court will consider each of the four pending motions in turn.

## A.    Motion to Strike Claims Relating to AIB and Bank Alfalah

The United States first moves to strike the claims of Shadman Claimants to the funds seized from the U.S. interbank accounts held by AIB and Bank Alfalah.  Those funds correspond to amounts that had been deposited in accounts held by three of the Shadman Claimants at AIB and Bank Alfalah.  According to the United States, the Shadman Claimants lack Article III standing to seek release of the funds seized in these U.S. interbank accounts because they already have unfettered access to and control over the corresponding funds held at AIB and Bank Alfalah.  Dkt. 234 at 7–8.  As a result, even if the Court were to order the release of these defendant funds, the Shadman Claimants would gain nothing; the money would go to AIB and Bank Alfalah, and the order would have no effect, direct or indirect, on any account maintained by or for the benefit of the Shadman Claimants.  For this reason, the United States asserts, the Shadman Claimants have suffered no redressable injury through the seizure of the U.S. interbank funds.

"[T]he requirement that a litigant have standing to invoke the authority of a federal court is," of course, "an essential and unchanging part of the case-or-controversy requirement of Article III."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (internal quotation mark omitted).  The requirement applies as much to intervenors or claimants in civil forfeiture actions as to any other party in federal court.  *See*, *e.g.*, *United States v. Emor*, 785 F.3d 671, 676 (D.C. Cir. 2015).  This means that, as an "irreducible constitutional minimum," the claimant asserting standing must be able to show (1) "an injury in fact" that is both "concrete and particularized"

and "actual or imminent, not conjectural or hypothetical;" (2) "a causal connection between the injury and the conduct complained of;" and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (internal citations and quotation marks omitted).

At this stage of the proceeding, the claimants have the burden of identifying "specific facts" sufficient to establish Article III standing.  The problem for the Shadman Claimants is that the "specific facts" that *they* posit—and that *their* evidence supports—are at odds with the requirements of Article III.  They candidly acknowledge that "[b]oth AIB and Bank Alfalah [have] discharged their obligations to the Shadman Claimants . . . at the direction of Afghanistan."  Dkt. 237 at 4; *see also* Dkt. 181 at 16; Dkt. 212-1 at 3–4.  The evidence, moreover, confirms that the Afghan Attorney General ordered AIB and Bank Alfalah to release the funds that they held on behalf of the Shadman Claimants.  Dkt. 138-5 at 2, 4; Dkt. 212-1 at 2–3 (Zian Aff. ¶ 2).  And it shows that Bank Alfalah has, in fact, "returned" the $3,939,141 at issue to Shadman and his brothers, *id.* at 4 (Zian Aff. ¶ 5), and that, to the extent any funds remain deposited at AIB, those funds are, as a matter of Afghan law, fully available to the Shadman Claimants, *see* Dkt. 41 at 4 (AIB Verified Claim, ¶ 13).

It is also undisputed that, as a matter of Afghan law, neither Bank Afalah nor AIB has any recourse against the Shadman Claimants to recover the amounts seized in the U.S. interbank accounts.  That, in fact, is precisely what Bank Alfalah attempted to do before the Afghan courts, and it lost before the trial court, the appellate court, and the Supreme Court of Afghanistan.  Dkt. 212-3 at 21; Dkt. 212-5 at 9–10.  Similarly, AIB asserts in its verified claim that, under Afghan law, it "does not have the right to 'set-off' or debit Shadman's accounts based on the seizure of the" funds in the U.S. interbank accounts.  Dkt. 41 at 4 (AIB Verified Claim, ¶ 13(d)).

Accordingly, far from carrying their burden of demonstrating that the seizure of the funds held in the U.S. interbank accounts on behalf of AIB and Bank Alfalah has caused them a concrete injury in fact that would "likely" be redressed by a favorable judgment, the Shadman Claimants embrace the conclusion that they already have access to and control over all of the funds that they deposited in the corresponding accounts at AIB and Bank Alfalah.  In short, although a favorable verdict might benefit AIB and Bank Alfalah, it would not redress any actual, concrete injury the Shadman Claimants suffered.

The Shadman Claimants do not dispute any of this, but nonetheless argue that they have a "colorable claim" to the funds seized from these U.S. interbank accounts, Dkt. 237 at 5; that if the Court strikes their claims for lack of standing, "there will be no claimant with standing to ensure the integrity of the forfeiture proceedings," *id.* at 9; that they were injured by the seizure of their funds "prior to the foreign banks' discharges," *id.* at 7; that they are seeking a "set off for the government's unlawful withholding and destruction of company property and failure to pay fully for the contract services performed," *id.* at 7–8; and that they have an interest in "clearing their name," *id.* at 9.  None of this, however, is sufficient to show that the Shadman Claimants have Article III standing to challenge the seizure of the funds held in the U.S. interbank accounts on behalf of AIB and Bank Alfalah.

1.     Section 981(k)

The Shadman Claimants first argue that they have a "colorable claim to the [d]efendant properties" under 18 U.S.C. § 981(k).  *See* Dkt. 237 at 5–7.  That subsection provides that, "if funds are deposited into an account at a foreign financial institution"—here, the Shadman Claimants' deposits at AIB and Bank Alfalah—and if that foreign financial institution "has an interbank account in the United States with a covered financial institution" then "the funds shall

be deemed to have been deposited into the interbank account in the United States." 18 U.S.C. § 981(k)(1)(A). As the Shadman Claimants stress, § 981(k) further provides that the "owner of the funds deposited in the account at the foreign financial institution . . . may contest the forfeiture by filing a claim." *Id.* § 981(k)(3). The term "owner," in turn, is defined to mean "the person who was the owner . . . of the funds that were deposited into the foreign financial institution . . . at the time such funds were deposited," *id.* § 981(k)(4)(B)(i), but may also include the foreign financial institution if the forfeiture action is premised on "wrongdoing committed by the foreign financial institution," or if the foreign financial institution can show that it had "discharged all or part of its obligation to the prior owner of the funds" prior to the seizure of the funds held in the interbank account, *id.* § 981(k)(4)(B)(ii). Based on this, the Shadman Claimants argue that because they owned the funds deposited at AIB and Bank Alfalah "at the time [those] funds were deposited," and because AIB and Bank Alfalah are not charged with any wrongdoing and did not release the relevant deposits "prior to the seizure" of the funds held in the interbank accounts, they are the sole "owners" of the funds under § 981(k), and thus they have Article III standing to challenge the seizure. That argument, however, as explained below, confuses *statutory standing* under § 981(k) with the creation of a property interest sufficient to confer *constitutional standing* under *Lujan* and its progeny.

In a prior opinion in this matter, the Court considered the question of AIB's statutory standing under § 981(k). *See United States v. Sum of $70,990,605*, 128 F. Supp. 3d 350, 354–62 (D.D.C. 2015). As the Court explained there, the interbank system allows foreign banks—and their depositors—to make use of "interbank" or "correspondence" accounts in the United States to facilitate the transfer of funds between jurisdictions. *Id.* at 354–55. Under this system, if a depositor in Country A wants to transfer funds to a recipient in Country B, the foreign

depositor's local bank can instruct the U.S. bank at which it holds an interbank account to transfer the requested amount of money to the U.S. bank in which the bank in Country B maintains an interbank account.  After the bank in Country B is notified of this transfer, it can then transfer a corresponding amount to the recipient's local account in Country B.  *Id.*  This system allows for more efficient transfers of funds between banks located in different countries, but it also, at least in theory, provides the U.S. government with a tool for reaching the proceeds of allegedly criminal acts committed outside the United States by seizing functionally equivalent funds held in the United States.  *Id.*

Prior to the enactment of § 981(k), however, "a major . . . loophole" in the U.S. forfeiture laws prevented law enforcement from making effective use of this tool.  147 Cong. Rec. 19,528 (2001) (Statement of Sen. Levin).  At that time, funds deposited in U.S. interbank accounts were "considered to be the funds of the foreign bank itself," and thus the foreign bank could obtain release of the funds by showing that the bank was a so-called "innocent owner" of the funds.  *Id.* As one Senator explained, that was "a strange reason for letting the foreign depositor who was engaged in wrongdoing escape forfeiture."  *Id.*  Congress, accordingly, enacted § 981(k) to treat "the correspondent account . . . as if it were the foreign bank itself, and the funds in the correspondent account were debts owed to the foreign bank's customers."  H.R. Rep. No. 107-250, pt. 1, at 58 (2001) (committee report on H.R. 3004, later incorporated into the USA PATRIOT Act, H.R. 3162, 107th Cong. (2001) (enacted)).  In this manner and, in particular, by depriving the foreign bank of statutory standing to challenge the seizure of funds unless the foreign bank was itself charged with wrongdoing or had discharged the foreign deposits before the seizure of the interbank funds, Congress was able to close the "innocent owner" loophole.

It is a leap too far, however, to conclude from this history and the language of § 981(k) that Congress intended to confer a property right on foreign depositors, which would permit them to double the value of their foreign deposits—that is, to withdraw the funds deposited at the foreign bank and *also* to obtain the functionally equivalent deposits contained in the correspondent account.  The Shadman Claimants contend that Congress intended just that, as evidenced by the fact that § 981(k) grants a foreign bank standing to file a claim but only if it "discharged all or part of its obligation to the" foreign depositor "*prior* to the . . . seizure" of the interbank accounts funds.  18 U.S.C. § 981(k)(4)(B)(ii)(II) (emphasis added).  But, *after* the interbank seizure, according to the Shadman Claimants, nothing in § 981(k) permits a "change [in] the ownership identify" of the seized assets.  Dkt. 237 at 6.  That is, in fact, what the statute says.  The problem for the Shadman Claimants, however, is that the statutory definition of "owner" is limited to the question of who may file a claim under § 981(k)—that is, it is directed solely at the issue of statutory standing.  It does not purport to create or to transfer any substantive property right.  Congress did not provide, for example, that if the United States were to stipulate to the release of the seized interbank assets that the Shadman Claimants would have a right, under § 981(k), to recover those assets from AIB and Bank Alfalah, notwithstanding the fact that AIB and Bank Alfalah have already discharged their obligations to the Shadman Claimants.  Yet, without such a property interest, they cannot show that they have a redressable claim.[3]

According to the Shadman Claimants, this conclusion leaves a troubling gap because the Court has already held that AIB lacks statutory standing to challenge the seizure of at least

---

[3]  *Cf., e.g.*, *United States v. Craft*, 535 U.S. 274, 278 (2002) ("The federal tax lien statute itself 'creates no property rights but merely attaches consequences, federally defined, to rights created under state law.'") (quoting *United States v. Bess*, 357 U.S. 51, 55 (1958)).

$147,938.59 of the $4,330,287.00 deposited at Standard Chartered Bank. *See Sum of $70,990,605*, 128 F. Supp. 3d at 365. Thus, the Shadman Claimants argue, "[i]f the Court also strikes [their] claim to the same funds for lack of constitutional standing, there will be no claimant with standing to ensure the integrity of the forfeiture proceeding and challenge the traceability of the defendant properties as proceeds of criminal activity at a subsequent merits hearing." Dkt. 237 at 9. But the absence of an alternative claimant does not relieve the Shadman Claimants of the need to show that they can satisfy the dictates of Article III standing. As the Supreme Court has repeatedly emphasized, "[t]he assumption that if [claimants] have no standing to sue, no one would have standing, is not a reason to find standing." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 489 (1982) (quoting *Schlesinger*, 418 U.S. at 227 ); *Clapper v. Amnesty Int'l. USA*, 133 S. Ct. 1138, 1154 (2013) (same). It is far from clear, moreover, that striking the Shadman Claimants' claims to the U.S. interbank accounts held on behalf of AIB and Bank Alfalah will insulate the United States' core allegations of fraud from review. Most notably, the United States has not moved to strike the Shadman Claimants' claims to the funds held for the benefit of Emirates NBD Bank at its interbank account at Deutsche Bank Trust Company Americas.[4] *Compare* Dkt. 24 (Shadman Claimants' verified claim) *with* Dkts. 182, 234 (U.S. motions to strike).

---

[4] In addition, although the Court expresses no view on the merits of such a contention, a bank with Article III standing might plausibly argue that, by releasing the foreign deposits to the Shadman Claimants, the bank became subrogated to their claim. *Cf. United States v. BCCI Holdings (Luxembourg), S.A.*, 48 F.3d 551, 554 (D.C. Cir. 1995) ("A bank liquidator, however, stands in the shoes of the bank it represents and enjoys precisely the same rights and interests."). Under such a scenario, the bank would stand in the shoes of the Shadman Claimants and would thus be unable to assert the type of innocent owner defense that Congress sought to foreclose. But, unlike the Shadman Claimants, it might be able to show that it would directly benefit from successfully challenging the seizure of the funds held in the interbank accounts.

2.      Separate Claims Against the United States

Next, the Shadman Claimants argue that they "suffered actual injury" due to (1) the

earlier seizure of their funds and their inability to invest or utilize these funds during this period

of time, and (2) "the government's unlawful withholding and destruction of company property

and failure to pay fully for the contract for services performed."  Dkt. 237 at 7–8.  They fail to

explain, however, how these asserted injuries have anything to do with whether the funds seized

from the U.S. interbank accounts should be released.  Without addressing whether the Shadman

Claimants have colorable claims against the United States, the Court simply concludes that they

have failed to identify any authority indicating that it is appropriate to assert claims of this type

in an *in rem* forfeiture proceeding or that, in any event, the existence of a counterclaim or set-off

provides a basis to overcome a lack of Article III standing on the principal claim.

3.      Reputational Damage

Finally, the Shadman Claimants assert that they have a "legally colorable interest in

rebutting the government's spurious allegations that their property was traceable to criminal

activity," that interest "does not disappear merely because they may have access to or control the

funds."  Dkt. 237 at 9.  Otherwise, the Shadman claimants say, they would be "block[ed] . . .

from clearing their name with respect to the property at issue."  *Id.*  That argument is wrong on

the facts and on the law.  As a factual matter, as noted above, the United States has not moved to

strike *all* of the Shadman Claimants' claims.  Accordingly, absent some further action by the

Court, the Shadman Claimants will continue to have a cognizable interest in the case—albeit a

reduced one—and will remain free to offer proof that Shadman did not engage in the fraudulent

activity alleged in the third amended verified complaint.

But even if the present motion were to dispose of the Shadman Claimants' entire stake in the case, their argument would still fail as a matter of law.  D.C. Circuit case law "makes clear that where reputational injury is the lingering effect of an otherwise moot aspect of a lawsuit, no meaningful relief is possible and that injury cannot satisfy the requirements of Article III" standing to challenge that action.  *Foretich v. United States*, 351 F.3d 1198, 1212 (D.C. Cir. 2003); *see also Anderson v. Carter*, 802 F.3d 4, 10 (D.C. Cir. 2015); *McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders*, 264 F.3d 52, 57 (D.C. Cir. 2001); *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1019 (D.C. Cir. 1991).  It makes no difference, moreover, that the pending motion is framed in terms of standing, as opposed to mootness; both doctrines require the same personal stake in a claim and simply differ in whether that assessment is made at the outset or during the course of the litigation.  *See, e.g., Geraghty*, 445 U.S. at 397. Applying the *Foretich* rule here, it is evident that the Shadman Claimants' asserted reputational injury is insufficient to support their standing to seek release of the U.S. interbank funds held on behalf of AIB and Bank Alfalah.  That asserted reputational injury is, at best, a "secondary effect" of the action the Shadman Claimants seek to challenge, and they have filed to identify any "'tangible, concrete effect'" of the that action that is "susceptible to judicial correction." *McBryde*, 264 F.3d at 57 (quoting *Penthouse Int'l.*, 939 F.2d at 1019).

Accordingly, the Court will grant the motion of the United States to strike the Shadman Claimants' claims to the funds held in the U.S. interbank accounts on behalf of AIB and Bank Alfalah for lack of Article III standing.

## B.     Motion to Strike Claims of Alleged Straw Owners

The United States also moves to strike the claims of Shadman's brothers—Rohullah Faizy and Najibullah Sadullah ("Najibullah")—and two companies—Faizy Elham Brothers, Ltd.

and Everest Faizy Logistics Services—on the ground that they are merely "straw owners" for
Shadman. Dkt. 182.  The scope of this motion is narrowed somewhat by the Court's decision
striking the Shadman Claimants' claims to the funds held in the U.S. interbank accounts on
behalf of AIB and Bank Alfalah.  That decision leaves only two U.S. interbank accounts, both
held for the benefit of Emirates NBD Bank at Deutsche Bank Trust Company Americas.  Dkt.
225 at 3–4, ¶ 8(b), (c).  The first corresponds to those Emirates NBD Bank accounts "controlled
by or for the benefit of Hikmatullah Shadman, including but not limited to, account number
███████████████████2002 in the name of Hekmat Shadman General Trading LLC."  *Id.* at 3,
¶ 8(b).  As to that account, the Shadman Claimants have submitted a verified claim attesting that
Shadman is the beneficial owner of the funds, Dkt. 24 at 11, 12, ¶¶ 21, 24.  Because the United
States' "straw owner" motion does not include Shadman, Hikmat Shadman Logistices Services
Company, or Hekmat Shadman General Trading LLC, this interbank account is not at issue.

As a result, all that remains for purposes of the "straw owner" argument is the U.S.
interbank account at Deutsche Bank Trust Company Americas that corresponds to "any account
at Emirates NBD Bank in the name of Yaser Elham."  Dkt. 225 at 4, ¶ 8(c).  The Shadman
Claimants assert that Yaser Elham is also known as Najibullah, Dkt. 24 at 15; Dkt. 34-1 at 12,
and that he is the beneficial owner of the funds in this account, Dkt. 189 at 8.  The United States
does not dispute Elham's identity, but it argues that he is "nothing more than [a] 'straw' owner[]
who took title to property to shield" Shadman and Hikmat Shadman Logistics Services
Company.  Dkt. 182 at 10.  According to the United States, Najibullah has suffered no
redressable injury and thus lacks Article III standing.  *Id.*

Each claimant in a civil forfeiture action must have both statutory and Article III standing
with respect to each asset in which he or she asserts an interest.  *See, e.g.*, *Emor*, 785 F.3d at 676.

Under § 981(k), "the owner of the funds deposited into the account at the foreign financial institution . . . may contest the forfeiture by filing a claim," 18 U.S.C. §981(k)(3), which, in turn, must "identify the specific property being claimed" and "state the claimant's interest in such property," *id* § 983(a)(2)(C).  And, for purposes of Article III, each claimant must have suffered a "concrete and particularized" "injury in fact" that "is fairly traceable to" seizure of the specific property and that will likely "be redressed by a favorable decision."  *United States v. 8 Gilcrease Lane*, 641 F. Supp. 2d 1, 4 (D.D.C. 2009) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000).  The claimant's burden of establishing standing varies, moreover, "with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan*, 504 U.S. at 561.  For present purposes, the United States concedes that its motion to strike Najibullah's claim should be reviewed under the same standard applicable to a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).  Dkt. 182 at 3.  The Court will, accordingly, accept the allegations of the claim as true.  *See Thompson v. District of Columbia*, 530 F.3d 914, 915 (D.C. Cir. 2008).  But, because the motion challenges the Court's jurisdiction, the Court will also consider "undisputed facts evidenced in the record."  *See Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 173 (D.D.C. 2016) (citing *Herbert*, 974 F.2d at 197).

It is not normally difficult for the putative owner of assets subject to forfeiture to establish statutory and constitutional standing.  *See United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 527 (2d Cir. 1999) ("[A]n owner of property seized in a forfeiture action will normally have standing to challenge the forfeiture."); *United States v. Any & All Funds on Deposit in Account Number XXXXX-XXXXXXXX at HSBC Bank Plc, 55 Corp. St., Coventry, U.K., held in the Name of Jittisopa Siriwan, & any Prop. Traceable Thereto*, 87 F. Supp. 3d 163, 167 (D.D.C.

25

2015) ("*Siriwan*").  But that is not always the case.  Courts have recognized that "[p]ossession of mere legal title," without more, "by one who does not exercise dominion and control over the property is insufficient even to establish standing to challenge a forfeiture."  *United States v. One Parcel of Land, Known as Lot 111-B*, 902 F.2d 1443, 1444 (9th Cir. 1990) (quoting *United States v. A Single Family Residence*, 803 F.2d 625, 630 (11th Cir. 1985)).  Where such a straw owner holds title to the property "for somebody else," the straw owner is not, in fact, injured "when the property is taken."  *Cambio Exacto*, 166 F.3d at 527.  The relevant question, then, is not merely whether the claimant's name appears on the title—or on the bank account—but whether he will suffer a "'distinct and palpable injury to himself' . . . that is the direct result of" the forfeiture and that is "likely to be redressed" if the claimant is successful in the litigation.  *Id.* (citations omitted); *see also United States v. 500 Del. St.*, 113 F.3d 310, 312 (2d Cir. 1997).

An assertion by the government that a plaintiff is a straw owner does not require the claimant to "prove his case to establish standing to bring suit."  *United States v. $38,570 U.S. Currency*, 950 F.2d 1108, 1112 (5th Cir. 1992).  Rather, at this stage in the litigation, the claimant need only show that he has "at least a facially colorable interest in the proceedings."  *Id.* (quoting *U.S. v. $321,470 in U.S. Currency*, 874 F.2d 298, 302 (5th Cir. 1989)); *accord, e.g.*, *United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 78 (2d Cir. 2002) (Sotomayor, J.); *Siriwan*, 87 F. Supp. 3d at 166.  Here, the Court concludes that Najibullah has made this minimal showing.

The Shadman Claimants have submitted a verified claim asserting ownership in, among other assets, the funds deposited at Deutsche Bank Trust Company Americas corresponding to the amounts deposits as Emirates NBD Bank "in the name of Yaser Elham," Dkt. 24 at 11, ¶ 18, and they have submitted evidence that Yaser Elham and Najibullah are one and the same.

26

Moreover, although their claim lacks the same allegation of "beneficial owners[hip]" in that particular account that they asserted with respect to other accounts, *see id*. at 12, ¶ 25 (asserting beneficial ownership in accounts held "in the name of Faizy Elham Brothers, Ltd."), that omission is most reasonably attributed to the fact that the account at issue, unlike the others, was assertedly held in Najibullah's own name, and not in the name of a company.  In any event, the verified claim unambiguously asserts that the Shadman Claimants "were owners of the funds at the time those funds were deposited in the foreign banks," *id.* at 8, ¶ 5, and Najibullah is the only person or entity identified with respect to the relevant Emirates NBD Bank account, Dkt. 225 at 4, ¶ 8(c); Dkt. 24 at 11, ¶ 18.

In response, the United States makes a single argument: that the Shadman Claimants have admitted that "Najibullah [is a] straw owner[] for [his] brother" Shadman.  Dkt. 182 at 1.  In support of that contention, the United States points to evidence that, after the United States initiated this action, Shadman transferred funds from the AIB accounts that were under his control to accounts "purportedly controlled by his brothers," Dkt. 182 at 6–7; Dkt. 28 at 33, ¶ 44, and to the Shadman Claimants' characterization of the reason for those transfers contained in a brief filed in the early stages of this litigation, Dkt. 182 at 7.  It is worth quoting the relevant portion of that brief in whole:

> First, the Government asserts that Claimants have "actively thwarted attempts to restrain the Defendant assets" (Doc 31, pp 1-2).  This is a factual mischaracterization.  After the U.S. Government's original seizure of the alleged criminal proceeds from Mr. Shadman and HSLSC in late 2012 and after a full investigation was conducted, the Afghanistan government and a U.S. military tribunal in Afghanistan both found no criminal wrongdoing and completely released the seized monetary funds.  Reasonably relying on this legal exoneration and complete release of funds, Mr. Shadman sought to continue his legitimate business operation; however, because the U.S. Government still possessed the entirety of his business property and refused to return it, Mr. *Shadman transferred the previously seized monetary funds to his brothers' business entities in order to continue business operations and attempt to provide for his family* (Doc 27-1, ¶ 54).  It is these transfers of the previously seized, but freely released monetary funds, that the Government now mischaracterizes as actively thwarting the

> Government restraints. But for the Government's wrongful seizure of HSLSC's entire
> business, such transfers would not have been necessary and would not have occurred.

Dkt. 33 at 7, ¶ 4 (emphasis added).

From this statement, the United States concludes that the Shadman Claimants have

conceded that Shadman "entered into sham transactions to transfer the proceeds of his

contracting fraud to his brothers to prevent the United States from seizing his ill-gotten gains."

Dkt. 182 at 8. The Court is not in a position to decide, based on the current record, whether or

not the transfers were a sham. It is clear, however, that the Shadman Claimants have conceded

no such thing. The first two sentences of the paragraph on which the United States relies, in fact,

assert just the opposite—they say that the Shadman Claimants were not engaged in an effort to

"thwart[] attempts to restrain the [d]efendant assets"—and the remainder of the paragraph merely

asserts that the transfers were made "in order to continue business operations and [to] attempt to

provide for [Shadman's] family." Dkt. 33 at 7, ¶ 4. To be sure, the paragraph does state that,

"[b]ut for the Government's wrongful seizure of [Hikmat Shadman Logistics Service

Company's] entire business, such transfers would not have been necessary," *id.*, but the context

surrounding that statement shows that it was meant simply to refer to the fact that the United

States had "stopped all [Hikmat Shadman Logistic Services Company's] operations when [it]

confiscated all the business's documents and equipment in October 2012," Dkt. 28 at 33, ¶ 44.

In short, the Court cannot conclude from the Shadman Claimants' "concession" that the transfers

were a sham.

For present purposes, the Court merely holds that Najibullah has shown that he has a

"colorable interest" in the defendant assets. Once the record is more fully developed, the United

States will have a further opportunity to argue that Najibullah is a straw owner, and Najibullah

will have an opportunity to argue that he possesses a genuine interest in the funds at issue. At

that later stage of the litigation, the parties should be prepared to address whether Najibullah was ever able to make use of the funds without Shadman's consent, whether he made withdrawals or transfers on his own accord, and whether Shadman has taken any actions evidencing a continuing interest in the funds.  *See, e.g.*, *United States v. $81,000*, 189 F.3d 28, 37 (1st Cir. 1999) (concluding that John Bulger had standing to claim funds deposited by James "Whitey" Bulger in account that Whitey opened in John's name without consulting him, because the bank statements were mailed to John, John made "withdrawals of significant amounts and stored the money in his home," John had physical possession of the checkbook "at almost all times," and John was the one who wrote checks drawn on the account); *Siriwan*, 87 F. Supp. 3d at 166–67 (concluding that the daughter of the former tourism minister of Thailand had standing to contest the forfeiture of bank accounts held in her name, without evidence that she physically possessed the bank statements, checkbook, or other documentation, because she made personal use of the funds in the account).  Absent that more detailed evidence, however, the Court cannot determine whether Najibullah is the real owner of the funds at issue.

The Court, accordingly, will deny without prejudice the United States' motion to strike Najibullah's claim for lack of standing (Dkt. 182).

## C.     Motion to Dismiss/Bilateral Security Agreement

The Shadman Claimants move to dismiss the third amended verified complaint (Dkt. 225) pursuant to Rule 12(b)(1), asserting that Afghanistan "has claimed exclusive jurisdiction over this case and any related cases."  Dkt. 274 at 5.  In support of this motion, they rely on two provisions contained in the Bilateral Security Agreement between Afghanistan and the United States and on a letter from the Afghan Minister of Foreign Affairs to the U.S. Secretary of State. The first of the two relevant provisions in the BSA is Article 13.  Dkt. 274-1 at 108–09.  Entitled

"Status of Personnel," Article 13 addresses the respective jurisdiction of Afghanistan and the

United States over those engaged in or supporting U.S. operations in Afghanistan.  *Id.*  With

respect to members of United States forces and its "civilian component," the United States

retains "the exclusive right to exercise jurisdiction over such persons in respect of any criminal

or civil offenses committed in the territory of Afghanistan."  *Id.* at 108.  But, with respect to

contractors like Shadman and his companies, Article 13 provides:  "Afghanistan maintains the

right to exercise jurisdiction over United States contractors and United States contractor

employees."  *Id.* at 109.  The second relevant provision is Article 24.  *Id.* at 117–18.  That

provision, entitled "Disputes and Implementation," states in relevant part:

> Any divergence in views or dispute regarding the interpretation or application of
> this Agreement shall be resolved through consultations between the Parties and
> shall not be referred to any national or international court, tribunal or other similar
> body, or any third party for settlement.

*Id.* at 117.  Relying on these provisions, the letter from the Afghan Minister of Foreign Affairs,

and the accompanying memorandum, assert that the BSA grants Afghanistan "exclusive

jurisdiction over United States contractors and their employees;" that exclusive jurisdiction over

this case and any related matters, accordingly, "rests with Afghanistan;" that the U.S. is "without

authority" to continue to prosecute this case; and, finally, that Article 24 of the BSA commits

resolution of this jurisdictional dispute to the consultative process and precludes judicial

resolution.  *Id.* at 33–38.

According to the Shadman Claimants, the letter from the Afghan Minister of Foreign

Affairs effectively puts an end to this matter and requires the Court to order the prompt release of

the seized assets.  Dkt. 274.  That letter, in their view, signals an undeniable "divergence in

views" regarding the respective jurisdiction of Afghanistan and the United States over the

present dispute and constitutes a formal invocation of the BSA's dispute resolution clause.  *Id.* at

5–6.  Invocation of the dispute resolution clause, they continue, bars the United States "from asserting [U.S.] jurisdiction over these matters and over this case in any court," leaving resolution of the jurisdictional dispute to "the exclusive method mandated by the BSA"— "diplomatic recourse."  *Id.*  Thus, according to the Shadman Claimants, "this Court must terminate its Orders, place all Parties back to the status quo prior to the case being filed, and dismiss the case."  *Id.* at 6.  They assert that "[n]o other measure will ensure that the United States fully complies with its binding obligations assumed by the Executive Branch when it entered into the BSA," *id.,* and that any further action by the Court in this matter would run afoul of the political question doctrine, *id.* at 11–17.

The Court starts from the premises that the President has the power, at least at times, to make sole executive agreements, and that some, but not all, executive agreements are self-executing.  *See* L. Henkin, *Foreign Affairs and the U.S. Constitution* 219, 226–28 (2d ed. 1996) ("Henkin") ("At least some sole executive agreements, then, can be self-executing and have some status as law of the land."); *see also Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003); *Dames & Moore v. Regan*, 453 U.S. 654, 682–83 (1981).  As Professor Henkin has explained, "[t]he difference between self-executing and non-self-executing treaties"—and, the Court might add, even more so the difference between self-executing and non-self-executing executive agreements—"is commonly misunderstood."  Henkin at 203.  Whether an international agreement "is self-executing or not, it is legally binding on the United States."  *Id.*; *see also United States v. Pink*, 315 U.S. 203, 230 (1942) (certain international agreements "have a similar dignity" to treaties); *United States v. Belmont*, 301 U.S. 324, 330 (1937) ("[A]n international compact . . . is not always a treaty which requires the participation of the Senate."); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 238 (D.C. Cir. 2003) ("Executive agreements are

essentially contracts between nations, and like contracts between individuals, executive

agreements are expected to be honored by the parties.").  But, if the agreement "is not self-

executing, . . . it is not 'a rule for the Court'" to apply, Henkin at 203, and it does not "itself give

rise to domestically enforceable federal law," *Medellín v. Texas*, 552 U.S. 491, 505 n.2 (2008).

Moreover, even when an international agreement is "self-executing in the sense that [it] create[s]

federal law, the background presumption is that '[i]nternational agreements, even directly

benefiting private persons, generally do not create private rights.'"  *Id.* at 506 n.3 (quoting

*Restatement (Third) of Foreign Relations Law of the United States* § 907 cmt. a (1986)).

The United States does not dispute that the BSA is binding on the United States as a

matter of international law.  *See*, *e.g.*, Dkt. 277-1 at 3; Dkt. 277 at 4.  It argues, however, that the

agreement has no bearing on this action for at least three reasons.  First, it argues that the BSA is

not self-executing—that is, it does not create any judicially enforceable rights.  Second, it argues

that the agreement does not give rise to any third-party rights; rather, according to the United

States, the obligations created in the agreement are owed only to the signatory states.  Dkt. 277-1

at 3.  Finally, it argues that, even if the BSA were judicially enforceable, by its plain terms the

agreement does not "grant exclusive jurisdiction to Afghanistan over [U.S.] . . . contractors," but

"merely recognizes that Afghanistan maintains" concurrent jurisdiction over U.S. contractors and

their employees.  *Id.*  The Court agrees that the BSA is not judicially enforceable and that, even

if it were judicially enforceable in some circumstances, it does not create any third-party rights.

Those conclusions are more than sufficient to deny the Shadman Claimants' motion.  And given

the fact that the final question—whether the BSA grants Afghanistan concurrent or exclusive

jurisdiction over U.S. contractors and their employees—is currently the subject of diplomatic

consultations between Afghanistan and the United States, the Court declines to opine on that

question.  To do so is not only unnecessary, but would needlessly inject the Court into an ongoing diplomatic dispute.

As an initial matter, the United States is plainly correct that the BSA is not self-executing.  There is not a great deal of guidance regarding when an executive agreement is judicially enforceable.  We know that, at least at times, an executive agreement must be given domestic legal effect.  *See*, *e.g.*, *Dames & Moore*, 453 U.S. at 679–80.  But the domestic legal effect of executive agreements is on less certain ground than treaties or congressional-executive agreements.  *See, e.g.*, Henkin at 227–28.  The Court need not step into that fray, however, because the D.C. Circuit has already spoken to a question that, in relevant respects, is on all fours with this case.

In *Holmes v. Laird*, 459 F.2d 1211 (D.C. Cir. 1972), the D.C. Circuit was called upon to decide whether the NATO Status of Forces Agreement ("SOFA") created judicially enforceable rights.  In that case, two U.S. soldiers were arrested in West Germany "on charges of attempted rape and related offenses."  *Id.* at 1214.  The United States allegedly investigated the matter and concluded that "the evidence did not warrant prosecution."  *Id.*  The Federal Republic of Germany, however, exercised its right under the NATO SOFA to assert jurisdiction over the soldiers, and they were subsequently indicted and convicted in the German courts.  *Id.*  Like the BSA here, the relevant provisions of the NATO SOFA were "designed to avoid jurisdictional clashes when military personnel of one country . . . are assigned to a . . . duty within the borders of another."  *Id.* at 1212.  This design, however, did not work perfectly in the *Holmes* case.  Rather, shortly before the German appellate court issued its decision, the two soldiers left Germany without authorization and returned to the United States, then sought to enjoin the U.S. "military from surrendering them to" Germany.  *Id.* at 1214.  In support of that effort, they

argued that they had been denied certain rights conferred by the NATO SOFA when tried in Germany.  *Id.*

For reasons that apply here with equal force, the D.C. Circuit held that the NATO SOFA was not judicially enforceable.  The Court recognized that international agreements can, at times, confer private rights and that "in the domestic realm courts are not only equipped to enforce self-executing treaties affecting individual rights, but by virtue of the Supremacy Clause are required to do so."  *Id.* at 1221–22.  But, "when the corrective machinery specified in the treaty itself is nonjudicial," the U.S. courts are without power to act.  *Id.* at 1222.  The NATO SOFA was, according to the D.C. Circuit, such an agreement because its "enforcement mechanism" was limited to "diplomatic recourse."  *Id.*  It specified:

> [A]ll differences between the Contracting Parties relating to the interpretation or application of [the NATO SOFA] shall be settled by negotiation without recourse to any outside jurisdiction.

*Id.* (quoting Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces, June 19, 1951, 4 U.S.T. 1792, T.I.A.S. No. 2846 (effective Aug. 23, 1953), art. XVI).  From this, the Court of Appeals concluded that "intervention by an American court into the matters of which [the soldiers] complain is foreclosed by the very terms of the document from which the rights insisted upon are said to spring."  *Id.*

The same is true here.  The BSA is, in all but name, a SOFA, *see* Dkt. 274-2 at 6; Dkt. 277 at 16, and the BSA's dispute resolution provision, like the NATO SOFA, commits any dispute "regarding the interpretation or application" of the agreement solely to diplomatic channels, Dkt. 274-1 at 117 (BSA Art. 24.1).  It provides that "[a]ny divergence in views or dispute regarding the interpretation or application of" the agreement must "be resolved through consulations between" the signatory nations, and it expressly precludes referral of such a dispute

"to any national or international court" for resolution.  *Id.*  That language could not be clearer—the BSA is not judicially enforceable.

Two appellate cases decided after *Holmes* reinforce this conclusion.  In 1984, the Seventh Circuit once again construed the NATO SOFA, and, like the D.C. Circuit, concluded that "the recourse for such a treaty violation . . . is diplomatic, not judicial."  *In re Burt*, 737 F.2d 1477, 1488 (7th Cir. 1984).  And less than two years ago, the Ninth Circuit construed similar language contained in the U.S.-South Korea SOFA in precisely the same way.  *See Patterson v. Wagner*, 785 F.3d 1277, 1283–85 (9th Cir. 2015).  As the Ninth Circuit explained, "[l]ike the NATO agreement, the [U.S.-South Korea] SOFA establishes an enforcement mechanism that is 'diplomatic, not judicial.'"  *Id.* at 1285 (quoting *In re Burt*, 737 F.3d at 1488).

The Shadman Claimants do not take issue with the premise that disputes between the United States and Afghanistan under the BSA must be resolved exclusively through diplomatic means.  Dkt. 274 at 5–6.  But, in their view, that premise leads to precisely the opposite conclusion from the one pressed by the United States.  Thus, while the United States urges the Court to conclude that the BSA is not judicially enforceable and, accordingly, has no bearing on this case, the Shadman Claimants contend that the BSA's diplomatic enforcement mechanism divests this Court, and any other U.S. court, of jurisdiction to adjudicate this or any related case.  In their view, the only way to give meaning to the BSA's diplomatic enforcement mechanism—and, in particular, to its inclusion of disputes regarding the *application* of the BSA—is to treat the United States as "estop[ped] . . . from pursuing any judicial remedies" once Afghanistan has asserted "divergence of views."  Dkt. 274-2 at 9–10.  That conclusion, however, turns the BSA's dispute resolution mechanism on its head.

35

The United States has not invoked the BSA, and it has not asked that the Court interpret or apply it in this case.  Rather, it is the Shadman Claimants who rely on the BSA, and it is the Shadman Claimants who seek specific judicial relief based on the BSA; they ask that the Court terminate all of its orders, release the seized assets, and dismiss the action—all because, in their view, the BSA compels those steps.  Dkt. 274 at 5–6.  That, however, is the very definition of judicial enforcement of an agreement, and it cannot be squared with the language of the BSA or the decisions in *Holmes*, *Burt*, and *Patterson*.  It makes no difference, moreover, that the Shadman Claimants seek to enforce the dispute resolution clause of the BSA, as opposed to a substantive provision of the agreement.  If anything, the irony of asking the Court to exercise its authority to enforce the very provision that precludes "any national or international court" from enforcing *any* provision of the BSA is particularly acute.  Dkt. 274-1 at 117 (BSA Article 24.1).

This is not to say that Afghanistan is without a remedy to the extent it believes that the United States has breached the BSA by bringing—or, more accurately given the fact that the BSA was not signed until years after this *in rem* action was brought and almost eighteen months after the assets at issue were seized, by *maintaining*—this action.  But, as the BSA provides, that remedy is diplomatic, and not judicial.  And, unsurprisingly, that is exactly the approach that the Afghan government has followed.  It has "sought to establish a diplomatic dialogue" with the United States, "and the U.S. Department of State is in the process of carrying out appropriate consulatations."  Dkt. 277-1 at 4.  The Shadman Claimants' efforts to bring that dispute to this Court conflates the very distinction between judicial and diplomatic remedies that Article 24.1 of the BSA enshrines, and it risks inserting the Court into a dispute that the signatory nations have agreed should remain beyond the judiciary.  That effort fails on its own terms.

The Shadman Claimants' invocation of the political question doctrine, moreover, fares no better, and, indeed, it suffers from the same contradiction that underlies their interpretation of the BSA; that is, it seeks to inject the Court into an international dispute based on a rule designed to police the boundaries between the political branches and the judiciary.  *See Baker v. Carr*, 369 U.S. 186, 210 (1962) ("The nonjusticiability of a political question is primarily a function of the separation of powers.").  The political question doctrine is, of course, "a narrow exception" to the rule that "the Judiciary has a responsibility to decide cases properly before it."  *Zivotofsky ex. rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012); *see also Simon v. Republic of Hungary*, 812 F.3d 127, 149–50 (D.C. Cir. 2016).  As the Supreme Court has explained, "[a] controversy is nonjusticiable—*i.e.*, [it] involves a political question—where there is a 'textually demonstrable constitutional commitment of the issue to a coordinate political department[] or a lack of judicially discoverable and manageable standards for resolving it.'"  *Nixon v. United States*, 506 U.S. 224, 228 (1993) (quoting *Baker*, 369 U.S. at 217); *see also Zivotofsky*, 566 U.S. at 195 (quoting same).  "The doctrine," however, "is one of 'political *questions*,' not one of 'political *cases*,'" and thus should not be invoked in the absence of

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] a lack of judicially discoverable and manageable standards for resolving it; [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217 (emphasis added).  Here, these concerns are raised, if at all, by the Shadman Claimants' request that the Court apply the BSA to dismiss the action and to release the seized assets.

Under the view of the United States, the BSA has nothing to do with this case—at least as far as the Court is concerned.  To the extent it *is* at issue, that is a question for the Executive Branch to address through diplomatic consultations.  Under this view, the Court's actions pose no threat to any exclusive executive authority; the Court's decision would be guided by established—and clearly manageable—domestic legal standards; the Court would not be required to make any nonjudicial policy determinations; and there would be no risk that the Court might be required to make a pronouncement on a question of international diplomacy that might conflict with that of the political branches or might otherwise demonstrate a lack of respect for a coordinate branch of government.  Under the Shadman Claimants' view, in contrast, the Court would be asked to step into an ongoing international dispute and to grant Afghanistan the precise relief that it has sought through diplomatic channels, Dkt. 274-1 at 36–37—relief that the U.S. Department of State has, at least to date, declined to provide.  Although there may be times when providing relief of this type in a judicial forum would be appropriate, it can hardly be maintained that the Court's refusal to apply a non-self-executing executive agreement impermissibly injects the Court into an area textually committed by the Constitution to a coordinate branch.

Finally, even if the Court were to accept the premise that the BSA is justiciable, the Shadman Claimants' argument would suffer from an additional fatal flaw, which the Court need only briefly mention:  The BSA does not bestow any private rights on the Shadman Claimants. As the Supreme Court has emphasized, "[i]nternational agreements, even those directly benefiting private persons, generally do not create private rights."  *Medillín*, 552 U.S. at 506 n.3 (quoting  *Restatement (Third) of Foreign Relations Law of the United States* § 907 cmt. a (1986)); *see also United States v. Khatallah*, 160 F. Supp. 3d 144, 153 (D.D.C. 2016).  And,

although this "background presumption" is not absolute, *Medellín*, 552 U.S. at 506 n.3, it can be overcome only if the agreement itself reflects an intent to create judicially enforceable private rights, *see Restatement (Third) of Foreign Relations Law of the United States* § 907 cmt a (1986). Here, there is no basis to conclude that the BSA creates private rights. As a result, even if the BSA were self-executing, the Shadman Claimants' efforts to invoke it as a shield to this litigation would fail.

The Court therefore concludes that the BSA has no bearing on this action and, accordingly, will deny the Shadman Claimants' motion to dismiss the complaint for lack of jurisdiction.

**D.      Motion for Summary Judgment/Act of State and International Comity**

The Shadman Claimants also move for summary judgment on the basis of the act of state doctrine and principles of international comity. The Court is, once again, unpersuaded.

1.      *Act of State Doctrine*

Under the act of state doctrine, federal and state courts in the United States must "presume the validity of an 'official act of a foreign sovereign performed within its own territory.'" *Republic of Austria v. Altmann*, 541 U.S. 677, 713 (2004) (quoting *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp.* 493 U.S. 400, 405 (1990)). The doctrine applies when "the relief sought or the defense interposed would [require] a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *Kirkpatrick*, 493 U.S. 405. Neither a statute nor the "text of the Constitution [requires] the act of state doctrine." *Banco National de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964). Rather, "its continuing vitality depends on its capacity to reflect the proper distribution of the functions between the judicial and political branches of the Government on matters bearing upon foreign

affairs." *Id.* at 427–28.  "As such, it operates as a rule of judicial restraint in decisionmaking, not [as] a jurisdictional limitation like the political question doctrine," *Hourani v. Mirtchev*, 796 F.3d 1, 12 (D.C. Cir. 2015), or as "some vague doctrine of abstention," *Kirkpatrick*, 493 U.S. at 406.

Although the Supreme Court's "description of the jurisprudential foundation for the act of state doctrine has undergone some evolution over the years," *id.* at 404, the Court's most recent decisions have made clear that the doctrine is narrow in scope.  Among other limitations, it applies "only when the case turns on the validity or invalidity of a foreign official act"—it is "not implicated" merely because "one possible outcome would logically imply that a foreign official act was invalid," unless "that implication is . . . itself a component of the reasoning underlying the result."  John Harrison, *The American Act of State Doctrine*, 47 Geo. J. Int'l L. 507, 519 (2016) (hereinafter "Harrison").  Emphasizing this limitation, the Supreme Court explained in *Kirkpatrick* how the act of state doctrine operated in four of its prior decisions:  The doctrine applied in *Underhill v. Hernandez*, 168 U.S. 250 (1897), because "holding the defendant's detention of the plaintiff to be tortious would have required denying legal effect to acts of a military commander representing the authority" of a government that the United States subsequently recognized, 493 U.S. at 405; the doctrine applied to a dispute over title to personal property in *Oetjen v. Central Leather Co.*, 246 U.S. 297 (1918), and *Ricaud v. American Metal Co.*, 246 U.S. 304 (1918), because the relief sought would have required the court to treat the seizure and sale of the property in Mexico by the "legitimate Mexican government" as invalid; and the doctrine applied in *Sabbatino*, 376 U.S. 398, because "upholding the defendant's claim to the funds [at issue] would have required a holding that Cuba's expropriation of goods located in Havana was null and void."  *Kirkpatrick*, 493 U.S. at 405–06.  As exemplified by each of

these cases, the act of state doctrine applies only "when a court *must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign."[6] *Id.* at 406.

According to the Shadman Claimants, the relief sought in this action would require the Court to declare invalid several official acts of the government of Afghanistan, which fall into two general categories:  (1) orders relating to the release of seized funds, and (2) assertions of exclusive jurisdiction over disputes relating to Shadman's alleged fraud and the seized assets.

    a.  Afghan Orders Relating to the Release of Seized Funds

The first official act that the Shadman Claimants proffer is a March 17, 2013, memorandum from Rahmatullah Nazari, Assistant in Scrutiny Affairs, Inspector General Department, Office of the Attorney General of Afghanistan, to AIB.  After recounting the Inspector General Department's earlier memorandum "regarding freezing assets" held in the Shadman Claimants' accounts at AIB, the memorandum continued:

> Recently the above mentioned companies [Hekmatullah Shadman Logistics Services Inc. and Faizi Ilham Brothers Ltd.] showed up for investigation process and there is an investigation regarding their case.

> Therefore, we are informing you about the situation and requesting [that you] legally release the blocks on their funds and [that you] inform us [of the result] officially.

---

[6]  The D.C. Circuit has extended the act of state doctrine to cases in which a court in the United States is called upon to adjudicate "the legality" of—and not merely "the validity" of—an official act of a foreign state.  *See Hourani*, 796 F.3d at 15; *World Wide Minerals, Ltd. v. Republic of Kazakhastan*, 296 F.3d 1154, 1164–67 (D.C. Cir. 2002); *Riggs Nat'l Corp. v. Commissioner*, 163 F.3d 1363, 1367–69 (D.C. Cir. 1999).  That view finds support in the *Restatement (Third) of Foreign Relations Law of the United States* § 443 (1987) ("Courts in the United States will generally refrain . . . from sitting in judgment on . . . acts of a governmental character done by a foreign state within its own territory and applicable there.").  *But see Harrison* at 543–49 (arguing that the doctrine does not extend this far).  This distinction, however, has no bearing on the present dispute.

Dkt. 138-5 at 2 (last alteration in original); *see also id*. at 4.  In a letter sent to the U.S.

Attorney General almost a year later, the Afghan Attorney General characterized this

memorandum as his "order" to release the frozen AIB accounts.  Dkt. 138-3 at 3.

According to the Shadman Claimants, the relief that the United States seeks in this action

would require invalidating this "order" "releasing the defendant assets."  That is incorrect for at

least two reasons.  First, the March 17, 2013, memorandum is directed to AIB.  Nothing in the

currently operative complaint, however, seeks to seize or to forfeit any funds held at AIB or,

indeed, at any bank located in, or otherwise under the jurisdiction of, Afghanistan.  *See* Dkt. 225

at 3–4.  To the contrary, Afghanistan has ordered that the funds held at AIB be released, Dkt.

138-5 at 2; that order has been implemented, Dkt. 237 at 4; and nothing in this action would

require the Court to question the validity or the lawfulness of the order of the Afghan Attorney

General releasing those funds.  Second, the Shadman Claimants seek to avoid this difficulty by

arguing that "the United States bypassed the" March 17, 2013, memorandum "by seizing the

Afghan defendant assets through U.S. banks with contractual relationships with the Afghan

banks."  Dkt. 138-1 at 25.  But, even if that contention were sufficient—and the Court doubts

that it is—it has been overtaken by the Court's decision granting the motion of the United States

to strike the Shadman Claimants' claims relating to the funds held in the U.S. interbank accounts

on behalf of AIB and Bank Afalah.  *See supra* Part III A.  That decision leaves only the

interbank funds held at Deutsche Bank Trust Company of Americas on behalf of Emirates Bank.

Those banks are located, respectively, in the United States (Dkt. 225 at 28) and Dubai (Dkt. 157

at 4), and thus, the Shadman Claimants no longer have any stake in the litigation relating to the

seizure of funds "through U.S. banks with contractual relationships with . . . Afghan banks."

The Shadman Claimants also contend that "the Supreme Court of Afghanistan issued a judicial order to release the current defendant assets." Dkt. 138-1 at 27. Notably, when the Shadman Claimants filed their opening brief, they characterized this order as directed at the defendant "assets in Afghanistan." *Id.* In their reply brief, however, they shifted course, arguing that "the Afghan Supreme Court's judicial order released the present defendant assets identified in Plaintiff's second amended complaint," Dkt. 159 at 8—that is, the interbank funds held in the United States. In both briefs, the Shadman Claimants cite the same exhibit—the decision of the "Legal and Judicial Committee of the Islamic Republic of Afghanistan's Meeting." Dkt. 138-3 at 17. That is the Committee chaired by President Karzai, which included the Chief Justice, Minister of Justice, Attorney General, Advisor to the Director of the National Directorate of Security, and Director of the Central Bank of Afghanistan, along with others. *Id.* The "[a]genda" for the Committee meeting reflected that one topic for discussion was "Hekmatullah Shadman's complaint regarding closure of his bank accounts inside and outside the country by the American sources and to prevent addressing his case in one of the courts in Washington." *Id.*

The results of the meeting are relatively clear, and, to the extent any material question exists, the Shadman Claimants have not carried their burden on summary judgment. *See Celotex*, 477 U.S. at 324. The minutes report:

> After every member of the committee shared their comments, it was decided that the bank accounts of Hekmatullah Shadman should be released *inside the country*. Also, the case of Hekmatullah Shadman should be assessed by the Supreme Court of the [Islamic Republic of Afghanistan] and in cooperation with the Attorney General and the Ministry of Foreign Affairs, necessary and lawful measures should be adopted and return of the case should be requested for assessment from the court in Washington.

Dkt. 138-3 at 18 (emphasis added).[7]  Thus, in plain terms, the Committee directed the release of

the funds held "inside" Afghanistan, but did not direct—nor, presumably, could it have

directed—the release of funds held in the United States.  With respect to those funds, the

Committee simply directed that the Afghan Attorney General and Minister of Foreign Affairs

"request[]" that the case pending before this Court be transferred to Afghanistan for

"assessment."  And, in fact, the record reflects that the Afghan Attorney General and Minister of

Foreign Affairs have engaged in diplomatic efforts requesting that the U.S. Department of

Justice forego the present litigation.  *See*, *e.g*., Dkt. 138-3 at 3–5; Dkt. 274-1 at 33–38.  None of

this, however, demonstrates the existence of an "official act" of the government of Afghanistan

purporting to order or direct the release of the funds that are currently at issue—that is, the funds

held in the United States at Deutsche Bank on behalf of Emirates Bank.

      The Court, accordingly, is not called upon to sit in judgment of the validity—or

lawfulness—of an "official act" purporting to release the defendant funds.

### b.  Assertions of Exclusive Jurisdiction

      The Shadman Claimants further contend that the request for relief in this case would

require the Court to declare invalid several claims of "exclusive jurisdiction" embodied in

official acts of the government of Afghanistan.  They point to a "decree" from the Office of the

Attorney General of Afghanistan asserting that "[i]t is the authority of Afghanistan courts to

handle the [fraud] case [against Shadman]" and that the "decree of [the U.S. court] is not

enforce[able] in Afghanistan."  Dkt. 138-4 at 3 (Inspector General Admin. Directorate); *see also*

---

[7]  Given the Court's ruling, it need not address the apparent tension between the Shadman
Claimants' characterization of the Committee's decision as a decision of the Supreme Court of
Afghanistan, Dkt. 138-1 at 27, and the Committee's direction that "the Supreme Court of"
Afghanistan should "assess[]" the matter, Dkt. 138-3 at 18.

Dkt. 138-8 at 7–8 (Misbah Decl. ¶¶ 12, 23).  They also point, once again, to the decision of the
Legal and Judicial Committee, which asserted that "the case of Hekmatullah Shadman should be
assessed by the Supreme Court [of Afghanistan]."  Dkt. 138-3 at 6; *see also id.* at 17–18.  In
reply, they point to a decision from "the Afghan Commercial Court of Kabul Province," which
they assert "also claimed exclusive jurisdiction for Afghanistan over th[e] present civil forfeiture
action."  Dkt. 159 at 7; *see also* Dkt. 138-3 at 6 (letter from Afghan Ministry of Foreign Affairs
referring to "a letter . . .  dated . . . 19 January 2014 . . . sent by the General Directorate of Appeal
Court in Kabul Province"); Dkt. 159-1 at 4 (Supp. Misbah Decl. ¶ 17) (referring to same).  And,
finally, in their subsequent motion to dismiss (Dkt. 274 at 22), they supplement the pending
motion and point to the April 17, 2016, letter from the Afghan Minister of Foreign Affairs to the
U.S. Secretary of State invoking the BSA and asserting that the seizure of the assets in the
Emirates Bank's U.S. correspondence accounts and the continued "process[ing]" of this case are
"against Afghanistan's expectations and laws."  Dkt. 274-1 at 33.

 As an initial matter, the Court is not convinced that any of these materials support the
Shadman Claimants' contention that the Afghan government has entered an order or decree that
purports to divest this Court of jurisdiction to adjudicate the pending *in rem* action against assets
located in the United States.  There is no evidence, for example, that the "decree" from the
Afghan Attorney General contemplated litigation in the United States against defendant assets
located exclusively in the United States.  The decision of the Legal and Judicial Committee,
moreover, merely asserted that "the case of Hekmatullah Shadman should be assessed by the
Supreme Court of" Afghanistan, and did not order or decree that the jurisdiction of the Afghan
courts was exclusive; to the contrary, as noted above, the Committee appears to have
contemplated that the "return" of the Shadman case to Afghanistan would be addressed through

diplomatic channels.  Likewise, the only description of the decision from the Afghan

Commercial Court of Kabul Province that the Shadman Claimants identify is contained in the

letter to the U.S. Secretary of State from the Afghan Ministry of Foreign Affairs, and that letter

merely refers to a "a letter . . .  dated . . . 19 January 2014 . . . sent by the General Directorate of

Appeals Court in Kabul Province," and provides no relevant detail.[8]  And, finally, the letter from

the Afghan Minister of Foreign Affairs cannot be construed, by any stretch, to constitute an order

or decree; it was a diplomatic communication.

 The act of state doctrine is an affirmative defense, *see United States v. Sum of

$70,990,605*, 4 F. Supp. 3d 189, 204 (D.D.C. 2014), and thus the Shadman Claimants bear the

burden of demonstrating that the undisputed facts support application of the defense, *id.* (citing

*Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998)).  As a result, any

uncertainty, ambiguity, or incompleteness in the record must be construed against them, and, for

that reason alone, they are not entitled to summary judgment based on any purported decree or

order of the Afghan government asserting exclusive jurisdiction over this matter.

 The argument over Afghanistan's purported exclusive jurisdiction, moreover, also fails as

a matter of law for one simple reason:  an *assertion* is not an *act*.  Thus, even if the Shadman

Claimants could identify a decree or order from the government of Afghanistan *asserting*

exclusive jurisdiction over the adjudication of this *in rem* action against assets located in the

---

[8]  The Court has considered whether the Shadman Claimants intend to refer to the decision of the Commercial Court of Kabul Province in the litigation between Shadman and his brother and Bank Alfalah, *see* Dkt. 212-3 at 21, which was affirmed by the intermediate court and the Supreme Court of Afghanistan, *id.*, but the Court can find no support for that conclusion in the materials cited by the Shadman Claimants in support of their act of state argument.  It is not the Court's role, moreover, to act like a "pig[] hunting for truffles buried in briefs or the record." *Potter v. District of Columbia*, 558 F.3d 542, 553 (D.C. Cir. 2003) (internal quotation mark omitted) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

United States, it would not be enough.  They would also need to identify an *act* by the government of Afghanistan the validity—or legality—of which this Court must decide.  "[T]hat is, . . . the outcome of the case [must] turn[] upon—the effect of [an] official action by" the government of Afghanistan.  *Kirkpatrick*, 493 U.S. at 406.  They have not done so.  A foreign state acts, for example, when a military commander orders that someone be detained; when it seizes and sells, nationalizes, or appropriates property, *id.* at 405–06; when it requires a bank to pay tax on a transaction, *Riggs Nat'l Corp.*, 163 F.3d at 1366–68; or when it publishes allegedly defamatory material on an embassy website, *Hourani*, 796 F.3d at 15.  It does not "act" in the relevant sense, however, when it merely *declares* its position on an issue that reaches beyond its borders and over which it lacks the power to dictate any actual consequences.

To accept the Shadman Claimants' invitation to construe the act of state doctrine to apply here would drastically expand the scope of the rule; it would apply in virtually any case in which a foreign government issues a formal decree or decision that declares that a position taken by a litigant in a court in the United States is contrary to an international agreement or the laws of the foreign state.  Such a rule would not only break with centuries of practice and precedent, but would undermine the core tenant of the act of state doctrine—that courts should respect "the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs."  *Sabbatino*, 376 U.S. at 427–28.  The fact that a case might frustrate the expectations or views of a foreign state, moreover, is no reason for a court to disregard the principle that "[c]ourts in the United States have the power, and ordinarily the obligation, to decide cases and controversies properly presented to them."  *Kirkpatrick*, 493 U.S. at 409.  "The act of state doctrine does not establish an exception for cases or controversies that may embarrass foreign governments, but merely requires that, in the process of deciding, the *acts*

47

of foreign sovereigns taken within their own jurisdiction shall be deemed valid." *Id.* (emphasis added).

*   *   *

The Shadman Claimants' invocation of the act of state doctrine raises one remaining issue that the United States contends should at least bolster the Court's conclusion that the doctrine is inapplicable here.  To the extent the doctrine is premised on the "competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations," and on a concern that permitting courts to engage "in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the communication of nations as a whole in the international sphere," *Sabbatino*, 376 U.S. at 423, the doctrine should have little or no purchase in litigation brought by the Executive Branch, Dkt. 157 at 21–22.  That position finds support in two recent decisions from this Court.   In *United States v. All Assets Held in Account Number XXXXXXXX*, 83 F. Supp. 3d 360, 372 (D.D.C. 2015), Judge Bates held that the act of state doctrine did not warrant dismissal of the action "[b]ecause th[e] action [was] brought on behalf of the United States to enforce United States laws, [and] there [was] little concern that the Court's decision" would interfere with foreign relations.  And, in *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 12 (D.D.C. 2013), Judge Contreras recognized that "[w]hen the Executive Branch brings suit, . . . the doctrine's rationale no longer applies."

A plurality of the Supreme Court took a similar view on a related, but distinct issue, in *First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 768–70 (1972) (opinion of Rehnquist, J.).  There, the plurality concluded "that where the Executive Branch, charged as it is with primary responsibility for the conduct of foreign affairs, expressly represents to the Court

48

that application of the act of state doctrine would not advance the interests of American foreign policy, that doctrine should not be applied by the courts." *Id.* at 768. A majority of the Court, however, disagreed. *See id.* at 772 (Douglas, J., concurring in the result) ("[T]he Executive Branch cannot by simple stipulation change a political question into a cognizable claim."); *id.* at 773 (Powell, J., concurring in the judgment) ("I would be uncomfortable with a doctrine which would require the judiciary to receive the Executive's permission before invoking its jurisdiction."); *id.* at 788–89 (Brennan, J., dissenting) (joined by Stewart, Marshall, and Blackmun, JJ.) ("The Executive Branch, however[] extensive its powers in the area of foreign affairs, cannot by simple stipulation change a political question into a cognizable claim."). And, more recently, the Supreme Court declined to decide whether the act of state doctrine admits of "an exception for cases in which the Executive Branch has represented that it has no objection to denying validity to the foreign sovereign act." *Kirkpatrick*, 493 U.S. at 405.

This case, like the cases before Judges Bates and Contreras, presents a more compelling basis for deferring to the political branches than that raised in *Banco Nacional de Cuba*. The United States has not merely "stipulated" that the case is cognizable, and the Court is not asked to turn to the Executive for "permission" to invoke its jurisdiction. Rather, the Executive Branch has brought suit, and the question is whether permitting *that* suit to go forward is more or less likely to inject the judiciary into a field beyond its institutional competence. The Executive Branch, moreover, is not alone in making the judgment that suits of this nature will not unduly trammel on foreign relations. It was Congress that created a mechanism for seizing assets held in U.S. interbank accounts, even when doing so might predictably cause consternation in the foreign jurisdiction where the correspondent account is located. And, indeed, Congress recognized that application of the interbank provision might lead to "a conflict of law . . .

between the laws of the jurisdiction in which the foreign financial institution . . . is located and the laws of the United States," but deferred to the Executive Branch regarding whether "suspension or termination" of the forfeiture action "would be in the interest and justice and would not harm the national interests of the United States." 18 U.S.C. § 981(k)(1)(B). At least in this limited context, the Court is inclined to agree with the United States that the concern for separation of powers and the conduct of foreign affairs that animates the act of state doctrine carries minimal weight here. For present purposes, however, the Court need only conclude that, as the United States urges, this consideration merely bolsters the conclusion already compelled by the other flaws in the Shadman Claimants' argument.

2.      *International Comity*

International comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895). "The term "'comity' summarizes in a brief word a complex and elusive concept—the degree of deference that a domestic forum must pay to the act of a foreign government not otherwise binding on the forum.'" *de Csepel v. Republic of Hungary*, 714 F.3d 591, 606 (D.C. Cir. 2013) (quoting *Laker Airways v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984)). This concept does not admit of clear boundaries; rather, its application "varies according to the factual circumstances surrounding each claim for its recognition." *Laker Airways*, 731 F.2d at 937. Ordinarily, a court in this country will give effect to a foreign judgment, if the court is

> satisfied that . . . there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or

50

fraud in procuring the judgment, *or any other special reason why the comity of this nation should not allow it full effect*.

*Hilton*, 159 U.S. at 202 (emphasis added).  One such "special reason," dating "from the earliest times," "recognize[s] that the obligation of comity expires when the strong public policies of the forum are vitiated"—or are threatened with vitiation—"by the foreign act."  *Laker Airways*, 731 F.2d at 937.

The Shadman Claimants content that, as a matter of international comity, the Court should defer (1) to an Afghan "judicial order" and (2) to the Afghan government's assertion of exclusive jurisdiction.

### a.  March 20, 2013 "Judicial Order"

According to the Shadman Claimants, the Afghan Attorney General entered a "judicial order" finding "that no evidence was found to meet the burden of proof for the civil forfeiture allegations" raised by the United States, Dkt. 138-1 at 14, and they contend that the Court must defer to that "final judgment" as a matter of international comity.  In support of their major premise, the Shadman Claimants rely on an expert declaration from Abdul Subhan Misbah, the Vice President of the Afghanistan Lawyers Union.  Dkt. 138-8 at 2.  According to that declaration, the Afghan Attorney General interpreted the request from the United States for assistance in freezing the Shadman Claimants' accounts in Afghanistan as a request that Afghanistan conduct an "independent investigation into the U.S. government's allegations against . . . Shadman," and he, accordingly, "submitted the case to [three] Afghan senior prosecutors."  *Id.* at 9.  The senior prosecutors then investigated the matter, allegedly provided the United States with "notice and an opportunity to be heard through diplomatic channels," and ultimately made a recommendation to the Afghan Attorney General.  *Id.* at 9–10.  The expert declaration further asserts that, after the "senior prosecutors found no evidence to support the

forfeiture allegations," "[t]hey . . . issued a judicial order for exoneration," and the Afghan Attorney General reviewed and approved that "order." *Id.* at 10. Finally, the declaration asserts that this procedure—including the issuance of a "judicial order" by the investigating prosecutor—is consistent with Afghan law. *Id.* at 9.

As the Shadman Claimants acknowledge, international comity "'is an affirmative defense' for which the party seeking recognition of the judgment bears the burden of proof." *de Csepel*, 714 F.3d at 607 (quoting *Taveras v. Taveraz*, 477 F.3d 767, 783 (6th Cir. 2007)). Accordingly, the Court cannot grant summary judgment in favor of the Shadman Claimants unless it concludes that the record contains undisputed facts demonstrating that they have established each of the essential elements of the defense, *see Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 507 (2016)—that is, that "there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial under regular proceedings, after due citation or voluntary appearance of the defendant, . . . under a system of jurisprudence likely to secure an impartial administration of justice," *Hilton*, 159 U.S. at 202.

The documentary evidence relied upon by the Shadman Claimants in support of their international comity argument is both sparse and far from clear. Notwithstanding the *conclusions* set forth in their expert declaration, there is little or no *evidence* that anything resembling a trial occurred. To be sure, in some systems of jurisprudence the investigatory and adjudicatory functions are combined. But, here, the United States argues with some support that the Afghan Interim Criminal Procedures Code differentiates between the investigation, indictment, trial and appeal of a criminal case. Dkt. 157 at 9–10. The "Primary Saranwal"—or prosecutor—for example, conducts an investigation and decides whether to "submit to the Court the act of indictment requesting the assessment by trial of the [defendant's] criminal

responsibility." Dkt. 157-2 at 18 (Article 39).  In contrast, it is the court that conducts the trial

after receiving "the act of indictment."  *Id.* at 22 (Article 53).  The Shadman Claimants counter

that "[t]he absence of a trial does not preclude international comity for executive orders and

legislative acts," Dkt. 159 at 12, but they cite no authority for the improbable contention that a

criminal investigation is sufficient to trigger a comity defense.  They also argue that the Afghan

Interim Criminal Procedures Code grants prosecutors "the authority to issue a judicial order in

cases where they find no evidence to produce an accusation letter."  *Id.*  That proposition,

however, is contested, and, in any event, the label attached to the prosecutor's decision not to

seek an indictment is unimportant.  What matters is whether the prosecutor's decision or

"decree" bears the hallmarks of "full and fair trial abroad before a court of competent

jurisdiction."  *Hilton*, 159 U.S. at 202.  The Shadman Claimants have not carried their burden of

showing from the uncontested evidence that the investigation conducted here was in fact, if not

in name, a trial before a court.

It is also far from clear that the Afghan prosecutors fully and finally exonerated Shadman

of committing the fraudulent and other unlawful acts alleged in this case.  To start, the United

States amended its complaint *after* the Afghan investigation to include claims of bribery, fuel

theft, and wire fraud, *see* Dkt. 225 at 7–11 (Third Am. Compl. ¶¶ 21–37), and there is no reason

to believe that anyone in the government of Afghanistan ever considered those charges.  But,

more importantly, the documentary evidence produced by the Shadman Claimants is subject to

reasonable dispute.  The primary evidence they cite appears on two pages from the March 20,

2013, "decree."  Dkt. 138-4 at 2, 7.  On the first page they cite, *id.* at 2, the Afghan prosecutors

concluded that, "[d]ue to lack of legal reasons, documents and evidence[]" the allegations against

Shadman were "untrustworthy and extoversive," and that "in this situation, the motivating causes

of [the] criminal case . . . cannot be justified."  On the second page, *id.* at 7, the Attorney General

of Afghanistan approved the recommendation from the three senior prosecutors, explaining that

"provoking a criminal claim is not justifiable . . . because based on the content of the mentioned

note, the contracts have been signed based on mutual agreement of both parties through the

signing and commitment procedures."  The Shadman Claimants may well have more to support

their defense, but these references lack the clarity required to prevail at this stage of the

litigation.[10]

Finally, the Shadman Claimants acknowledge that a comity defense requires that the

opposing party have had a fair opportunity to be heard in the foreign proceeding, Dkt. 138-1 at

12, but, again, none of the evidence that they cite is sufficient to support the entry of summary

judgment.  They cite, for example, the letter from the Afghan Attorney General asserting that the

three senior prosecutors "asked [the United States] for supportive evidence to the accusation

from the U.S. legal and judicial bodies" and that the United States failed to answer that request.

Dkt. 138-3 at 3.  And they cite a declaration (and accompanying exhibits) from an Afghan

official attesting that he "requested the U.S. government to provide evidence for the civil

forfeiture case against . . . Shadman to be considered during the Afghan investigation and

judicial proceeding."  Dkt. 159-3 at 2.  Considered in the relevant context, however—and,

particularly in light of the claim of the United States that no trial ever occurred—the Court

---

[10]  The Shadman Claimants' expert appears to recognize that these primary sources are insufficient, and, accordingly, relies instead on a letter from the Afghan Attorney General to the U.S. Attorney General, which was sent almost a year after the alleged "judicial order" was entered.  Dkt. 138-8 at 10 (citing Dkt. 84-1 at 5).  That letter asserts that, "[a]s a result of broad and extensive investigation and review of the [relevant] allegations and other information related to the case, I considered the . . . allegations illegal and baseless based on the judicial findings of the prosecutors with respect to . . . Shadman's innocence."  Dkt. 84-1 at 5.  Although more affirmative, this letter professes only to describe the findings described above; it can thus explain, but not replace, the actual March 20, 2013, decree.

cannot conclude that this evidence demonstrates that the United States was invited to participate in a trial.  Rather, the United States had sent Afghanistan a request for mutual legal assistance, seeking help in freezing certain bank accounts.  Dkt. 225 at 18, ¶ 51.  In response, the government of Afghanistan requested additional information or support for that request.  That sequence of events, standing alone, does not establish that the United States was told that the government of Afghanistan intended to conduct a trial to adjudicate the U.S.'s allegations of wrongdoing by Shadman or that the United States was invited to participate in any such trial.

       b.       <u>Respect for Afghan Law and Assertion of Exclusive Jurisdiction</u>

The Shadman Claimants also contend that principles of international comity require that this Court defer to Afghan law and to the determinations of the Afghan Attorney General and the Committee chaired by President Karzai that Afghanistan maintains exclusive jurisdiction over this dispute.  Dkt. 138-1 at 12–22.  Their first contention—that the U.S. must defer to Afghan law—however, principally repeats their contention that the government of Afghanistan entered a final judgment, which they contend should be controlling in this case.  That contention fails for the reasons provided above.  In addition, their contention that the United States has sought to circumvent the Afghan "final judgment" by seizing assets held at interbank accounts in the United States has it backwards—the government of Afghanistan acted within the realm of its authority when it declined to freeze funds held in Afghanistan, but nothing cited by the Shadman Claimants suggests that Afghanistan ever purported to assert authority to adjudicate an *in rem* action brought against assets held exclusively in the United States.

This, then, leaves the Shadman Claimants' contention that international comity requires this Court to defer to the "exclusive jurisdiction" of the Afghan legal system.  The Court has already addressed this contention in the context of the Shadman Claimants' act of state

argument, and it need not repeat its analysis here.  In short, for the same reasons given above, the Court is not convinced that any of the materials cited by the Shadman Claimants conclusively show that the government of Afghanistan has entered an order or decree that purports to divest this Court of jurisdiction to adjudicate the pending *in rem* action against assets located in the United States.   Moreover, even putting this failing aside, the Shadman Claimants have yet to respond to the Court's invitation—made over two years ago—to identify any "case law that supports the argument that international comity requires a United States district court to abdicate its jurisdiction in the face of a foreign court's assertion of exclusive authority." *United States v. Sum of $70,990,605*, 991 F. Supp. 2d 154, 169 (D.D.C. 2013).  Without any authority to the contrary, the Court will continue to adhere to the fundamental principles that a federal court must determine its own jurisdiction, *see, e.g.*, *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999), and "ordinarily" has both the power and "obligation[] to decide cases and controversies properly presented to [it]," *Kirkpatrick*, 493 U.S. at 409.

*     *     *

Finally, the United States argues that international comity does not apply in a case, such as this one, in which the Executive Branch has initiated the suit.  Dkt. 157 at 21.  That contention parallels the similar argument made by the United States in opposition to the Shadman Claimants' act-of-state defense, and it, again, finds support in this Court's precedents.  In those decisions, Judges Bates and Contreras rejected the international comity defenses in civil forfeiture actions brought by the United States on the ground that the Executive "has already done the balancing in deciding to bring the case in the first place." *All Assets Held in Account No. XXXXXXXX*, 83 F. Supp. 3d at 372; *One Gulfstream*, 941 F. Supp. 2d at 10.  The argument also finds support in *Hilton* itself, which includes an important proviso to the international

comity defense:  The obligation of "nations to give effect to foreign laws" gives way when to do so would be "prejudicial to their own rights and interests."  159 U.S. at 165 (quoting Story, *Commentaries on the Conflict of Laws* §§ 33–38).

The precise formulation of this proviso, however, is not entirely clear.  According to the Court of Appeals for the Second Circuit, "courts will not extend comity to foreign proceedings when doing so would be contrary to the policies or prejudicial to the interests of the United States."  *Pravin Banker Assocs., Ltd. v. Banco Polular Del Peru*, 109 F.3d 850, 854 (2d Cir. 1997).   Similarly, in a case involving a battle over control of parallel cases pending in the U.S. and U.K courts, the D.C. Circuit declined to concede jurisdiction to the U.K. court and opined that "[n]o nation is under an unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum."  *Laker Airways*, 731 F.2d at 915, 937. In a separate line of cases dealing with the enforcement of foreign judgments in the United States in which the Executive Branch is not a party, however, the D.C. Circuit has recognized only "a narrow 'public policy' exception" for cases "where the foreign judgment is 'repugnant to fundamental notions of what is decent and just in the State where enforcement is sought.'"  *de Csepel*, 714 F.3d at 606 (quoting *Tahan v. Hodgson*, 662 F.2d 862, 864 (D.C. Cir. 1981)).

These distinct lines of authority might be reconciled by applying the repugnant-to-fundamental-notions-of-decency-and-justice test to cases in which the Executive Branch is not a party, and applying the broader public policy test to cases brought by the Executive Branch. Such a rule would give added weight to the fact that a coordinate branch of government that bears responsibility for the conduct of foreign relations has made the decision to bring the suit. And, as discussed above with respect to the act of state doctrine, it would not require courts to defer to the Executive Branch in defining their own jurisdiction; it would merely require courts

to give due weight to the fact that the Executive Branch has brought suit, presumably after assessing the consequences for international comity.  This case, moreover, presents a particularly compelling context for applying such a rule.  The United States is the alleged victim of a fraud involving U.S. military operations overseas, and all of the defendant assets are located in the United States.  Given the uncertainty about the contours of the relevant exception to the international comity defense, however, and given the other compelling reasons to reject the Shadman Claimants' motion for summary judgment, the Court will not—at least at this time— premise its decision on that ground.  Rather, as with the similar proviso to the act of state doctrine, the Court need only hold that the strong public policy interest in permitting the United States to bring suit to recover the alleged proceeds of a fraud against the United States simply bolsters the Court's conclusions.

The Court will, accordingly, deny the Shadman Claimants' motion for summary judgment on grounds of international comity.

**CONCLUSION**

The motion of the United States to strike all of the Shadman Claimants' claims relating to assets held in U.S. interbank accounts on behalf of AIB and Bank Alfalah, Dkt. 234, is **GRANTED**.  The motion of the United States to strike Najibullah as a straw owner, Dkt. 182, is **DENIED** without prejudice, and the motion of the United States to strike the other claims of the Shadman brothers and their companies is **DENIED** as moot.  The Shadman Claimants' motion to dismiss for lack of jurisdiction, Dkt. 274, and for summary judgment, Dkt. 138, are **DENIED**.

      **SO ORDERED**.


                                           /s/ Randolph D. Moss
                                         RANDOLPH D. MOSS
                                         United States District Judge

Date:  February 13, 2017